**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

VERONICA ALAINE FOX,      *
                                 *

      Plaintiff,          *    CIVIL ACTION FILE
                                 *

v.                       *    NO. 1:17-cv-209-MHC
                                 *

GENERAL MOTORS LLC,      *
                                 *

      Defendant.        *

**PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE PORTIONS
OF MICHAEL CARHART'S PROPOSED TESTIMONY**

GM designed Veronica Fox's 2004 "ultraview" SRX to have a roof that was made of plastic composite and glass and was attached to the roof rails of the SUV with nothing but glue.  In her rollover, the glued-on roof came completely off and the remaining pillars and roof rails collapsed down on her, crushing her spine and rendering her a 21-year-old quadriplegic.

GM seeks to introduce through Michael Carhart 42 'tests' to support one argument: *that roof crush does not matter in a rollover.*  GM contends that it should never be held accountable for its weak roofs because *supposedly* people suffer their paralyzing injuries by "diving" into the roof in the *milliseconds before* the roof gets

a chance to crush all the way down to their shoulders.[1]  The auto industry has tried to peddle these 'tests' to regulators for decades in attempt to stave off higher roof strength requirements.

Nobody in the known world, however, (other than the automakers' paid testifiers) believes "roof crush don't matter."  *The very idea is contrary to federal law:  "The purpose* of this standard [federal minimum standard 216] *is to reduce deaths and injuries due to the crushing of the roof into the occupant compartment in rollover crashes."*  49 CFR 571.216 (S2) (emphasis added).  That means, as a matter of law, that roof crush *does* matter.

That, and that alone, renders inadmissible as a matter of law every one of the 42 'tests' GM and Carhart want to try to use to 'prove' that "roof crush don't matter," just as the argument itself is.  *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ("expert opinions that are contrary to law are inadmissible").

NHTSA—the federal National Highway Transportation Safety Administration—has never bought the automakers' argument, and NHTSA has long been substantially 'in the pockets' of the automakers, with most of its political

---

[1] According to GM, roof strength only matters when something like a boulder falls onto the roof of a car.  5/22/15 GM 30b6 Dep. 92/7-93/17.

appointees coming from the industry and returning to the industry after their sojourn in government.

The independent Insurance Institute for Highway Safety (IIHS)—funded solely by liability insurance companies—literally *mocked* the automakers' nonsense.[2]

Judge William P. Adams didn't buy it.  When an automaker conceded the argument was "counter-intuitive," he said in his view the argument "could be described as *something other than* counter-intuitive."  Ex. A (8/20/13 *Hatfield v. Ford* Order) at 2 (emphasis added).  What Judge Adams meant seems very clear.

Most of the 'tests' in Carhart's file were created by the infamous hired-gun firm, Exponent, Carhart's employer.  David Michaels, former assistant U.S. Secretary of Labor for Occupational Safety and Health stated in his 2008 book, "[w]hile some might exist, I have yet to see an Exponent study that does not support the conclusion needed by the corporation or trade association that is paying the bill."  DAVID MICHAELS, DOUBT IS THEIR PRODUCT (Oxford Univ. Press 2008).

---

[2] *See* Oesch, Stephen (IIHS), "Statement before the US Senate Committee on Commerce, Science, and Transportation" (June 4, 2008) (Noting that studies purportedly finding 'roof crush doesn't matter' "defy logic, because . . . the basic principles of occupant protection dictate that the compartment be designed to resist intrusion. . . . There is no logical reason to assume that in a rollover crash, you would design a vehicle to permit excessive intrusion.").

Exponent has authored "studies" that claim things like second-hand smoke from tobacco does not cause cancer and shoulder-and-lap seatbelts are no safer than lap-belt-only designs.[3]

Exponent will go to any length to defend the indefensible—including using 'tests' that were designed to misrepresent what happened to Ms. Fox in her collision.  It is the Court's duty under *Daubert* to exclude such "tests."

What Exponent's work lacks in quality, it makes up in quantity.  Carhart's file with the 42 'tests' is so enormous it was delivered via *hard drive* to Plaintiff's counsel.  It is 127 gigabytes.  It holds 1,935 folders and 29,703 files.  Among other things, it contains: more than 13,500 pictures of the "tests," 495 videos, and 40 reports.  In *Fox I*, GM listed this entire hard drive as a single exhibit.  The sheer volume of the stuff GM seeks to throw at the jury to prove a nonsensical contrary-to-law argument is overwhelming. That is the purpose:  throw enough stuff, and maybe it will look real.  It's like modern politics.

The truth of that statement is proved by this fact:  Exponent has failed to create a single 'test' that resembles the collision in this case.  Of the 42 'tests' in Carhart's file, 37 were conducted on vehicles *other than* the 2004 Cadillac SRX.

---

[3] Ex. B ("Big Companies in Legal Scrapes Turn to Science-for-Hire Giant Exponent, Business Ethics (12/13/16)).

*None* of those 37 'tests' involve a roof like the 2004 SRX. *None* of those 37 'tests' involve a seatbelt system like the one Veronica Fox was using. *None* of those 37 'tests' replicate the conditions of this wreck. ***Not a single one***. Those 'tests' are completely dissimilar from the wreck that rendered Ms. Fox a quadriplegic. Some, for example, involve 'tests' on unbelted dummies, even though GM concedes Ms. Fox was wearing her seatbelt properly. Some involve vehicles that are over 30 years old. All involve vehicles with different head clearances and roof designs. The vast majority are *litigation "testing" from other cases*, done by Exponent to defend automakers. All were supposed to model *some wreck other than Ms. Fox's wreck*. The list of differences between the 37 non-SRX 'tests' and the facts of this case goes on and on.

Of the 42 'tests' in Carhart's file, only five were done on a 2004 SRX.[4] Three SRX 'tests' were inverted vertical drop 'tests'—two of an SRX with a roll cage installed inside it, and one without.[5] Plaintiff moves to exclude those three

---

[4] Appendix A is a list of 40 'tests' from Carhart's files. The numbering of those 'tests' corresponds to the numbering of the 'tests' on Carhart's hard drive under the folder "Carhart TESTING." The Exponent FMVSS 216 test is on the hard drive in the folder "Exponent Testing – FMVSS 216 Test." That hard drive and the late-produced 2006 test will be physically filed on the record under a "Notice of Filing."

[5] Two SRX 'tests' were surrogate tests. Plaintiff does not move to exclude those two surrogate tests.

drop "tests," because they were conducted in exactly the opposite way that the wreck happened, and they do not "fit" the facts of this case in any way, shape, or form.

GM has conceded that, in a rollover, "*small changes* in contact configuration *change the dynamics*."  *See* Carhart Dep. 154/6-16 (deposition excerpts attached as Ex. E) (emphases added).  The idea that small changes make a big difference in whether someone gets hurt in a rollover shows up over and over in GM's defense of this case.  *Id.* ("[Y]ou've got to look at the details of the individual crash to understand injury potential in that crash."); Ex. C (1/18/16 GM's 7th Interrog. Resp. at 23) (injury causation in a rollover "depends upon the location and position of the occupant as various parts of the vehicle hit the ground").  Obviously, if small changes make a big difference in whether someone gets injured, any test trying to replicate those injuries must faithfully replicate *all* the details of the crash.  GM, however, has altered virtually *every detail* of Ms. Fox's crash in its SRX "tests."  GM's purpose is clear: to mislead the jury.

To show what happened to Ms. Fox in a *rollover*, GM dropped an SRX *vertically* on its roof.  It used vehicles with *undamaged* roofs to show how Ms. Fox interacted with the roof that, in the actual crash, would have already been *damaged* by roof crush in two prior rolls.  It used an SRX with a *missing* roof to show how

6

Ms. Fox interacted with the roof that, in the actual crash, would have been *attached*. If anything should be accurate in a roof crush "test" it is the roof itself.[6] Exponent used dummies that have spines that do not move or experience roof crush forces like human spines, and it fabricated a special bracket to rig the dummy's head in the position Exponent wanted to get its desired result.

Carhart's file also contains a variety of litigation "tests," including "Malibu I and II" and two Controlled Rollover Impact System ("CRIS") "tests." Automakers try to put these misleading demonstrations in front of juries all over the country in every roof crush case. These 'tests' were designed by the automaker's paid court testifiers, and as described below, they are rigged to produce the result automakers desired. These kinds of tests are "misleading" and should be (and have been) excluded because they could "be seen [by the jury] as loosely resembling the actual event." Ex. A (8/20/13 *Hatfield v. Ford* Order) at 2.

There are also litigation-specific 'tests' that Exponent performed *for other cases*, a host of irrelevant 'tests' about the glazing of windows and ejection potential (issues that aren't related to Ms. Fox's claims), and a handful of

---

[6] There is one detail that Exponent got right. For its surrogate "tests," it explicitly sought out and hired an African American to recreate Ms. Fox's seatbelt usage. Ex. D - 1/5/16 Email from Janine Smedley of Exponent to Karen Justice of Fieldwork Phoenix (stating African American model is preferred).

miscellaneous 'tests' that, like the others, do not "fit" the facts of Ms. Fox's rollover.  *See* Ex. E, Carhart Dep. 14/9-13 ("[W]e have like an over-inclusive list.  I have a bunch of glazing material on there and I didn't anticipate there were a lot of glazing questions or issues, but I have them on there.").  All should be excluded.

Plaintiff therefore moves to prevent Exponent testifier Michael Carhart from attempting to use 40 of the 42 'tests' in his file because (1) GM cannot meet its burden to prove the 'tests' "fit" the facts of the case under Rules 702, 402 and *Daubert*, since none of them resemble the wreck in this case, and (2) under Rule 403, any probative value that GM can articulate is vastly outweighed by the risk of unfair prejudice and likelihood of misleading the jury.[7]

## I.      LEGAL STANDARD

Neither the SRX drop testing nor the 37 'tests' in non-SRX vehicles meet the standard set out in Rule 702 and *Daubert*.  To be admissible, evidence adduced through experts must "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  "The consideration has been aptly described . . . as one of 'fit.' "  *Daubert v. Merrell Dow Pharm., Inc.*, 509

---

[7] Plaintiff also moves to exclude the FMVSS 216 test conducted by Exponent on a 2006 SRX—and all references to that test in the deposition testimony—for the reasons articulated in Plaintiff's *Daubert* motion to exclude Ewing's testimony, which are incorporated by reference here.

U.S. 579, 591 (1993).  "Fit" means that the purportedly scientific testimony must have a "valid scientific connection to the pertinent inquiry."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (quoting *Daubert*, 509 U.S. at 592).  The standard for "fit," or connection to the pertinent inquiry, is "higher than bare relevance."  *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 529 n.1 (6th Cir. 2014); *Cotromano v. United Techs. Corp.*, No. 10-80840-CIV, 2018 WL 2047468, at *14 (S.D. Fla. May 2, 2018).  An expert's opinion that does not "fit" should be excluded.  *Daubert*, 509 U.S. at 591, 593.

GM, as the party seeking to introduce the expert testimony, *bears the burden of demonstrating that the testimony fits the facts of the case*, and the Court's exclusion of expert testimony will be affirmed absent an abuse of discretion or a "manifest injustice."  *Daubert*, 509 U.S. at 597; *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1308 (11th Cir. 2014).

Tests and experiments can mislead the jury when "the demonstration resembles the disputed accident" but does not meet the "substantial similarity" requirement.  *Muth v. Ford Motor Co.*, 461 F.3d 557, 566 (5th Cir. 2006); *United States v. Gaskell*, 985 F.2d 1056, 1060 (11th Cir. 1993).  This is because 'tests' and experiments conducted under dissimilar conditions pose "the danger of misleading members of the jury who may attach exaggerated significance to the test."  *Barnes*

*v. Gen. Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977).

As a result, 'tests' are inadmissible unless the conditions are "so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed." *Burchfield v. CSX Transp., Inc.*, 636 F.3d 1330, 1336-37 (11th Cir. 2011) (holding that substantial similarity requirement applied where "[t]he results of the experiment purported to coincide with [CSX's] theory of how the accident occurred" (quotation and citation omitted)); *see also Gaskell*, 985 F.2d at 1060; *Barnes*, 547 F.2d at 277. The substantial similarity requirement for 'tests' or experiments is related to relevance under Rule 402. *See Glick v. White Motor Co.*, 458 F.2d 1287, 1294 (3d Cir. 1972) ("Experimental evidence is admissible so long as it is relevant and probative, and such evidence has probative value ***if*** the conditions of the experiment are ***identical with or similar to*** the conditions of the transactions in litigation." (emphasis added)).

*None* of the 'tests' Plaintiff seeks to exclude are substantially similar to the subject wreck. None "fit." All must be excluded.

## II.   ARGUMENT

### A.   Exponent's inverted SRX drop 'tests' are not substantially similar nor do they "fit" the facts of this case.

As GM has admitted, even "***small changes*** in contact configuration ***change***

10

***the dynamics***" in a rollover.  *See* Ex. E, Carhart Dep. 154/6-16 (emphases added).

Therefore, if GM wants to test what happened to Veronica Fox in her rollover, it

must avoid even "small changes" that could "change the dynamics" in a rollover.

Virtually nothing about the Exponent drop "tests," however, is the same—or even

substantially similar—to GM's own (incorrect) version of what happened in Ms.

Fox's wreck.  These drop 'tests' must therefore be excluded.

In May 2016, Exponent performed three "drop tests" on two 2004 Cadillac

SRXs with an "ultraview" roof: two 'tests' on an SRX with a roll cage installed

inside, and one "test" on an SRX without a roll cage installed.  The Exponent

litigation 'tests' consisted of turning the SRX upside down, raising it to a specific

height, and then dropping it straight down onto a concrete floor covered with a

sheet of plywood, with an instrumented Hybrid III test dummy rigged into an

artificial position in the driver's seat.  Exponent choose 10 inches to simulate the

first roll and 24 inches to simulate the third roll.  Carhart Dep. Ex. 201 (Expert

Report) at 29-30 (excerpts attached as Ex. F).

### 1.    The Third Roll

Explaining what Exponent did in these rigged tests requires discussing the

collision backwards—because Exponent did the "testing" in a manner that was

opposite of how the collision occurred.

The first two 'tests' were supposedly a recreation of the third roll in Ms. Fox's wreck.  Exponent dropped two production versions of the SRX—one with a roll-cage installed to allegedly recreate what would have happened to Ms. Fox if the SRX had had a stronger roof, and one without a roll cage.  This non-roll-caged vehicle was supposed to recreate what happened to Ms. Fox in the actual rollover with the weak roof.  The purpose of the test is to show no matter how strong GM made the roof, she would still get her injury—in other words, "roof crush don't matter."  *See* Ex. E, Carhart Dep. 302/3-13 (describing purpose of 'tests').[8]

This setup has no "fit" with the rollover it purports to simulate.  *First*, the movement of the car itself is the opposite of the movement of Ms. Fox's actual SRX.  Ms. Fox's SRX rolled in a circle; Exponent's SRXs fell down in a straight line.  Obviously, if GM wants to recreate what happened to Ms. Fox in a rollover, the only substantially similar test is one that at the very least includes a *roll*.[9]

---

[8] Ironically, the 'tests' show the opposite—a stronger roof reduced the force on the dummy's spine.  In the two third-roll "tests," the dummy in the roll-caged roof experienced roughly 140 lbs. less force than the dummy in the non-roll-caged roof.  Ex. E, Carhart Dep. 309/2-310/14.  *But proving that will require a virtual mini-trial.*

[9] Drop tests, of course, can have some usefulness.  Plaintiff, for example, uses them to demonstrate the difference in roof crush for a production roof and a reinforced roof under the same conditions.  The problem with what GM has done is that it purports to show what happened to Ms. Fox and how she got her injury using a false recreation of the wreck.

*Second*, the roof of the Exponent vehicles are completely different than the roof of Ms. Fox's car during the third roll.  Ms. Fox's SRX had experienced two roof-to-ground impacts by the time it began the third roll.  One was such a hard impact that it left a large furrow in the dirt that was still there *five months* after the wreck.  In fact, even Carhart admits that Ms. Fox's roof was damaged before the third roll began.  *See* Ex. E, Carhart Dep. 261/15-262/2.  Yet, in Exponent's version of reality, the third roll is recreated with roofs that are perfectly undamaged. That alone is enough reason to exclude Exponent's "test."

After Exponent dropped the roll-caged SRX *one time*, the roof came off. Ex. E, Carhart Dep. 289/18-290/1.  In other words, one roof-to-ground impact ripped the roof completely off, even in Exponent's "testing" in a laboratory.  That not only illustrates how terrible the glued-on glass and plastic SRX roof is—it also illustrates that after two rolls the SRX roof will be completely different from an undamaged roof—*GM's own evidence shows the roof is probably entirely gone*.

Obviously, if GM wants to recreate how Ms. Fox interacted with the roof, one thing that should be substantially similar is the roof itself.  Exponent's attempt to show the jury how Ms. Fox interacted with a severely damaged roof by using an SRX with a pristine roof does not "fit" the case at all—it is not even vaguely similar.

*Third*, the Exponent drop 'tests' have another major dissimilarity problem: the use of Hybrid III dummies.  Even the industry experts who concoct "roof crush don't matter" demonstrations admit that the forces dummies measure in drop 'tests' do not represent the actual forces that humans experience in rollover wrecks.  *See, e.g*., Ex. E, Carhart Dep. 309/8-11 ("Q: Do you believe that Veronica Fox's thoracic spine experienced 967 pounds of force?  A: No.  I think her back broke before the load rose to that level.").

GM designed these dummies in the early 1970s to test for frontal impacts. 5/22/15 Lu Dep. 191/25-192/6 (excerpts attached as Exh. G).  GM's expert agrees that the necks of Hybrid III dummies are not like human necks.  Ex. E, Carhart Dep. 279/8-13.  The author of the original CRIS test even acknowledged that "[i]t was not intended in these rollover tests to make a judgment whether the forces recorded by the dummy instrumentation were representative of certain injury levels to humans."  (Moffatt, E.A. et al., "Matched Pair Rollover Impacts of Rollcaged and Production Roof Cars Using the CRIS," SAE 2003-01-0172) at GRCC 0030 (attached as Ex. H). That is because Hybrid III dummies necks are stiffer in compression than human necks.  "Compression" refers to the kind of force that pushes down on the spine from the top and compresses the vertebrae together.[10]

---

[10] Carhart claimed at his deposition that Hybrid III dummies are "pretty decent" in

That stiffness matters because the dummy's head doesn't move or flex in a way that reduces force on the spine like a human would—and that in turn artificially drives up the force measurements on the dummy, making them inaccurate representations of force on a human under the same conditions.

Because dummies don't move in compression like a human does, Exponent "fabricated a bracket" so that it "could get the dummy into a chin to chest type orientation." Ex. E, Carhart Dep. 294/15-295/4; *id.* at 296/8-10 (he needed the fabricated bracket to "allow[] the dummy's neck to flex more"). The seatbelt in these third roll tests was also "slipped" on the dummy, to get the dummy as close as possible to the roof, and therefore drive up the force on the dummy's spine.

Even "small changes" affect how a person moves in a rollover. *See* Ex. E, Carhart Dep. 154/6-16. These "third roll" 'tests' have huge differences from Ms. Fox's wreck. They are not substantially similar, and they must be excluded.

### 2.     The First Roll

After Exponent dropped the SRXs from a height of two feet, it did a very

---

compression. Ex. E, Carhart Dep. 273/5-11. But the paper by Nightingale that he claims supports his conclusion states the opposite: "The Hybrid III neck form is stiffer along its axis than the cervical spine." Nightingale, R.W., et al., *The Influence of End Condition on Human Cervical Spine Injury Mechanisms*, SAE Paper No. 912915 (1991).

strange thing.  It conducted a third "drop test," from 10 inches, to recreate what happened to Ms. Fox in the first roll—but it used the roll-cage SRX that had already been dropped and was *missing the roof*.

This "test" of the first roll conditions suffers from even worse "fit" problems under Rule 703 than the prior two "tests."  *First*, this SRX was dropped *straight down;* that *cannot* show the jury how Ms. Fox would have interacted with the roof in a *rollover*.

*Second*, the roof of the roll cage vehicle had been torn completely off as a result of the prior 24-inch drop "test."  It bears repeating that the "test" we are discussing was supposed to show how Ms. Fox would have interacted with a stronger roof during the first roof-to-ground impact.  At the first roof-to-ground impact, Ms. Fox's SRX obviously had an undamaged, intact roof.  Yet, by the time Exponent "tested" what happened to Ms. Fox in the first roll, the "test" vehicle had *no ultraview roof at all*.  Seeing is believing. *See* Carhart Inverted SRX Drop Test Rpt. at 117 (available on Carhart Dep. Ex. 202, excerpts attached as Ex. I).



This is a roof defect case.  If you are going to honestly test interaction with

the roof, *then the roof should be on the vehicle*.[11]  Yet Exponent claims that the absence of the roof in the "test" does not matter.  Ex. E, Carhart Dep. 288/19-25. This is the kind of junk science Exponent and GM will feed the jury if they are permitted to do so.

GM will argue that the reason the missing roof doesn't matter is because Exponent positioned the dummy's head to hit the roof *rail* instead of the gaping hole where the roof used to be.  That, however, brings us to the *third* problem: Exponent pre-positioned the dummy to get the result it wants.  Exponent positioned the dummy's head "against the pinched flange of the driver's door." Ex. E, Carhart Dep. 288/11-15.  But Veronica Fox's head was not pre-positioned in any way.  If GM wants to show the jury a "test" that reflects what happened to Veronica Fox, it must do so by creating substantially similar conditions to the wreck—not by rigging the test and dummies to get a pre-ordained result.

*Fourth*, Exponent did no "first roll" vertical drop of an SRX *without* a roll-cage to provide a comparable.  The lack of a control test is egregious in this case because even according to *defense* experts, Hybrid III dummies are only useful *as*

---

[11] Carhart actually admitted this in his sworn deposition: he "thought it important that the roof panel be intact [during the 'tests' of the first roll] because our crash indicates that it was intact."  Ex. E, Carhart Dep. 288/19-25.

*a comparison* with a control that can be used as a baseline.  *See supra* 14-15.  But there are no baseline injury scores for a dummy in the production SRX to which the jury could compare injury scores for the roll-caged SRX.  Thus, the dummy's instrumentation readings in the reinforced SRX mean nothing.  The whole GM/Exponent gambit is indisputably illegitimate.

Tellingly, Exponent *never tested the production SRX with a dummy in the "diving" position GM claims Ms. Fox was in during the first roll.*  It only tested the "diving" position in the reinforced SRX.  That means GM paid Exponent over a hundred thousand dollars to crash SRXs and has no test to support its defense—that Ms. Fox was paralyzed before the roof crush occurred.

### 3.    These 'tests' Must Be Excluded

The Fifth Circuit has addressed the level of similarity required to introduce testing that attempts to recreate a rollover.  In *Muth v. Ford*, 461 F.3d 557 (5th Cir. 2006), Ford argued that the district court erroneously excluded videos and photographs from crash tests that supposedly illustrated the biodynamics of a rollover.  According to Ford, the conditions of the roll were "very close to the conditions of the [crash] tests," both with respect to the roll itself and the position of the dummies. *Muth v. Ford*, Reply Br. of Ford, 2005 WL 6075031, at *22-23. "Ford characterized the CRIS test as essentially depicting Ford's theory of the

accident." 461 F.3d at 567. *Even under those circumstances*, the Fifth Circuit upheld the district court's exclusion of the tests.

The Eleventh Circuit has also held that if a test or demonstration is not "so nearly the same in substantial particulars as to afford a fair comparison" to the subject incident, *the admission of the test or demonstration necessitates reversal*. *Gaskell*, 985 F.2d at 1060. In *Gaskell*, a criminal defendant was convicted of having injured an infant by shaking her, and the government's expert witness demonstrated the principle of shaking before the jury by using a doll. The doll's neck was not biofidelic, however, because it "was stiffer than that of a seven-month-old infant." *Id.* The defense cross-examined the government's expert about the lack of biofidelity, that expert admitted the discrepancy, and the district court instructed the jury on the dissimilarity between the doll's neck and an infant's. *Id.* at 1060-61. On appeal, the Eleventh Circuit held that the cross-examination and jury instruction were insufficient and reversed the conviction. *Id.* at 1061-62.

GM proposes to combine the infirmities rejected in *Gaskell* and *Muth*: a dummy with a non-biofidelic spine to demonstrate Ms. Fox's spinal injuries and test conditions that are different from Ms. Fox's wreck. As in *Gaskell*, the Exponent "drop tests" are not "so nearly the same in substantial particulars as to afford a fair comparison." *Id.* at 1060. Therefore, the "drop tests" (tests nos. 31

and 32) should be excluded.

Those dissimilarities are the result of Exponent's *deliberate choice* not to design a test to actually replicate the events of this wreck.  Exponent chose to conduct drop 'tests' in the order exactly opposite of what happened to Ms. Fox. The jury could easily be confused and misled into believing that these 'tests' accurately represent what happened in the wreck, even though they plainly do not. Of course, that is GM and Exponent's objective.

### B.     Dissimilar 'tests' on *different vehicles* should be excluded.

By GM's own admission, injury causation in a rollover "depends upon the location and position of the occupant as various parts of the vehicle hit the ground."  Ex. C, 1/18/16 GM's 7th Interrog. Resp. at 23. 'Tests' using a methodology in which a dummy is in a *different location* with a *different restraint system* and a *different position* inside a *different roof* that is hitting the ground at *different points* simply do not "fit" and are irrelevant to what caused Ms. Fox's injury in this case.  GM cannot credibly deny that, because GM itself has already admitted that injury causation in a particular rollover depends on all these things.

Because these dissimilar and irrelevant 'tests' fail the "fit" requirement of Rule 702 and *Daubert*, they must be excluded.  *See Daubert*, 509 U.S. at 591-92. These 'tests' should also be excluded under Rule 402 because they are not

substantially similar to Ms. Fox's rollover.

### C. The "Malibu" experiments do not satisfy the "fit" requirement of Rule 702 and *Daubert* and are not substantially similar to Ms. Fox's rollover.

#### 1. Description of the Malibu Experiments

Three decades ago, in the 1980s, GM sponsored and conducted two series of rollover experiments using the 1983 Chevrolet Malibu, a midsize four-door sedan. Both series of experiments, commonly called Malibu I and Malibu II, included eight dolly rollover "tests." Both Malibu I and II featured four cars with production roofs and four cars with roll-cage-reinforced roofs. For these 'tests', a 1983 Malibu was placed in a dolly, accelerated along a track to 32 mph, and then launched into the air when the dolly abruptly stopped. After landing, the cars rolled several times. The dolly rollover test was chosen not because it mimics real-world rollovers but rather because it is repeatable.[12]

Malibu I was conducted in 1983 and reported in a 1985 paper published by two GM employees and Edward Moffatt, a former GM employee. GM hopes to present Moffatt as another of its expert witnesses. The Malibu I experiments

---

[12] Kenneth F. Orlowski, R. Thomas Bundorf & Edward A. Moffatt, *Rollover Crash Tests—The Influence of Roof Strength on Injury Mechanics*, SAE Paper No. 851734 (1985), at 182. Orlowski left GM and became a full-time testifying expert for automakers.

featured two *unrestrained* Hybrid III 50th-percentile male dummies in the front seats.  The cars launched from the dolly in Malibu I rolled between 2 and 3½ times. The unbelted dummies were predictably thrown around inside the 1983 Malibu.

Malibu II was conducted in 1987 and reported in a 1990 paper published by four current GM employees and two former GM employees, Kenneth Orlowski and Moffatt.[13]  These dolly rollover "tests," unlike those in Malibu I, featured two *restrained* Hybrid III 50th-percentile male dummies seated in the front seats.  The dummies were restrained using the 1980's-era seatbelt that came in the Malibu, which bears no resemblance to the seatbelt in Ms. Fox's 2004 SRX.  Once the dummies were belted in the car, GM then added 1 inch of slack to the seatbelt.

Malibu II also included four drop tests using 1983 Malibus: two with production roofs and two with roll-cage-reinforced roofs.  For each test, a Hybrid III 50th-percentile male dummy was seated in the front seats.  Two 'tests' (one of each roof type) were run with restrained dummies, and two 'tests' were run with unrestrained dummies.  All four cars were hoisted 12 inches off the ground—a

---

[13] Ex. J, G.S. Bahling, R.T. Bundorf, G.S. Kspzyk, E.A. Moffatt, K.F. Orlowski, J.E. Stocke, *Rollover and Drop Tests—The Influence of Roof Strength on Injury Mechanics Using Belted Dummies*, SAE Paper No. 902314 (1990).

concrete floor covered by a sheet of plywood.  The cars were then rolled 20 degrees to ensure that the driver side was closer to the ground and thus would hit first.  The cars were then dropped.

To compare the performance of the production and roll-cage-reinforced roofs in both Malibu I and II, GM ***made up*** a measurement called "potentially injurious impact" (PII).  GM defined PII as any impact to the dummy's head causing a neck axial compression load of at least 2000 N.[14]  GM admitted that PII—its made-up measurement—did not indicate or correspond to any particular injury; rather, it was for comparison purposes only.[15]  This is crucial, because GM's experts plan on telling the jury that if the force on the dummy reaches the made-up PII measurement, *then that means a person in the dummy's seat would have received a serious injury*.  That is obviously false.

The problem, however, is that GM set the PII threshold so that *every* Malibu launched from a dolly showed "potentially injurious impacts," regardless of whether the car had a production or roll-cage-reinforced roof or how much roof crush occurred.  That was GM's intent—so it could proclaim roof strength doesn't matter in a rollover.  Setting aside GM's arbitrary PII threshold, the results GM's

---

[14] *Id.* at 105.

[15] *Id.*

23

experiments show roof crush *did matter*.  The neck loads in cars with stronger

roofs were almost 40 percent less than in cars with weaker roofs.  Reality, however,

is no barrier—GM will tell the jury this junk science proves its defense.

### 2.     Comparison to Ms. Fox's rollover

Ms. Fox's wreck is substantially *different* than the Malibu experiments in

almost every material way.  A short list of these differences between the Malibu

'tests' and Ms. Fox's rollover includes:

- The cars were built in different centuries.

- The cars are in different classes—one is a sedan and one is an SUV—and have different weights, dimensions, and centers of gravity.

- The roof—i.e., *the defective product*—is totally different.  The Malibu had a welded-on steel roof; Ms. Fox's 2004 SRX had a glued-on glass and plastic roof.

- The speed of the 'tests' is different from Ms. Fox's wreck;

- The number of rolls and the distance traveled during many of the 'tests' were different than Ms. Fox's wreck.

- In the Malibu I experiments, the dummies were *unrestrained.*  Ms. Fox was wearing her seatbelt properly at the time of her wreck.

- In the Malibu II experiments, the dummies were restrained using the 1980's seatbelt that was anchored to the B-pillar in the Malibu. The 2004 SRX had the much advanced "all belts to seat" (ABTS) seatbelt design, where the belt was mounted directly into her seatback.  That design was created *to keep people in their seats,* and it allowed less excursion from the seat than a pillar-mounted belt like that in the Malibu.

- Ms. Fox's ABTS design also did not have a tension relieving device that

would have allowed slack in the seatbelt system; the belts in the Malibu II experiments did.

▪ In Malibu II, Moffatt and his collaborators deliberately pulled out an extra inch of slack *to make it easier for the dummies to get out of the seats*. (Sound "rigged"?  It was.)  In contrast, everyone agrees Ms. Fox was properly wearing an entirely different seatbelt, without any extra slack.

GM knows that small differences in a rollover can make big differences in the outcome, because they have said it over and over in this case.  *The differences in the cars alone* are enough to exclude this evidence.  The roofs are different and would crush differently; the cars weigh different amounts, and would move differently; and the restraints are different, and would allow occupants to move differently.  On top of all this, there are huge differences in the wreck conditions.

Obviously these 'tests' cannot be used to show what happened to Ms. Fox in her rollover.  The Malibu experiments are irrelevant, confusing, fail Rule 702 and *Daubert*'s "fit" requirement, and should be excluded.

**D. The CRIS experiments do not satisfy the "fit" requirement of Rule 702 and *Daubert* and are not substantially similar to Ms. Fox's rollover.**

**1. Description of the CRIS experiments**

In the early 2000s, Ford paid Exponent, Carhart's employer, millions of dollars to design a tractor-trailer apparatus to perform the original "Controlled Rollover Impact System" (CRIS) experiments.  Representatives from Ford's legal

department were involved in the planning stages of the original CRIS experiments. Orlowski Dep. 31/21-32/6 (excerpts attached as Exh. K).  The original CRIS experiments, which featured a 1998–2000 model Ford Crown Victoria, took place at Exponent's private test facility with the participation of Ford employees.  *Id.* at 50/12-24.



In the CRIS experiments, a test car is hoisted into the air and suspended behind a tractor-trailer—just how high varied from test to test.  Next, the test car was spun along its longitudinal axis like a rotisserie chicken until it reached some predetermined roll rate.  Finally, the test car is dropped while the tractor-trailer was moving at some desired speed.

After numerous courts across the country have excluded the photographs and videos of the original CRIS "tests,"[16] Carhart has abandoned any effort to

---

[16] *See, e.g.*, *Muth v. Ford Motor Co.*, 461 F.3d 557, 565-67 (5th Cir. 2006) (affirming trial court's exclusion of the photos and videos from the original CRIS testing); *Shipp v. Gen. Motors Corp.*, 750 F.2d 418, 427 (5th Cir. 1985) (affirming exclusion of Malibu I 'tests'); *Pannu v. Land Rover N. Am., Inc.*, 120 Cal. Rptr. 3d 605, 623 (Cal. Ct. App. 2011) (holding exclusion of Malibu and CRIS 'tests' not an abuse of discretion); 12/15/17 Order, *Hill v. Ford Motor Co.*, No. 16-C-04179-S2 (excluding Malibu and CRIS 'tests'); 8/20/14 Order, *Hatfield v. Ford*, (same).

testify about them here.  Instead, he hopes to introduce something *worse*: two litigation CRIS 'tests' performed almost a decade ago *for different cases* litigated by a law firm in Miami, Florida.[17]  Unsurprisingly, Exponent performed both "tests."  One test (no. 12) involves a 2005 Volvo XC90.  The other test (no. 13) involves a 1996 Isuzu Rodeo with a modified roof.

Exponent ensured that the test cars in the CRIS experiments would strike the ground nearest to the dummies' heads before anything else struck the ground.  The CRIS fixture spun each car at least 25 times before the car was dropped from a predetermined height and at a specific roll rate while the tractor-trailer was moving at a set speed.  Because of Exponent's setup, each car struck the ground after rotating more than 180 degrees from right-side-up (i.e., rotated upside down and then some).

In both CRIS experiments, Exponent changed the weight and the distribution of that weight across the car.  The devices attached to the test cars to allow the CRIS fixture to "grasp" and spin them and all the recording equipment Exponent installed drastically increased the test cars' weight.  To try to counterbalance these additions, numerous standard features had to be removed.  For example, Exponent

---

[17] That law firm (then known as Seipp & Flick LLP, later Seipp, Flick & Hosley LLP) has merged with Bowman and Brooke LLP—GM's law firm in this case.

removed the following from the 2005 Volvo XC90: both bumpers, engine and interior trim components, front passenger and rear seats, roof rack, headliner, fuel tank, and spare tire components.  Volvo XC90 Rpt. at 25 (excerpts attached as Ex. L).  In the 1996 Isuzu Rodeo, Exponent removed both bumpers, "miscellaneous" engine and interior trim parts, front passenger and rear seats, fuel tank, front brake calipers and rotors, and spare tire components.  Isuzu Rodeo Rpt. at 18 (excerpts attached as Ex. M).[18]  Even after removing these parts, Exponent's modifications made both cars about 200 pounds heavier.

Now for the specifics about each test.  For the Volvo XC90 test, Exponent took great pains to position the dummy seated in the driver seat, a Hybrid III 50th-percentile male, *with just 1.5 inches of vertical head clearance* after adjusting the seat to its "full up position."  Exponent buckled the dummy into the seat and *then added 1.9 inches of slack to the seatbelt*.  The seatbelt was clamped in place *to keep it from retracting as designed*, and tape was affixed to the dummy's shoulder to keep the belt from slipping off.  Exponent strapped the dummy in place with cables that were not released until the car's roof was 3 inches from striking the

---

[18] Exponent also modified the roof of the Isuzu Rodeo, installing modified A-pillars, header, and roof structures.  Ex. M, Isuzu Rodeo Rpt. at 18.  As a result, the Rodeo, like the XC90, was also missing the original headliner and roof rack.

ground.  This method of holding a dummy's head in place during a CRIS test is supposed to "stick the landing" so the test will allow for a head strike exactly where the tester wants it.  *See, e.g.*, *Muth v. Ford*, 12/07/04 morning trial tr. 111/4 (testimony of the author of the original CRIS test) (excerpts attached as Ex. N). Once attached to the CRIS fixture, the 2005 Volvo XC90 was raised 10.8 inches off the ground.  The fixture then spun the car over and over again at a roll rate of 224 deg./sec. as the tractor-trailer reached a speed of 7.7 mph on Exponent's private test track.  After the fixture reached Exponent's specially designed drop area, the XC90 was released.  After striking the ground, the car rolled only a quarter turn.

For the 1996 Isuzu Rodeo test, Exponent made many modifications to the standard A-pillars, headers, and roof structures.  The modified roof did not contain a headliner.  Unlike the XC90 test, the vertical head clearance of the dummy in the driver seat was not noted, so neither the Court, nor the jury, nor Plaintiff could know what it was.  Exponent put the seat as far forward on the seat track as it would go, reclined the seat 57 degrees from horizontal, and buckled the dummy in the seat.  The dummy was then held in the place where Exponent wanted it with a "harness" made from nylon strap that wrapped the dummy's chest and pelvis.

Once attached to the CRIS fixture, the 1996 Isuzu Rodeo was raised 18.9

inches off the ground.  The fixture then spun the car repeatedly at a roll rate of 317 deg./sec as the tractor-trailer reached a speed of 37.4 mph.  After the fixture reached Exponent's specially designed drop area, the Rodeo was released.  After striking the ground, the car rolled 26 quarter turns, or 6½ times.

Even though the dummies were *seated* in the driver seat, Exponent used dummies with *standing* pelvises—*because that made them more likely to slip out of the lap belts.*  Ex. L, 2005 Volvo XC90 Rpt. at 4 (describing the Hybrid III dummy as having a "pedestrian pelvis"); Ex. M, 1996 Isuzu Rodeo Rpt. at 4 (same).

### 2.    Comparison to Ms. Fox's rollover.

Ms. Fox's wreck is substantially *different* than the CRIS experiments GM wants to use in almost every material way.  The defective 2004 Cadillac SRX at issue in this case has almost nothing in common with either the 2005 Volvo XC90 or the 1996 Isuzu Rodeo, and the roll conditions are radically different:

- The roofs—i.e., the defective product—are different: the Rodeo had a modified (meaning fortified) welded-on steel roof; the XC90 features a welded-on steel roof with a SWR of 4.6.  Ms. Fox had a glued-on glass and plastic roof with a roof that was nowhere near that strength.

- The cars have different weights, dimensions, centers of gravity, and head clearances.

- In Exponent's XC90 CRIS test, Exponent intentionally introduced slack into the seatbelt system and had to tape the seatbelt to the dummy's

shoulder.  Ms. Fox was wearing her seatbelt properly; it was not taped to her shoulder.

- In Exponent's CRIS experiments, the Hybrid III dummies were strapped into their seats with either a harness or cables to ensure that they stayed right were Exponent wanted them; Exponent did not untether the dummies until the last possible moment before the test car hit the ground. Ms. Fox was not strapped into her car with anything other than a properly fastened seatbelt.

- In Exponent's CRIS experiments, dummies with "standing" pelvises were used.  Ms. Fox was seated.

- In Exponent's CRIS test, the spinning cars were dropped on the test ground at speeds of 7.7 mph (XC90) and 37.4 mph (Rodeo).  Ms. Fox's rollover began at a higher speed.

- In Exponent's CRIS experiments, the dropped cars experience either 1 quarter turn (XC90) or 6½ full turns (Rodeo).  Ms. Fox's rollover was 4 rolls.

- In Exponent's CRIS experiments, spinning cars were dropped from the back of a tractor-trailer.  Ms. Fox's wreck involved a car that swerved, tripped, and rolled.

- In Exponent's CRIS experiments, the headliners of the cars were removed.  The headliner in Ms. Fox's SRX was one of the surfaces that she hit.

- The cars were made by different manufacturers, and built at different times (the Rodeo was built in a different century; the Volvo was built after the SRX).

The dissimilarities between the CRIS experiments GM wants to use in this case and Ms. Fox's rollover are overwhelming.  Those experiments are irrelevant, not substantially similar, and do not "fit" the facts of this case.

**E.     The other rollover-related 'tests' in Appendix A do not "fit" or are not substantially similar as the wreck in this case.**

In addition to the CRIS experiments, Appendix A contains several more litigation-specific 'tests' performed for law firms—often Bowman and Brooke, GM's law firm in this case.  Carhart admitted during his deposition that Appendix A included many 'tests' that are irrelevant to this case, yet GM refused to agree to stipulate that it would not try to introduce them—perhaps in the hopes the Court will "split the baby"—excluding the worst of Carhart's file and leaving those tests that GM cares about the most (CRIS, Malibu, and its dissimilar SRX testing). Exclusion of these "tests," however, is not a close call—so in the interest of brevity, Plaintiff will not recount all their differences with Ms. Fox's wreck.

Six 'tests' (nos. 1-6) are Malibu-type experiments created to defend automakers in different cases.  Like the Malibu and CRIS "tests," these are unlike Ms. Fox's rollover both in terms of the car's specifics and the facts of the rollover.

Other litigation 'tests' involve a so-called vehicle spin demonstration (nos. 35, 36).  For these "tests," non-SRX vehicles are chopped up so that they would fit on a "spin fixture."  Exponent used standing pelvises on the dummies (Ms. Fox was not standing) and wired their heads in place (Ms. Fox's head was not wired), altered the stature in one case, and spun them to roll rates much higher than those experienced by Ms. Fox in this case.  If a confused jury concluded this test

replicated the wreck or Ms. Fox's movement, it would indisputably be wrong.

Another "test" (no. 39) is supposed to show that the Hybrid III dummies Exponent used in the SRX drop tests are biofidelic. But Exponent dropped dummies in its SRX 'tests' on their heads—and "test" no. 39 has nothing to do biofidelity in a drop test. In fact, the paper specifically states it assesses only the biofidelity of dummies before the vehicle begins to "trip"—which is before the roll begins.[19] There was no trip in Exponent's "test," so no. 39 doesn't "fit" the facts of this case. GM wants to use this irrelevant material to convince the jury that the dummies are biofidelic when the roof is crushing down on them. That is false.

Two other litigation 'tests' that should be excluded are called steering induced rollover 'tests' (nos. 37-38). These 'tests' involve one car, a 2012 Toyota Camry, and one truck, a 2012 Toyota Tundra. Neither the vehicles nor the wreck conditions are substantially similar to this case. These 'tests' should be excluded for lack of substantial similarity and potential to confuse or mislead the jury.

There are three rollover 'tests' that did not fit neatly within one of the earlier categories (nos. 7-9). Each test involves a car or truck that is not substantially

---

[19] Gary T. Yamaguchi, et al., *Electromyographic Activity and Posturing of the Human Neck During Rollover Tests,"* SAE Paper No. 2005-01-0302 (2005), at 8 (contained in the test 39 folder in Carhart Dep. Ex. 202).

similar to the 2004 SRX and rollovers that are dissimilar from the November 2013 wreck that left Ms. Fox paralyzed.  These 'tests' thus fail Rule 702 and *Daubert*'s "fit" requirement, risk confusing or misleading the jury, and are irrelevant under Rule 402.

Almost half of Carhart's 'tests' relate to window glazing or ejection (nos. 14-30, 40).  These 'tests' should be excluded because window glazing and ejection are not at issue.  Carhart also identified a 2006 test in the last 24-hours of discovery. *First*, it should be excluded because its designation was untimely.  *See generally* 7/31/18 Pl.'s Motion to Strike.  Second, it should be excluded because it is dissimilar to the wreck in this case.  A disembodied dummy head was pushed onto a door frame of a different vehicle for a different case over a decade ago.

The truth seems apparent: GM has engaged in an unbridled offloading of clearly irrelevant or dissimilar 'tests' in the hopes that some will get through the *Daubert* barrier, or if not, that GM will have something to fuss about on appeal.

**F.    All these dissimilar 'tests' will confuse the jury.**

GM will undoubtedly argue that Carhart's non-SRX testing is offered to explain "general scientific principles" and is thus admissible without a showing of substantial similarity.  There are at least three problems with that argument.  *First and most importantly*, the idea that GM wants to introduce rollover 'tests'—*but*

doesn't want the jury to conclude what happened in those rollover 'tests' happened to Veronica Fox—requires total suspension of disbelief.  It defies common sense and basic deductive thinking to even suggest it.  The State Court of Gwinnett County recently addressed the same argument by an automaker and easily dismissed it.  Ex. O, (12/15/17 Order Excluding All Evidence, Defense, Argument, or Reference to "Malibu" and "CRIS" testing, *Hill v. Ford*, No. 16-C-04179-S2) at 2.  That court held that if an automaker truly wanted to demonstrate a "scientific principle," it could do so with "countless other demonstrative methods" that would not confuse the jury.  *Id.*

*Second*, almost every single one of these 'tests' were created for litigation. They are not designed to illustrate "general scientific principles"—*they were designed to illustrate an automaker's defense in those cases.*  They have no relevance to this case.

*Third*, in the unlikely event someone were to believe that GM was being honest and really wanted to just illustrate "general scientific principles," the 'tests' should nonetheless be excluded under 403.  As courts have held, this kind of testing can be confusing and unduly prejudicial *because* the testing *appears* to recreate the subject rollover wreck.  "The more troublesome cases . . . are ones like this one where some principles of some kind may be demonstrated but in a fashion

that looks very much like a recreation of the event that gave rise to the trial."

*Muth,* 461 F.3d at 566.  The *Hill* court analyzed the Malibu and CRIS experiments

under Rule 403 and found:

> Introduction of the "CRIS" and "Malibu" tests, however, would
> present a real likelihood of issue confusion, given the manner of
> testing.  These complex tests could easily be construed by the jury as
> suggestive and advocative of a desired outcome of this issue, rather
> than merely demonstrative of basic scientific principles.  The Court
> finds that these two tests, *perhaps* not to the extent of being something
> other than counterintuitive, are certainly more prejudicial than
> probative.

Ex. O (12/15/17 Order, *Hill v. Ford*, No. 16-C-04179-S2) at 3 (citation omitted).

In *Gladhill v. General Motors Corp*., 743 F.2d 1049, 1051-52 (4th Cir.

1984), for example, the plaintiff was injured because the brakes in a General

Motors car allegedly locked up under only slight pedal pressure.  At trial, GM

introduced a brake test conducted on flat, straight surface with an experienced

driver, whereas the subject wreck had occurred on a downhill, curving surface with

a lay driver.  Following a defense verdict, GM contended on appeal that the test

had been properly admitted, although the test conditions were not substantially

similar to those of the wreck.  GM argued that "the test was not a re-enactment of

the accident but rather a demonstration" of the vehicle's operating characteristics.

*Id*. at 1051.  In reversing the district court, the Fourth Circuit expressly rejected

GM's argument.  *Id*. at 1051-52.  The court held that even if the purpose of the test

was "to illustrate a principle" rather than re-enact the wreck, the subject wreck was "so different from this test as to make the results [of the test] largely irrelevant if not misleading." *Id.*

In *Chase v. General Motors Corp.,* the plaintiff was injured because of allegedly defective brakes. 856 F.2d 17, 18 (4th Cir. 1988). The district court allowed the introduction of a brake test in which the surface conditions, ambient temperature, steering inputs, and brake inputs differed from those of the subject wreck. On appeal, the proponent of the brake test contended that the 'tests' had been properly admitted, but the Fourth Circuit rejected its argument. The Fourth Circuit concluded that "[i]t is possible to call almost any evidence of this type 'a demonstration to illustrate a principle,' *but when the demonstration is a physical representation of how an automobile behaves under given conditions, those conditions must be sufficiently close to those involved in the accident at issue to make the probative value of the demonstration outweigh its prejudicial effect.*" *Id.* at 19 (emphasis added) (quoting *Gladhill,* 743 F.2d at 1052). The Fourth Circuit reversed, ordering that on retrial "not only will the videotapes be excluded but also the NHTSA test results and testimony obtaining thereto." *Id.* at 20.

In *Finchum v. Ford Motor Co.*, 57 F.3d 526, 530 (7th Cir. 1995), the Seventh Circuit upheld the district court's exclusion of dynamic sled tests. The court noted

that in the crash test, the dummy was not restrained in the same manner as those

injured in the wreck.  In the wreck, the vehicle's occupants were belted, but in the

crash test, the dummies were not.  Accordingly, the dummies moved about the

car's interior in a manner unrepresentative of the wreck.  The court held that the

district court did not abuse its discretion in excluding this evidence.  As the

Seventh Circuit noted, "[t]he sled test was just similar enough to the [subject]

accident to confuse the jury and leave jurors with the prejudicial suggestion that

the [plaintiffs' bodies] flipped over backwards during the crash."  *Id*.[20]

This Court should reject, as have many other courts, the argument that

---

[20] *See also Weaver v. Ford Motor Co.*, 382 F. Supp. 1068, 1071-73 (E.D. Pa. 1974)
(excluding testing based on insufficient similarity between test conditions and
actual conditions), *aff'd without opinion*, 515 F.2d 506 (3d Cir. 1975); *Hall v. Gen.
Motors Corp.*, 64 7 F.2d 175, 180-81 (D.C. Cir. 1980) (excluding dissimilar
testing); *Rodriguez v. Hyundai Motor Co.*, 944 S.W.2d 757,767 (Tex. App. 1997)
(trial court properly excluded evidence of manufacturer's drop test where trial
court found difference between accident and test in speeds and rolls of two cars,
the surfaces involved, and the damage sustained by the vehicles, concluding that
admitting the test evidence would create high possibility of misleading jury), *rev'd
on other grounds*, 995 S.W.2d 661 (Tex. 1999); *Carillo v. Ford Motor Co.*, 759
N.E.2d 99, 107-08 (Ill. App. Ct. 2001) (affirmance of trial court decision to
exclude evidence of sled test where seat was strengthened so that it was stronger
than it normally was, and crash pulse and timing of sled test differed from actual
accident); *Harsh v. Petrol,* 840 A.2d 404, 419-23 (Pa. Commw. Ct. 2003)
(affirming trial court decision to exclude evidence of crash tests where tractor-
trailer involved in test was modified with a reinforced bumper and therefore
differed from tractor-trailer which collided with subject vehicle).

dissimilar crash testing merely "illustrates general scientific principles." It is categorically untrue here—GM seeks to prove its defense with this litigation testing from other cases. In addition, the testing that GM seeks to introduce is *substantively* unrelated to the conditions of the subject wreck but *appear* to replicate the type of crash at issue. As other courts have concluded, that renders the 'tests' more prejudicial than probative.

Finally the unrelated 'tests' will waste an enormous amount of time and require mini-trials on the dissimilarities of the 37 non-SRX "tests." *Even the 'tests' that Exponent designed for this case do not resemble Veronica Fox's wreck.* One can only imagine how many dissimilarities exist between 'tests' made to demonstrate a different wreck altogether. In reality, there really is nothing "mini" about litigating these differences—after all, Carhart produced more than 14,000 documents about these 'tests.' If the 'tests' are used at trial, Plaintiff will be forced to explain to the jury why they should be disregarded. One would be hard-pressed to imagine a bigger waste of the jury's and the Court's time. Therefore, all videos, photos, and testimony about the 'tests' should be excluded.

## III.   CONCLUSION

For the reasons above, Plaintiff asks the Court to exclude all testing in Carhart's file, except the surrogate testing in the 2004 SRX.

Respectfully submitted this 31st day of July, 2018.

BUTLER WOOTEN & PEAK LLP


  s/  Tedra L. Cannella
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
  jim@butlerwooten.com
TEDRA L. CANNELLA
  Georgia Bar No. 881085
  tedra@butlerwooten.com
ROBERT H. SNYDER
  Georgia Bar No. 404522
  rob@butlerwooten.com
RORY A. WEEKS
  Georgia Bar No. 113491
  rory@butlerwooten.com
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax

KENNETH S. NUGENT
WILLIAM G. HAMMILL
  Georgia Bar No. 943334
  whammill@attorneykennugent.com
4227 Pleasant Hill Road
Building 11, Suite 300
Duluth, GA 30096
(404) 885-1983


**ATTORNEYS FOR PLAINTIFF**

# <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rules 5.1B and 7.1D, I hereby certify that the foregoing filing complies with the applicable font and size requirements and is formatted in Times New Roman, 14-point font.

<u>s/  Tedra L. Cannella</u>
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
  jim@butlerwooten.com
TEDRA L. CANNELLA
  Georgia Bar No. 881085
  tedra@butlerwooten.com
ROBERT H. SNYDER
  Georgia Bar No. 404522
  rob@butlerwooten.com
RORY A. WEEKS
  Georgia Bar No. 113491
  rory@butlerwooten.com
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that on July 31, 2018, I electronically filed with the Clerk

of the Court Plaintiff's *Daubert* Motion to Exclude Portions of Michael Carhart's

Proposed Testimony using the CM/ECF system which will automatically send

email notification of such filing to the following attorneys of record:

<table>
<tr>
<td>
C. Bradford Marsh, Esq.<br>
Myrece Johnson, Esq.<br>
Swift, Currie, McGhee & Hiers, LLP<br>
1355 Peachtree St., N.E., Suite 300<br>
Atlanta, GA  30309
</td>
<td>
Thomas M. Klein, Esq.<br>
KLEIN THOMAS<br>
20 East Thomas Road, Suite 2200<br>
Phoenix, AZ 85012<br>
<br>
Kevin J. Malloy, Esq.<br>
Bowman and Brooke LLP<br>
1441 Main Street, Suite 1200<br>
Columbia, SC 29201
</td>
</tr>
</table>

s/ Tedra L. Cannella_____
JAMES E. BUTLER, JR.
 Georgia Bar No. 099625
TEDRA L. CANNELLA
 Georgia Bar No. 881085
ROBERT H. SNYDER
 Georgia Bar No. 404522
RORY A. WEEKS
 Georgia Bar No. 113491
BUTLER WOOTEN & PEAK LLP
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax