**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **VERONICA ALAINE FOX,** | |
| **Plaintiff,** | **CIVIL ACTION FILE** |
| **v.** | **NO. 1:17-CV-209-MHC** |
| **GENERAL MOTORS LLC,** | |
| **Defendant.** | |

## **ORDER**

This matter comes before the Court on the following motions:

By Defendant General Motors LLC ("GM"):

- Motion to Exclude the Expert Testimony of G. Bryant Buchner [Doc. 105];

- Motion to Exclude the Expert Testimony of Cathy Gragg-Smith [Doc. 106];

- Motion to Exclude the Expert Testimony of Brian Herbst [Doc. 107];

- Motion to Exclude the Expert Testimony of Lila Laux [Doc. 108];

- Motion to Exclude the Expert Testimony of Allan Kam [Doc. 109];

- Motion to Exclude the Expert Testimony of Mariusz Ziejewski [Doc. 110];

- Motion to Exclude the Expert Testimony of Jonathan Eisenstat, M.D. [Doc. 111];

- Motion to Exclude Certain Expert Testimony of Gustavo Pradilla, M.D. [Doc. 112];

- Motion for Summary Judgment [Doc. 113]; and

- Motion for Leave to File Under Seal [Doc. 199].

By Plaintiff Veronica Fox ("Fox"):

- Motion to Exclude GM Expert Witnesses [Doc. 125];

- <u>Daubert</u> Motion to Exclude Portions of Michael Carhat's Proposed Testimony [Doc. 126];

- <u>Daubert</u> Motion to Exclude any Medical Testimony or Opinions of GM's Paid Testifiers Michael Carhart and Geoffery Germane [Doc. 127];

- <u>Daubert</u> Motion to Exclude Edward Moffatt's Testimony [Doc. 128];

- <u>Daubert</u> Motion to Exclude GM's "Experts" Proposed Testimony on Statistics [Doc. 129];

- Motion to Exclude the Testimony of GM "Expert" Kon Mei Ewing [Doc. 130];

- Motion for Leave to File Under Seal [Doc. 154];

- Motion for Leave to File Under Seal [Doc. 173]; and

- Motion for Leave to File Under Seal [Doc. 197].

## I.     BACKGROUND

This lawsuit arises out of Fox's injuries sustained in a rollover crash

occurring on November 12, 2013.  GM's Statement of Undisputed Material Facts

in Supp. of its Mot. for Summ. J. ("Defs.' SUMF") [Doc. 113-27] ¶ 1; Pl.'s Resp. to GM's Statement of Undisputed Material Facts and Pl.'s Statement of Additional Disputed Material Facts ("Pl.'s Resp. to Defs.' SUMF and Add'l SDMF") [Doc. 152-45] ¶ 1.  Fox was driving her 2004 Cadillac SRX, a four-door sports-utility vehicle ("SUV"), north on I-285, south of the I-20 interchange.  Defs.' SUMF ¶ 2; Pl.'s Resp. to Defs.' SUMF and Add'l SDMF ¶ 2.  Fox steered her vehicle to the right and then steered back to the left, causing it to skid or spin in a counterclockwise direction.  Defs.' SUMF ¶¶ 4-6; Pl.'s Resp. to Defs.' SUMF and Add'l SDMF ¶¶ 4-6.  The vehicle "tripped" and rolled over no fewer than four times.  Defs.' SUMF ¶ 7; Pl.'s Resp. to Defs.' SUMF and Add'l SDMF ¶ 7.

Fox alleges that the proximate cause of her injuries is the defective design of the roof of her 2004 Cadillac SRX.  Compl. [Doc. 1-1] ¶ 5.  When her vehicle rolled over, the "entire, glued-on roof came off during the rollover, leaving a gaping hole in the top of the vehicle and depriving the roof system of the transverse support the top of the roof should provide to prevent the sides from collapsing inward . . . ."  Id.  The "remaining roof structure was so inadequate that it buckled and crushed onto" Fox, injuring her.  Id.  Fox was rendered quadriplegic in the accident.  Id. ¶ 1.

Fox filed her complaint for damages in the State Court of Fulton County, Georgia, on December 13, 2016, alleging that GM is liable for Negligence (Count I), Failure to Warn (Count II), and for Attorneys' Fees and Expenses of Litigation (Count III).  Id.  GM removed the case to this Court on January 18, 2017.  Notice of Removal [Doc. 1].

## II.   LEGAL STANDARD

### A.   Admissibility of Expert Testimony

In federal court, federal law applies to the admissibility of expert testimony. Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005) (holding that in diversity cases, the Federal Rules of Evidence govern the admissibility of evidence in federal court); see also Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1193 (11th Cir. 2010) ("Although the standards for finding causation are governed by [state] law, we apply federal law to determine whether the expert testimony proffered to prove causation is sufficiently reliable to submit it to the jury.").  Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)    the testimony is based on sufficient facts or data;
> (c)    the testimony is the product of reliable principles and methods; and
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  The Supreme Court has directed that

> [u]nlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.  See Rules 702 and 703.  Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592 (1993).  Because Rule 702 permits a broader range of testimony, the Supreme Court has made clear that district courts must perform a critical "gatekeeping" function concerning the admissibility of all expert testimony to ensure that an expert witness's testimony is not only relevant, but reliable.  United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert, 509 U.S. at 589 n.7, 597).  In particular, district courts are "charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand."  Corwin v. Walt Disney Co., 475 F.3d 1239, 1250 (11th Cir. 2007).

5

In performing this gatekeeping function, the Eleventh Circuit has developed "a rigorous three-part inquiry" to determine the admissibility of expert testimony under Rule 702, that considers whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Frazier, 387 F.3d at 1260 (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)). "While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." Id.

"A district court's gatekeeper role under Daubert 'is not intended to supplant the adversary system or the role of the jury.'" Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison v. McGhan, 184 F.3d 1300, 1311 (11th Cir. 1999)); accord Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); Adams v. Lab. Corp. of Am., 760 F.3d 1322, 1332, 1334 (11th Cir. 2014) (citations omitted) ("Bias in an expert witness's testimony is usually a

6

credibility issue for the jury. . . . The risk of bias would mean, at most, that [the expert's] testimony is to some extent 'shaky,' and shakiness goes to the weight of her testimony, not its admissibility."). Rather, the Court's role as a gatekeeper under Daubert "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co., 526 U.S. at 152.

The proponent of expert testimony "always bears the burden to show that his expert is qualified to testify competently regarding the matters he intended to address; the methodology by which the expert reached his conclusions is sufficiently reliable, and the testimony assists the trier of fact." Frazier, 387 F.3d at 1260 (quoting McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) (internal punctuation omitted)); see also Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., 402 F.3d 1092, 1107 (11th Cir. 2005) (explaining that it is the proponent's burden to lay the foundation for admission of expert testimony).

The Eleventh Circuit has cautioned that "[m]any factors will bear on the inquiry, and [there is no] definitive checklist or test." Maiz, 253 F.3d at 665 (quoting Daubert, 509 U.S. at 593). While Daubert and its progeny provide flexible guidelines for the admissibility of evidence under Rule 702, "expert

7

testimony that does not meet all or most of the <u>Daubert</u> factors may sometimes be admissible" based on the particular circumstances of a specific case.  <u>United States v. Brown</u>, 415 F.3d 1257, 1268 (11th Cir. 2005); <u>see also</u> <u>United States v. Scott</u>, 403 F. App'x 392, 397 (11th Cir. 2010) (quoting <u>Kumho Tire Co.</u>, 526 U.S. at 152) (finding that the <u>Daubert</u> factors are only general guidelines and the trial judge has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable"); <u>Quiet Tech. D C-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1341 (11th Cir. 2003) (finding that the court should consider the <u>Daubert</u> factors "to the extent possible" but that "these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis").

### 1.    Qualification

There are various ways for determining whether an expert is qualified. "While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." <u>Frazier</u>, 387 F.3d at 1260-61.  Federal Rule of Evidence 702 provides that an expert's qualification may be based on "knowledge, skill, experience, training, or education." <u>See also</u> FED. R. EVID. 702 advisory committee's note (2000 amends.) ("Nothing in this

amendment is intended to suggest that experience alone . . . may not provide a

sufficient foundation for expert testimony."). Thus, "there is no mechanical

checklist for measuring whether an expert is qualified to offer opinion evidence in

a particular field." Santos v. Posadas de P.R. Assocs., 452 F.3d 59, 63 (1st Cir.

2006). Rule 702 requires an expert witness relying solely on experience to

"explain *how* that experience leads to the conclusion reached, why that experience

is a sufficient basis for the opinion, and how that experience is reliably applied to

the facts." Frazier, 387 F.3d at 1261 (citing FED. R. EVID. 702 advisory

committee's note (2000 amends.)).

### 2.    Reliability

The district court has "substantial discretion in deciding how to test an

expert's reliability and whether the expert's relevant testimony is reliable." United

States v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999) (citation and quotation

omitted). "[T]he proponent of the testimony does not have the burden of proving

that it is scientifically correct, but that by a preponderance of the evidence, it is

reliable." Allison, 184 F.3d at 1312 (citation omitted). Thus, the inquiry into

reliability must focus on "principles and methodology" and not the expert

witness's conclusions. Daubert, 509 U.S. at 595. While an expert's qualifications

may bear on the reliability of his proffered testimony, qualifications alone do not

guarantee reliability.  <u>Frazier</u>, 387 F.3d at 1261 (citing <u>Quiet Tech. D C-8</u>, 326

F.3d at 1341-42).  Because "one may be considered an expert but still offer

unreliable testimony," it remains a basic foundation for admissibility under Rule

702 and <u>Daubert</u> that proposed expert testimony must be based on "good grounds."

<u>Id.</u>

Daubert delineates a list of "general observations" for determining whether

expert testimony is sufficiently reliable to be admitted under Rule 702, including:

(1) whether the theory in question can be and has been empirically tested;

(2) whether the theory in question has been subjected to peer review and

publication; (3) the theory's known or potential error rate and whether that rate is

acceptable; and (4) whether the theory is generally accepted in the scientific

community.  <u>Daubert</u>, 509 U.S. at 593-594.  The advisory committee notes for

Rule 702 identify additional factors that courts consider in assessing the reliability

of expert testimony:

> (1) Whether experts are proposing to testify about matters growing
> naturally and directly out of research they have conducted independent
> of the litigation, or whether they have developed their opinions
> expressly for purposes of testifying.
> (2) Whether the expert has unjustifiably extrapolated from an accepted
> premise to an unfounded conclusion.
> (3) Whether the expert has adequately accounted for obvious
> alternative explanations.

(4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

FED. R. EVID. 702 advisory committee's note (2000 amends.) (internal quotation marks and citations omitted).

### 3.    Helpfulness

Finally, the court must assess whether the expert testimony is helpful to the trier of fact.  This factor turns on whether the expert testimony "concerns matters that are beyond the understanding of the average lay person."  Frazier, 387 F.3d at 1262.  "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  Id. at 1262-63.

### B.    Summary Judgment[1]

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

---

[1] At the outset, as this case is before the Court on GM's Motion for Summary Judgment, the Court notes that it views the evidence presented by the parties in the light most favorable to Fox.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Sunbeam TV Corp. v. Nielsen Media Research, Inc., 711 F.3d 1264, 1270 (11th Cir. 2013).  In addition, the Court has excluded assertions of facts by the parties that are immaterial or presented as arguments or legal conclusions or any fact not supported by citation to evidence (including page

R. CIV. P. 56(a).  A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court in considering whether to grant summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).

If a movant meets its burden, the party opposing summary judgment must present evidence that shows there is a genuine issue of material fact or that the movant is not entitled to judgment as a matter of law.  Celotex, 477 U.S. at 324.  In determining whether a genuine issue of material fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in

---

or paragraph number).  LR 56.1B(1), NDGa.  Further, the Court accepts as admitted those facts in the parties' statements of material facts that have not been specifically controverted with citation to the relevant portions of the record.  LR 56.1B(2), NDGa.  See Defs.' SUMF; Pl.'s Resp. to Defs.' SUMF and Add'l SDMF.

favor of that opposing party.  Anderson, 477 U.S. at 255; see also Herzog v. Castle

Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  A fact is "material" only if it

can affect the outcome of the lawsuit under the governing legal principles.

Anderson, 477 U.S. at 248.  A factual dispute is "genuine" if the evidence would

permit a reasonable jury to return a verdict for the nonmoving party.  Id.

"If the record presents factual issues, the court must not decide them; it must

deny the motion and proceed to trial."  Herzog, 193 F.3d at 1246.  But, "[w]here

the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party," summary judgment for the moving party is proper.

Matsushita, 475 U.S. at 587.

## III.  ANALYSIS

### A.    GM's Motions to Exclude Expert Testimony

#### 1.    G. Bryant Buchner

GM's first Daubert motion contends that the testimony of Fox's accident

reconstructionist expert G. Bryant Buchner ("Buchner") should be excluded at trial

under Federal Rule of Evidence 702 because he overlooked critical physical

evidence at the scene of the crash, thereby rendering his conclusions flawed.  GM's

Br. in Supp. of its Mot. to Exclude the Expert Test. of G. Bryant Buchner [Doc.

105-1] at 1.  According to GM, Buchner missed "an entire deposit of roof glass

13

when he inspected the scene" and the glass "is critical to the case because it helps establish where in the roll sequence the glass broke and the roof module became detached from the vehicle." Id. at 4.  GM asserts this renders his testimony "unreliable because it is based on insufficient facts and data." Id.  Fox responds by arguing that Buchner did not ignore the glass shards, but rather, "concluded that glass should not be used to reconstruct Ms. Fox's rollover wreck because the entire roof, including the roof glass, completely separated from the vehicle."  Pl.'s Resp. in Opp'n to GM's Mot. to Exclude Expert Test. of G. Bryant Buchner [Doc. 144] at 4.  Therefore, Fox asserts that "the location of the roof glass fragments cannot be a reliable indicator of the path or motion of the SRX later in the roll sequence." Id.

The Court finds that Buchner's opinion testimony meets the standards of Federal Rule of Evidence 702.  Buchner's report and affidavit show that he did consider the existence of the glass fragments, but did not base his report on the location of the fragments because in his opinion they did not reliably represent the path or motion of the vehicle.  Aff. of G. Bryant Buchner, P.E. [Doc. 144-2] ¶ 12. Therefore, Buchner "adequately accounted for obvious alternative explanations." FED. R. EVID. 702 advisory committee's note (2000 amends.).  Further, whether these glass fragments should have been relied upon for the accident reconstruction is a matter that goes to the weight of his opinion, not admissibility.  Henley v.

Chrysler Corp., No. 1:02-CV-290-TWT, 2004 WL 5492700, at *5 (N.D. Ga. Feb. 27, 2004) (citing Quiet Tech. D C-8, 326 F.3d at 1345) ("[I]ssues with the amount or type of evidence upon which [the expert] bases his opinion[] are matters for cross examination—not a motion to exclude under Daubert."). "Any concerns Defendant[] may have regarding what information [the expert] did or did not utilize in forming his opinions and how [the expert]'s opinion may otherwise be impacted by his after-the-fact examination of the evidence may be sufficiently addressed through cross-examination." Nixon v. Zurich Am. Ins. Co., No. 7:15-CV-34 (HL), 2016 WL 1572949, at *3 (M.D. Ga. Apr. 19, 2016). GM's Motion to Exclude the Expert Test. of G. Bryant Buchner is **DENIED**.

### 2. Cathy Gragg-Smith

Cathy Gragg-Smith ("Gragg-Smith") is Fox's expert regarding the cost of Fox's estimated future care. GM contends her testimony is inadmissible as unreliable because the costs of each item that she uses in the line items of her report are based on "the amount that would be billed for each item by the healthcare provider, not the actual amount that would be paid for each item or the market rates paid by all market payers." GM's Br. in Supp. of its Mot. to Exclude the Expert Test. of Cathy Gragg-Smith [Doc. 106-1] at 4. According to GM, "the costs included in the plan are not the product of an application of reliable

15

principles and methods to the facts of this case because the billing amounts differ from actual cost." Id.  GM does not provide any specific examples of the pricing being incorrect or unreliable.

GM's motion rests on the fallacy that there is a readily ascertainable "market rate" for specific medical costs that Gragg-Smith could easily have used.  That simply is not the case.  Entire industries have arisen that deal solely with estimating pricing for specific medical procedures, devices, and services which vary wildly depending upon a number of factors.  See How to Research Health Care Prices, WALL STREET JOURNAL, available at: http://guides.wsj.com/health/ health-costs/how-to-research-health-care-prices/ (last visited January 25, 2019). Gragg-Smith's use of Shepherd Center's prices, the facility where Fox actually received care, is not an "unreliable" measure; it is simply one measure.  GM is free to present its own expert opinion on the appropriate market rates for these services. GM's Motion to Exclude the Expert Testimony of Cathy Gragg-Smith is **DENIED**.

### 3.    Brian Herbst

Brian Herbst ("Herbst") is Fox's expert on "the roof structure of the vehicle; see what GM did in the development process; decide if it's a robust design; and research also what alternative designs would be or were available at the time."

16

May 17, 2016, Dep. of Brian Herbst [Doc. 107-5] at 26.  GM requests that his

testimony be excluded in the following respects:

(1)     The strengthening of a roof on an exemplar vehicle and the subsequent drop testing should be excluded because it did not use reliable methods and will not be helpful to the jury to determining whether a strengthened roof would help reduce injury;

(2)     Any opinions about the NHTSA [National Highway Traffic Safety Administration]'s rule change or IIHSS [Insurance Institute of Highway Safety Standards] ratings system, both adopted more than five years after the 2004 Cadillac SRX was built, should be excluded because they rely upon statistical studies, and Mr. Herbst is not a biomechanic or statistician; and

(3)     Mr. Herbst should not be allowed to offer any opinions regarding injury causation, because he is not a biomechanic and admitted he is not qualified to offer any opinions in that area.[2]

GM's Br. in Supp. of its Mot. to Exclude the Expert Test. of Brian Herbst ("Mot.

to Exclude Herbst") [Doc. 107-1] at 10-11.  The Court will examine each

contention in turn.

### a.     The Exemplar Vehicle

As part of rendering his opinion in this case, Herbst purchased a Cadillac

SRX and made his own modifications to the roof, adding material and

---

[2] GM drops this last request in its Reply [Doc. 187], but the Court addresses it here.

reinforcements to strengthen it.  Mot. to Exclude Herbst at 4-5.  He then turned the modified vehicle upside-down and dropped it on its roof.  Id. at 5.  He did not use a test dummy.  Id.  GM contends that this test proves only that the roof can be strengthened, a fact which GM concedes.  GM states that the issue in this case is whether a stronger roof would prevent injury, and Herbst's testing, which failed to include a test dummy, cannot be helpful to the jury in making this determination. Id.  GM argues that Herbst's testing is irrelevant and unreliable.

With respect to relevance, GM argues that Herbst's testing is not helpful to the jury because it has conceded the point that the roof could have been made stronger, and Herbst's test shows only that.[3]  Id. at 5.  But Herbst's report becomes irrelevant only if GM's theory of the case—that a stronger roof would not have prevented Fox's injury—proves correct.  Fox has another expert who will testify that a stronger roof actually would have prevented Fox's injury.  If the jury finds that a stronger roof would have prevented Fox's injury, then Herbst's testimony regarding the availability of alternative designs and their costs is relevant and

---

[3] Fox does not directly respond to this issue, but references similar arguments made in another roof-crush case, Trejo v. Ford, No. 16-C-4179-52 (State Ct. Gwinnett Cty., Ga.).  Pl.'s Resp. to GM's Daubert Mot. to Exclude Brian Herbst [Doc. 149] at 6.

helpful to the jury's determination of whether the Cadillac SRX roof was a design defect, and if so, whether GM was reckless or wanton in the design.

Regarding reliability, GM argues that Herbst's techniques are unreliable because the methods used are not suitable for mass production and the method he used was rejected by the Society of Automotive Engineers ("SAE") in 1990. Mot. to Exclude Herbst at 9-10. GM does not provide detail on why Herbst's alternative design is not feasible for mass production. Herbst states that his methods "employ basic engineering principles which are standard industry practices[,]" "were technologically and economically feasible" at the time the SRX was manufactured and that the "strengthening methods have been used historically by GM in past model vehicles, are present elsewhere in the subject Cadillac SRX's 2004-2009 platform structure and/or are used in the subsequent 2010+ Cadillac SRX structure." Aff. of Brian Herbst, P.E., in Resp. to GM's Mot. to Exclude the Expert Test. of Brian Herbst ("Herbst Aff.") [Doc. 107-7] ¶¶ 31-33. Herbst further states that GM's subsequent design of the 2010 Cadillac SRX and research by the federal government shows that the alternative designs are suitable for mass production and affordable. Id. ¶¶ 34-35. Herbst's affidavit, dated July 28, 2016, was prepared for the previous iteration of this case in the State Court of Cobb County, Civil Action File No. 14A-3468-4 ("Fox I"). GM itself filed Herbst's

affidavit in connection with its present motion and, therefore, had the benefits of previewing Herbst's position on its arguments prior to filing its motion to exclude. Despite this, GM does not address Herbst's points in either its motion or reply. GM may challenge Herbst's contentions on cross-examination.

With respect to the objection that "drop tests" such as the one Herbst performed have been rejected by SAE, Herbst criticizes the decision of the SAE to cancel SAE J996, the inverted vehicle drop test procedure, as "politically motivated." Herbst Aff. ¶ 44. He provides a detailed, point-by-point response to the reasons given by SAE for cancelling the test. Id. ¶ 45. GM does not respond to Herbst's detailed analysis of SAE's criticisms in either its motion or reply. Again, GM had the benefit of previewing Herbst's criticisms of SAE's decision prior to filing its motion and could have responded point-by-point. Instead GM relies solely on the decision from 1990 without any critical analysis or argument. In particular, Herbst notes that SAE J996 called for dropping the vehicle onto a compacted gravel surface, but Herbst "drops vehicles onto a platform equipped with several load cells in order to measure the forces experienced . . . ." Id. ¶ 44(b). This resolves the SAE criticism that "force measurement is not possible." Id. The Court holds that GM is free to present the conclusions of SAE to the jury

20

regarding Herbst's testimony, but the conclusions of SAE, without more, do not render Herbst's methods unreliable.[4]

### b.  Opinions Based on Statistics

Because Herbst has admitted he is not a statistician, GM contends that he cannot testify regarding the changes in the federal safety standards or Insurance Institute of Highway Safety Standards since "the government's decision to change the standard was based on statistical studies about which Mr. Herbst lacks qualifications to testify."  Mot. to Exclude Herbst at 8.  Fox makes similar arguments against GM's experts in its filings.  See Pl.'s Mot. to Exclude GM's "Experts" Proposed Test. on Statistics ("Pl.'s Mot. on Statistics") [Doc. 129].  The Court finds this argument to be without merit.  Herbst has multiple degrees in mechanical engineering and has worked for twenty years in the areas of accident reconstruction, automotive safety research, vehicle crashworthy analysis, roof structure and restraining system design, analysis, and testing.  See Herbst Aff. ¶¶ 3-4.  Herbst "routinely review[s] statistics performed by regulatory agencies, industry institutes, industry recognized experts, vehicle and component

---

[4] GM does not contend that the drop tests should be excluded under Burchfield v. CSX Transp., Inc., 636 F.3d 1330 (11th Cir. 2011).

21

manufacturers and academics for evaluation of the case at hand." Id. ¶ 27. "Using statistical tools to analyze a dataset is a common practice in many fields; one does not need a degree in statistics to be able to understand and apply basic statistical concepts." Bacho v. Rough Country, LLC, No. 3:14-CV-40-TCB, 2016 WL 4607880, at *4 (N.D. Ga. Mar. 17, 2016), recons. denied, No. 3:14-CV-40-TCB, 2016 WL 4607902 (N.D. Ga. June 1, 2016). The Court rejects this contention.

### c.      Opinions on Injuries

Although Herbst admits he is not a biomechanic, and therefore not qualified to render opinions on the cause of injuries, GM argues that his report nevertheless discusses injuries. Puzzlingly, GM has not provided Herbst's actual report for the Court to examine,[5] but rather points to an affidavit Herbst filed in Fox I. Mot. to Exclude Herbst at 6; Herbst Aff. GM objects that Herbst uses the phrase "occupant survival space" in the affidavit, as that "implies the conclusion that Mr. Herbst is not qualified to make, namely, that increasing roof strength will reduce occupant injury." Mot. to Exclude Herbst at 6-7. The Court does not agree. Herbst's affidavit states that "[s]trengthening the roof by eliminating the design

---

[5] Neither GM nor Fox provide a full copy of Herbst's expert report. Docket entry 152-17 contains several pages of the report.

weaknesses of the Cadillac SRX will dramatically reduce roof crush and maintain the appropriate occupant survival space as delineated by biomechanist Dr. Joseph Burton." Herbst Aff. ¶ 18. Herbst is not rendering his own opinion on injuries; rather, he is referring directly to the opinion of another expert, which he is permitted to do. Hendrix v. Evenflo Co., 255 F.R.D. 568, 607 n.75 (N.D. Fla. 2009) ("An expert may properly rely on the opinion of another expert."), aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183 (11th Cir. 2010).

GM also objects that Herbst discusses dummies and injury measurements in paragraph 22 of his affidavit when he did not utilize test dummies in his own testing of the Cadillac SRX. Mot. to Exclude Herbst at 7. GM only cites to this paragraph of the affidavit, making no reference to Herbst's actual reports. The paragraph is a quote from Herbst's deposition where he outlines his role versus the role of Dr. Joe Burton,[6] the biomechanist. Herbst Aff. ¶ 22. Herbst states that he is qualified to discuss test dummies in inverted drop testing, but not actual physical injuries. Id. It is not exactly clear what GM is objecting to, since Herbst merely discusses hypothetical areas of testimony. But to the extent that GM contends

---

[6] As discussed later in this Order, Dr. Burton is no longer testifying on behalf of Fox. Mariusz Ziejewski ("Ziejewski") is being called by Fox to testify as a biomechanist.

23

Herbst is unqualified to discuss the relationship between roof crush and neck injury potential and the use of test dummies in drop tests, Herbst is an expert on those subjects and has published extensively on those topics. See Herbst Aff. ¶ 16(c). For the same reason, Herbst may of course discuss "'literature' about roof crush and injury." See Mot. to Exclude Herbst at 7.

Based on the foregoing discussion, GM's Motion to Exclude the Expert Testimony of Brian Herbst is **DENIED**.

### 4. Lila Laux

Dr. Lila Laux ("Laux") is Fox's expert in "human factors," "otherwise known as ergonomics, [which] is essentially the study of the interrelationship between human behavior or capabilities and the surrounding environment." Hernandez v. Crown Equip. Corp., 92 F. Supp. 3d 1325, 1350 n.20 (M.D. Ga. 2015) (citation omitted). "[H]uman factors experts study factors such as: events that result from product warnings; purposes for which hazardous warnings are needed; potential human reactions caused by machinery control functions; and expected behavioral responses caused by the existence or lack of devices." Id. (citation omitted, alternations accepted). GM contends that Laux should not be allowed to testify to her opinion that Fox would not have purchased the vehicle had GM provided an accurate warning, because this opinion is based only upon

"speculation and [Laux's] own bias."  GM's Br. in Supp. of its Mot. to Exclude the Expert Test. of Lila Laux ("Mot. to Exclude Laux") [Doc. 108-1] at 12.  GM further requests that Laux "not be allowed to offer any opinion or testimony about whether the Cadillac SRX has an 'propensity' to roll over . . . ." Id.

Laux's Report confirms that she is not offering a design opinion about the Cadillac SRX.  Her opinions related to this issue are: "It was foreseeable to GM that the SRX could roll over in many anticipated driving situations" and "GM knew that the SRX was more likely to roll over than a sedan."  Laux Report [Doc. 148-1] ¶¶ 6-7.  These opinions are based on admissions and testimony by GM engineers, as well as a rollover that occurred on GM's proving grounds in December 2004.  Laux Report at 5.  While these facts are hotly disputed by GM, an expert need not prove the factual basis of his or her testimony.  The facts relied upon by an expert "must find some support in the record and must be supported by more than subjective belief and unsupported speculation, but mere weaknesses in the factual basis of an expert witness' opinion bear on the weight of the evidence rather than on its admissibility." In re Delta/Airtran Baggage Fee Antitrust Litig., 245 F. Supp. 3d 1343, 1361 (N.D. Ga. 2017) (alterations accepted, citations omitted), aff'd sub nom. Siegel v. Delta Air Lines, Inc., 714 F. App'x 986 (11th Cir. 2018).

25

GM's second objection to Laux's testimony—that Laux's opinion that Fox would not have purchased the vehicle had Fox been adequately warned is based only upon "speculation and her own bias"—ignores Laux's specialized training and experience in human factors.  As a human factors psychologist, Laux studies "how people detect, process, understand, and evaluate complex information, how they judge the likelihood that they are exposing themselves to a hazard, and how their beliefs about a product or system shape their behavior related to the products they purchase and use."  Laux Report at 3.  She has an expertise in "how people come to be aware of and understand that a hazard is present, and how people behave when they recognize the presence of a hazard."  Id.  Laux holds a PhD in the field, has published extensively in the field, and even worked previously for GM to develop a methodology for the creation of warnings.  Aff. of Lila Laux dated July 27, 2016 [Doc. 108-7] ¶¶ 2, 5, 6.  Her opinions are based on this education and experience.  Courts in this district have admitted testimony from human factors experts to present opinions on whether product defect warnings are adequate and how a reasonable person behaves when adequately warned.  Ahuja v. Cumberland Mall, LLC, 821 F. Supp. 2d 1317, 1323 (N.D. Ga. 2011); Watkins v. Vestil Mfg. Corp., No. 2:07-CV-0152-RWS, 2010 WL 883754, at *2 (N.D. Ga. Mar. 5, 2010); In re Stand 'N Seal, Prod. Liab. Litig., 636 F. Supp. 2d 1333, 1337

(N.D. Ga. 2009); Mann v. Taser Int'l, Inc., No. 4:05-CV-0273-HLM, 2008 WL 11424000, at *7-8 (N.D. Ga. Feb. 4, 2008).  GM may question Laux's analysis on cross-examination.

Finally, GM contends that Laux's methodology was flawed because she did not interview Fox to determine whether Fox was a "reasonable human being" who would react to the warnings as expected.  Mot. to Exclude Laux at 10-12; Reply in Supp. of GM's Mot. to Exclude the Expert Test. Of Lila Laux at 4-5.  GM presents no evidence that this is a necessary methodological requirement in the human factors specialty.  Rather, Laux states in her report that relying solely on deposition testimony of the injured plaintiffs is an accepted methodology in her field.  Laux Report at 4.  GM's Motion to Exclude the Expert Testimony of Lila Laux is **DENIED**.

### 5. Allan Kam

GM contends that Fox's expert Allan Kam ("Kam") should be excluded from testifying entirely.  GM's Br. in Supp. of its Mot. to Exclude the Test. of Allan Kam ("Mot. to Exclude Kam") [Doc. 109-1] at 9.  Kam is a retired attorney and former NHTSA employee.  Fox offers him as an "expert regarding [NHTSA] and applicable federal regulations relating to the subject 2004 Cadillac SRX's

occupant protection system for rollover."  Id. at 1.  GM has several objections to his testimony.

GM first objects that Kam would provide conclusions regarding applicable law and, therefore, invade the province of the Court.  Mot. to Exclude Kam at 2-4. "An expert may opine on an issue of fact within the jury's province, [but] he may not give testimony stating ultimate legal conclusions based on those facts." Plantation Pipeline Co. v. Cont'l Cas. Co., No. 1:03-CV-2811-WBH, 2008 WL 4737163, at *7 (N.D. Ga. July 31, 2008) (citation omitted, alteration accepted), clarified on denial of recons., No. 1:03-CV-2811-WBH, 2008 WL 11336246 (N.D. Ga. Nov. 18, 2008).  The Court has reviewed Kam's Report, and concludes that it does not opine on the ultimate legal conclusions as to whether GM breached a duty to warn, or recklessly and wantonly designed a vehicle with a defect.  See Kam Report [Doc. 147-6].  Rather, Kam explains the factual background related to the federal safety standards and states that in his opinion meeting those standards does not mean the vehicle is without defect.   Given Kam's background and expertise, this is permissible.  Tiller v. Ford Motor Co., No. 3:03-CV-489-J-32HTS, 2006 WL 166530, at *9 (M.D. Fla. Jan. 21, 2006) ("Mr. Kam is not directly testifying, nor is he qualified, on the ultimate issue whether the 1995 Town Car is defective. The Court further finds that Mr. Kam's testimony would serve as proper rebuttal

28

expert testimony if defendant's experts testify that compliance with FMVSS [Federal Motion Vehicle Safety Standard] 216 *ipso facto* renders the Town Car roof defect free."); <u>Evans v. Toyota Motor Corp.</u>, No. V-03-09, 2005 WL 3454456, at *6 (S.D. Tex. Aug. 9, 2005) ("[Mr. Kam] will also express his opinion that, generally, the fact that an automobile meets the requirements of the FMVSS does not necessarily mean that the subject vehicle is without defect.  It will be up to the jury to determine whether such was the case with the subject Land Cruiser."); <u>Garcia v. Kelly-Springfield Tire Co.</u>, No. 8:99-CV-1611-T-17TGW, 2004 WL 5488225, at *2 (M.D. Fla. Mar. 12, 2004) ("The Court notes Mr. Kam is not testifying on an issue of law, but on an issue of fact.").  GM is free to challenge the factual background and Kam's opinions through cross-examination or presentation of its own evidence.

GM also objects that Kam's testimony would waste time, confuse the jury, and unfairly prejudice GM.  Mot. to Exclude Kam at 6-8.  The Court disagrees and finds the proffered testimony will be useful to the jury in determining the weight to accord GM's defense that the Cadillac SRX complied with federal safety standards.  Given GM's reliance on its alleged compliance with federal safety standards (<u>see</u> discussion of summary judgment motion, below), the testimony will

not be unfairly prejudicial to GM.  Therefore, Fox is entitled to present to the jury

expert testimony on the meaning of that compliance.

Finally, GM objects that federal regulations bar his testimony.  Mot. to

Exclude Kam at 8-9.  Fox responds that Kam's testimony falls within permissible

guidelines as he is not testifying about a particular matter in which he personally

participated.  Pl.'s Resp. in Opp'n to GM's Mot. to Exclude Expert Test. of Allan

Kam [Doc. 147] at 15 (citing 49 C.F.R. § 9.5).  In 2003, NHTSA confirmed that

Kam is authorized to testify about the general nature of FMVSS as minimum

standards, including FMVSS 216 and the rollover resistance standard.  Id. at 16

(citing Ex. 10, Letter from Andrew DiMarsico, NHTSA Agency Counsel, to John

Gomez, Esq. (Jun 26, 2003) [Doc. 147-10]).  The Court agrees that Kam is not

barred by federal regulations from testifying generally.  GM's Motion to Exclude

the Expert Testimony of Allan Kam is **DENIED**.

### 6.    Mariusz Ziejewski

Ziejewski is Fox's biomechanic expert.  GM contends that Ziejewski should

be excluded from testifying altogether because "he has not performed the case-

specific testing necessary to support his opinions."  GM's Br. in Supp. of its Mot.

to Exclude the Expert Test. of Mariusz Ziejewski ("Mot. to Exclude Ziejewski")

[Doc. 110-1] at 1.  Fox explains that Ziejewski did not perform his own inversion

30

test because he relied upon the inversion test performed by GM's expert, Michael Carhart ("Carhart"), which provided him with the information necessary to form his opinions.  Pl.'s Resp. to GM's Mot. to Exclude the Expert Test. of Mariusz Ziejewski ("Resp. to Mot. to Exclude Ziejewski") [Doc. 146] at 5-6 (citing Mar. 6, 2018, Dep. of Mariusz Ziejewski ("Ziejewski Dep.") [Doc. 146-5] at 44, 170).

The Court finds that Ziejewski's testimony meets the standards of Federal Rule of Evidence 702 and should not be excluded.  Ziejewski considered but rejected the idea of performing his own testing, and instead chose to rely upon GM's expert's testing.[7]  That reliance, combined with other research and analysis performed by Ziejewski, shows that Ziejewski's methodology is reliable.  Whether he should have performed his own testing goes to the weight of the opinion, not admissibility.  See Henley, 2004 WL 5492700, at *5.

Alternatively, GM contends that if the Court permits Ziejewski to testify, it should prohibit Ziejewski from referencing testing that he performed for the Air Force.  Mot. to Exclude Ziejewski at 2.  The Air Force studies involved the effect of G-forces on the human body during vertical acceleration.  Ziejewski performed 900 tests with male and female pilots and determined that similar accelerations to

---

[7] GM does not respond to this point.

31

those experienced by Fox (of around 10 g) resulted in no injuries to the test subjects.  Ziejewski Report [Doc. 146-2] at 12.  Ziejewski concludes that "the level of acceleration measured at the vehicle's CG [center of gravity] during a rollover event is within human tolerances."  Id.  GM contends that these tests are irrelevant because they do not contain a constraint or "trapping mechanism" like Fox experienced.  Mot. to Exclude Ziejewski at 8.  Fox responds that the Air Force studies are relevant because they prove that "the forces occupants are subjected to in a rollover are easily survivable."  Resp. to Mot. to Exclude Ziejewski at 7.

The problem with the reliance on the Air Force studies is that neither party contends that Fox's injuries are a result of G-forces presented by the crash.  Rather, the parties agree that Fox's injuries were caused by her head coming into contact with the roof of the vehicle, either through roof intrusion into the passenger space as Ziejewski contends (see Ziejewski Report at 27) or through Fox slipping her shoulder belt during the first roll and the mass of her lower body moving towards the location where her head was constrained as GM's expert Carhart contends (see Carhart Report [Doc. 153-5] at 45[8]).  Because Fox has failed to show how the Air Force studies are relevant to any issue the jury will be asked to decide, Ziejewski

---

[8] Page references to the Carhart Report refer to the PDF pagination as filed.

will be prohibited from presenting the findings of those studies as it may confuse the jury. However, Ziejewski may refer to the study in the context of establishing his background and qualifications. Accordingly, GM's Motion to Exclude the Expert Testimony of Mariusz Ziejewski is **GRANTED IN PART and DENIED IN PART**.

### 7.    Jonathan Eisenstat, M.D.

Dr. Jonathan Eisenstat ("Eisenstat") is offered as Fox's expert to render an opinion on the cause of her injuries. Dep. of Jonathan Eisenstat ("Eisenstat Dep.") [Doc. 118] at 9. GM objects to Eisenstat offering two biomechanical opinions at his deposition:

> So all I can tell you is that her injuries were sustained as the roof and the rest of the vehicle were coming together. They were not sustained prior to the roof crushing.
> . . .
> Well, just from review—reviewing many cases and seeing this, when the vehicle is upside down she's upside down, and that's when the roof is coming in.

GM's Br. in Supp. of its Mot. to Exclude Certain Expert Test. of Jonathan Eisenstat, MD ("Mot. to Exclude Eisenstat") [Doc. 111-1] at 1-2 (citing Eisenstat Dep. at 12-13). GM's position is that because he is not a biomechanist, Eisenstat cannot testify as to whether Fox's injuries were sustained prior to the roof crushing in (as Fox contends) or by her body being in contact with the roof when it

33

impacted the ground (as GM contends). Mot. to Exclude Eisenstat at 5. However, as Eisenstat explains in his affidavit, he is qualified to render the medical opinion that Fox's injuries were more likely caused by the roof crushing down, rather than an impact on her head, based on an examination of the injury itself:

> Based on my education, background, training, and extensive experience as a forensic pathologist, I know the type of injuries that are caused from diving accidents. The classic "diving" injury would be diving into a pool and hitting one's head. There is typically and injury to the top of the head, in addition to specific types of cervical injuries including certain types of fractures and subluxation, a significant structural displacement/misalignment of the spinal column. There was no evidence in the medical records that Ms. Fox sustained injuries consistent with injuries produced in diving accidents.
> . . .
> [Rather,] I determined that it was more probable than not that the only way Ms. Fox's thoracic spine could be loaded and compressed to failure in this specific accident was from compression of her body by the roof.

Aug. 30, 2018, Aff. of Jonathan Eisenstat, MD [Doc. 145-2] ¶¶ 16-17. The Court does not agree with GM that these opinions are biomechanical in nature. Rather, they are based on Eisenstat's medical examination of the injuries sustained by Fox and the pattern of her fractures. See Showan v. Pressdee, No. 1:16-CV-468-ODE, 2017 WL 8781045, at *6 (N.D. Ga. July 13, 2017), mot. to certify appeal denied, No. 1:16-CV-468-ODE, 2017 WL 9439096 (N.D. Ga. Aug. 9, 2017) ("Although Dr. Oskouei concedes that he is by no means an expert in accident reconstruction or biomechanics, as a physician specializing in the spine, he testified that he has

seen numerous injuries resulting from blows, force, and various other traumas. This experiential background makes him competent to testify, . . . that based upon his knowledge of the April 2015 accident, the forces applied could have caused the injuries to Plaintiff's spine."). GM's Motion to Exclude the Expert Testimony of Jonathan Eisenstat is **DENIED.**

### 8. Gustavo Pradilla, M.D.

Dr. Gustavo Pradilla ("Pradilla"), Fox's treating physician, is offered by Fox to give expert testimony regarding Fox's injuries. GM objects to his testimony on the same grounds as Eisenstat: that Pradilla reaches biomechanical opinions regarding Fox's injuries when he states that Fox did not receive her cervical spinal injuries because she hit the crown of her head on the roof in a rollover wreck. GM's Br. in Supp. of its Mot. to Exclude Certain Expert Test. of Gustavo Pradilla, MD [Doc. 112-1] at 2.

For the same reasons stated above, the Court finds that Pradilla's opinions are medical, not biomechanical, in nature. GM's Motion to Exclude the Expert Testimony of Gustavo Pradilla, M.D. is **DENIED.**

35

### B.    Fox's Motions to Exclude Expert Testimony

### 1.    Motion to Exclude GM Expert Witnesses

Fox moves to exclude a variety of GM witnesses as experts for failure to comply with discovery rules.  Fox's Mot. to Exclude GM Expert Witnesses ("Pl.'s Mot. to Exclude") [Doc. 125].  Per the Court's Scheduling Order, discovery closed on June 30, 2018.  Scheduling Order [Doc. 68].  Fox contends that GM's disclosures on June 20, 2018 and June 29, 2018 are barred by the Federal Rules of Civil Procedure and Local Rules of the Court.  The Court will examine each contention in turn.

### a.    Marilyn Pacheco and Huizhen Lu

GM clarifies that, despite its June 20, 2018, email describing the need to supplement Marilyn Pacheco ("Pacheco") and Huizhen Lu ("Lu")'s expert reports, Lu and Pacheco are not being offered as experts.  GM's Br. in Opp'n to Pl.'s Mot. to Exclude GM Expert Witnesses ("Br. in Opp'n to Pl.'s Mot. to Exclude") [Doc. 153] at 2-4.  Accordingly, Fox's motion to exclude expert testimony by Lu and Pacheco is **DENIED AS MOOT**.

### b.    Jeff English

Fox contends that the Court should exclude the entirety of expert testimony by Jeff English ("English") as he was not identified at all until June 20, 2018, was

36

only disclosed as an expert on June 29, 2018, and has not provided an expert report as required by Federal Rule of Civil Procedure 26(a)(2).  Pl.'s Mot. to Exclude at 16.  GM contends that English's report[9] was provided on June 28, 2018.   Br. in Opp'n to Pl.'s Mot. to Exclude at 23.  GM blames the late disclosure on "the inability to discovery [sic] Dr. Pradilla's opinions before Plaintiff's intended 'trial' deposition of Dr. Pradilla."  Id.  GM contends that "the timing of Dr. English's report . . . is harmless and substantially justified" because the opinion is narrow, no trial date has been set, and Fox was notified on June 20, 2018, that the report was forthcoming.  Id. at 24.

Local Rule 26.2C governs the timing of expert disclosures and provides:

Any party who desires to use the testimony of an expert witness shall designate the expert *sufficiently early in the discovery period* to permit the opposing party the opportunity to depose the expert and, if desired, to name its own expert witness *sufficiently in advance of the close of discovery* so that a similar discovery deposition of the second expert might also be conducted *prior to the close of discovery*.

Any party who does not comply with the provisions of the foregoing paragraph shall not be permitted to offer the testimony of the party's expert, unless expressly authorized by court order based upon a showing that the failure to comply was justified.

---

[9] Fox strongly disagrees that this document, labelled a "medical narrative," is an expert report.  See Reply in Supp. of Mot. to Exclude GM Expert Witnesses ("Reply in Supp. of Mot. to Exclude") [Doc. 189] at 4.  As the Court finds that the expert is excluded for other reasons, the Court does not reach this issue.

LR 26.2C, NDGa. (emphasis added).  The Court finds that the late disclosure of

English was not "justified."

The only "justification" given by GM is that it was unable to discover the

opinions of Dr. Pradilla, Fox's treating physician, in a timely fashion.  Br. in Opp'n

to Pl.'s Mot. to Exclude at 23.  The Court has examined GM's timeline of events in

an attempt to understand GM's position.  In December 2017, Fox notified GM that

it intended to elicit expert testimony from Pradilla.  Id. at 11.  In March 2018, the

parties had difficulty scheduling Pradilla's deposition because of his professional

conflicts.  Id.  On May 24, 2018, the parties met to depose Pradilla, but GM was

unable to complete the deposition.  Id. at 12.  It is not clear from the timeline why

GM did not pursue deposing Pradilla in a more timely fashion, given that he was

disclosed as a potential expert in December 2017.  It also appears that GM has yet

to complete deposing Pradilla, so the event it claims prompted the need for an

additional expert has not even occurred.  Furthermore, GM is offering English's

opinion in an effort to rebut Pradilla's opinion that Fox's injuries are ascending

myelopathy.  However, Pradilla offered this opinion as early as March 2017,[10] so

---

[10] Pradilla signed his medical narrative concluding that Fox suffered an ascending
myelopathy on August 18, 2016.  [Doc. 150-4].  Fox produced the medical

GM's contention that Pradilla's opinion was not known until the end of discovery is without merit.  "A party's failure to comply with Local Rule 26.2C's disclosure requirement is not justified when the party knew or should have known that an expert was necessary before the late stages of the discovery period."  Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC, No. 1:15-CV-1422-AT, 2017 WL 1806384, at *3 (N.D. Ga. Feb. 1, 2017).  As GM has failed to show that this late disclosure was justified, Fox's Motion to Exclude expert testimony by English is **GRANTED**.

### c.    Nancy Michalski

Fox also moves to exclude Nancy Michalski ("Michalski"), who was identified in GM's February 17, 2017, initial disclosures, but for whom GM never produced an expert report.  Pl.'s Mot. to Exclude at 15.  GM admits that it never provided an expert report and that its failure to do so is "embarrassing."  Br. in Opp'n to Pl.'s Mot. to Exclude at 21.  Under Federal Rule of Civil Procedure 37(c)(1), if "a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to

---

narrative on March 13, 2017.  Pl.'s Resps. to Def. GM's First Req. for Produc. of Docs. [Doc. 153-16].

supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). "The failure to provide an expert report with the required information provides an independent ground for excluding an expert's testimony." Vision Airlines, Inc. v. SST Air, LLC, No. 2:12-CV-00021-WCO, 2013 WL 6908935, at *5 (N.D. Ga. Feb. 27, 2013).

GM does not contend the failure to produce an expert report was justified but argues that the failure to disclose was harmless. First, GM suggests that Michalski's testimony may not be allowed because it may violate the collateral source rule, an argument that hardly supports its position. Br. in Opp'n to Pl.'s Mot. to Exclude at 21-22; see also Pl.'s Resp. to GM's Mot. to Exclude Life Care Planner Cathy Gragg-Smith [Doc. 143] (discussing collateral source rule); Reply in Supp. of GM's Mot. to Exclude Life Care Planner Cathy Gragg-Smith [Doc. 186] (same). Second, GM states that "the information was drawn from Plaintiff's own medical bills," implying that Fox should have anticipated the testimony. Br. in Opp'n to Pl.'s Mot. to Exclude at 22. Under the Federal Rules of Civil Procedure and Local Rules of this Court, an opposing party's failure to provide an expert report cannot be excused based upon an adversary's anticipation of such testimony. Rather, the burden is placed on the proponent of the expert to provide the report.

40

If the Court were to admit this expert's testimony, Fox "will suffer harm . . . as [she] must expend resources responding to the new opinions in the report even if the Court waives the expert disclosure deadline and allows [her] to present a report from [her] expert in response to it." See Coward v. Forestar Realty, Inc., 282 F. Supp. 3d 1317, 1330 (N.D. Ga. 2017). As GM has failed to show that this late disclosure was harmless, Fox's Motion to Exclude expert testimony from Michalski is **GRANTED**.

### d.  New Opinions of Carhart, Natarajan, and Germane and Newly Disclosed 2006 Exponent Test

On June 20, 2018, GM notified Fox that "supplemental reports will be forthcoming from Drs. [Sridhar] Natarajan and [Michael] Carhart to address the new and additional statements expressed by experts Plaintiff substituted for Dr. Burton" and that Geoffrey Germane ("Germane") might also supplement. Br. in Opp'n to Pl.'s Mot. to Exclude at 12. On June 29, 2018, the last day of the discovery period, GM produced "supplemental" reports for Sridhar Natarajan ("Natarajan"), Carhart, and Germane. Id. Fox contends that the new statements are not supplemental at all; rather, they are rebuttal reports which were due on March 1, 2018. Pl.'s Mot. to Exclude at 18-19.

41

Under Federal Rule of Civil Procedure 26(e), "[a] party also must supplement or correct its disclosure 'in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect.'"  In contrast, "a rebuttal report is limited to contradicting or rebutting evidence on the same subject matter identified by another party and is not an opportunity to advance new opinions or new evidence."  Coward, 282 F. Supp. 3d at 1331.  GM admits that Natarajan and Carhart's new statements are critiques or responses to Fox's experts.  Br. in Opp'n to Pl.'s Mot. to Exclude at 12.[11]  As such, they are rebuttal statements and untimely.  Coward, 282 F. Supp. 3d at 1331.  As the court held in Cochran v. Brinkmann Corp., No. 1:08-CV-1790-WSD, 2009 WL 4823858, at *6 (N.D. Ga. Dec. 9, 2009), aff'd sub nom., Cochran v. The Brinkmann Corp., 381 F. App'x 968 (11th Cir. 2010), cited by GM (Br. in Opp'n to Pl.'s Mot. to Exclude at 20), "[The party's] twisted attempt to use Rule 26(e) to justify their untimely disclosures is unprecedented, and unfair."[12]

---

[11] Because Dr. Burton's substitution occurred on December 22, 2017, GM's contention that its late disclosures were justified by his substitution is baseless. Pl.'s First Am. and Suppl. Initial Disclosures [Doc. 57-1] at 12.

[12] GM also states that "[i]f Dr. Carhart's response is considered untimely 'rebuttal', Dr. Ziejewski's opinion on this point must be considered the same since he was critiquing Dr. Carhart, well after Dr. Carhart had been disclosed in this case."  Br.

42

GM also disclosed an Exponent test from 2006[13] on June 30, 2018, that Carhart's new statement relies upon. GM contends it needed to make a late disclosure because of errors in Ziejewski's statement. Br. in Opp'n to Pl.'s Mot. to Exclude at 19. But Ziejewski's report was provided to GM on January 30, 2018, and he was deposed on March 6, 2018. Email from Tedra Canella to counsel for GM dated Jan. 30, 2018 [Doc. 153-27] (attaching Ziejewski's report); Ziejewski Dep. GM gives no reason why it was required to wait until the final day of discovery to disclose the new testing.

GM tries to distinguish its late disclosures from those in Cochran. GM argues that "[h]ere, there has been no new testing, no disclosure after the discovery deadline, and no revision or new opinion; rather the test simply demonstrated further support, in light of Prof. Ziejewski's criticism, for the opinion Dr. Carhart offered years ago concerning the location of Ms. Fox's head strike." Br. in Opp'n to Pl.'s Mot. to Exclude at 20. Even if GM's actions are not as egregious as were the plaintiff's actions in Cochran, GM violated the discovery rules by attempting to

---

in Opp'n to Pl.'s Mot. to Exclude at 19-20. This issue is not before the Court, as GM has not moved to exclude Ziejewski's opinion on these grounds.

[13] Fox separately moves to exclude this test in its Motion to Exclude Portions of Michael Carhart's Proposed Testimony.

43

disclose additional expert information on the last day of the discovery period, rendering Fox unable to respond. Such actions are clearly prohibited under the Local Rules of this Court and Federal Rules of Civil Procedure. GM's reliance on Kondragunta v. Ace Doran Hauling & Rigging Co., No. 1:11-CV-01094-JEC, 2013 WL 1189493 (N.D. Ga. Mar. 21, 2013), similarly is misplaced. Fox did not "[lie] in wait, hoping that [GM's] non-compliance would doom [her] ability to offer any expert testimony." Id. at *8. Rather, as counsel for GM is aware, Fox raised the issue via email with the Court immediately after it occurred. The parties exchanged many emails with the Court on the topic, and the Court ultimately ruled in a telephonic conference that the issue would be addressed "by motion before trial." See Tr. July 26, 2018 [Doc. 103] at 31.

With respect to Germane, his "supplemental" report concerns glass fragments collected at the scene of the accident that Fox notified GM of in June 2016. Br. in Opp'n to Pl.'s Mot. to Exclude at 12. On June 12, 2018, GM asked to inspect the glass. Pl.'s Mot. to Exclude at 23. GM admits that the statement reflects Germane's consideration of additional evidence. Br. in Opp'n to Pl.'s Mot. to Exclude at 12. As such, the statement is not a supplement under Federal Rule of Civil Procedure 26(e). See Cochran, 2009 WL 4823858, at *5 (holding

44

that Rule 26(e) "is not a device to allow a party's expert to engage in additional work[.]").

The Court concludes that GM's late disclosures are not harmless.  Fox "will suffer harm . . . as [she] must expend resources responding to the new opinions in the report even if the Court waives the expert disclosure deadline and allows [her] to present a report from [her] expert in response to it."  Coward, 282 F. Supp. 3d at 1330.  The Court further finds that permitting GM's late disclosures would be harmful to the judicial system, as it would reward GM for its discovery abuses.

> The purpose of expert reports and a deadline for serving them is to put an opposing party on notice of what it must contend with at trial.  [A party's] strategy of ongoing testing and report amendment defeats the purpose of the report requirement and the order of this Court, which was to end discovery and fix for the parties the evidence and opinions with which they would have to contend at trial so a trial court be fairly and efficiently conducted.  That effort would be hopelessly and unfairly frustrated if the Court allowed [the party's] tactic in this case.

Cochran, 2009 WL 4823858, at *5.  Consequently, the Court **GRANTS** Fox's motion to exclude the new opinions of Carhart, Natarajan, Germane, and the new 2006 Exponent test.

### e.    Sanctions for Carhart, Natarajan, and Germane's Late Disclosures

Fox also requests that the Court exclude any testimony from Carhart, Natarajan, and Germane as a sanction for GM's willful failure to comply with the

Court's Orders, the Federal Rules, and the Local Rules.  Pl.'s Mot. to Exclude at

22, 24.  Under Federal Rule of Civil Procedure 37(c):

> If a party fails to provide information or identify a witness as required
> by Rule 26(a) or (e), the party is not allowed to use that information or
> witness to supply evidence on a motion, at a hearing, or at a trial, unless
> the failure was substantially justified or is harmless.  In addition to or
> instead of this sanction, the court, on motion and after giving an
> opportunity to be heard:
> . . .
>  (C) may impose other appropriate sanctions, including any of the
> orders listed in Rule 37(b)(2)(A)(i)-(vi).

FED. R. CIV. P. 37(c).  GM states that "there is no reason supplemental disclosures

during the discovery period would justify a remedy as harsh as Plaintiff's request

that the experts be excluded in full, especially considering that these experts' initial

opinions have not changed and were disclosed by report and deposition literally

years ago."  Br. in Opp'n to Pl.'s Mot. to Exclude at 14-15.  While the Court

agrees with Fox that GM's actions were improper, the Court concludes that

excluding the entirety of their earlier opinions is too harsh a remedy.

Accordingly, Fox's Motion to Exclude GM Expert Witnesses is **GRANTED**

**IN PART and DENIED IN PART**.  The motion to exclude Marilyn Pacheco and

Huizhen Lu is **DENIED AS MOOT.**  The motion to exclude Jeff English and

Nancy Michalski is **GRANTED.**  The motion to exclude the new opinions of

Sridhar Natarajan, Michael Carhart, Geoffrey Germane, and the 2006 Exponent

test is **GRANTED.**  The motion to exclude the entirety of the opinions of Sridhar

Natarajan, Michael Carhart, and Geoffrey Germane is **DENIED**.

### 2.  Michael Carhart's Proposed Testimony

Fox moves to exclude 40 of the 42 tests upon which Carhart relies in his

testimony.  Pl.'s <u>Daubert</u> Mot. to Exclude Portions of Michael Carhart's Proposed

Test. ("Mot. to Exclude Carhart Tests") [Doc. 126].  The tests are the following:

1. Dolly Rollover 1998 Ford Expedition
2. Dolly Rollover 2004 Volvo XC90
3. Dolly Rollover 2001 Ford F-150
4. Dolly Rollover 2000 Lincoln Navigator
5. Dolly Rollover 2000 Ford Explorer
6. Dolly Rollover 1995 Ford Explorer
7. **Dolly Rollover Subaru Foresters**
8. Dolly Rollover Volvo XC90 Public Testing
9. Autoliv
10. **Malibu II**
11. Malibu I
12. CRIS Volvo XC90
13. CRIS Isuzu Rodeo
14. Sled Test NHTSA TRC
15. Full ATD Drop Test
16. Driver Side A-Pillar Roof Crush Tests on 2003 Lincoln Navigators and Partial ATD Drop Testing
17. Full vs Partial ATD Drop Testing Evaluation of Neck Loads
18. Retention Characteristics of Production Laminated Side Windows
19. Headform Drop Test Modified 1991 Aerostar Door
20. GM Head Impact Volvo XC90
21. Asphalt Drop Testing
22. Head Impact Research
23. Quasi-Static Load Test 2005 Buick LaCrosse
24. Quasi-Static Push Test (Windshield Glass)

25. Quasi-Static Load Test Volvo S60 (production)
26. Quasi-Static Load Test Ford Aerostar (tempered)
27. MADYMO Simulations of Side Glazing Test Protocols Evaluation of Effective Mass
28. MADYMO Simulations of Headform Impacting Pre-Fx Side Window Glazing
29. Simulated Headform and Partial ATD Impacts into Fixed and Perimeter-Bonded Windshield Glass
30. MADYMO Simulations of Headform Impacting Laminated Glazing
31. **Surrogate Belt Fit Evaluations and Inversion Demonstrations 3-3-16**
32. **Surrogate Inversion Demonstration 5-23-16**
33. **Inverted Drop Tests (reinforced) 5-26-16**
34. **Inverted Drop Tests (production) 5-27-16**
35. **Spin Demonstration, Moffatt 2003 (PH07127)**
36. Spin Demonstration, 2004 Ford Expedition
37. SIRT Sedan
38. SIRT Pickup
39. Human Tip Up Testing (Yamaguchi, SAE 2005-01-0302)
40. Field Accident 1997 Ford E350
41. FMVSS 216 test
42. 2006 Exponent test

Exhibit A, List of Carhart Tests [Doc. 126-1].[14]  The items indicated in bold are the

seven tests GM identifies for which Carhart "likely would testify."  GM's Resp. to

Pl.'s Daubert Mot. to Exclude Portions of Michael Carhart's Proposed Test. ("GM

Opp'n to Mot. to Exclude Carhart Tests") [Doc. 156] at 9.  "Dr. Carhart may also

---

[14] The numbers on this list correspond to the hard drive provided to the Court, and the Court will reference the tests by number.  Notice of Filing [Doc. 139].  Test 41 and 42 are not numbered on the hard drive but will be referenced by the Court as Test 41 and 42.

refer to some of the other tests if Plaintiff asks a question on cross-examination that requires him to reference them." Id.

Before turning to the merits of the briefs, the Court can winnow down the areas of dispute. First, Fox does not move to exclude Tests 31 and 32, Surrogate Belt Fit Evaluations and Inversion Demonstrations 3-3-16 and Surrogate Inversion Demonstration 5-23-16. Mot. to Exclude Carhart Tests at 5 n.5.[15] Thus, these tests are not excluded. Second, as discussed above, Test 42, the 2006 Exponent test, was disclosed on the last day of the discovery period and is excluded as untimely. Finally, GM's response appears to defend a small sub-set of the tests from exclusion. GM's response does not make reference to most of the individual tests by name or number, but rather discusses them by general concepts. The Court has endeavored to sort through the tests, but it does not appear that GM makes any arguments concerning the admissibility of the following tests: 1-6, 8,[16] 9, 12, 13,[17]

---

[15] Fox erroneously refers to the drop tests as Tests 31 and 32 on pp. 19-20 of its Motion to Exclude Carhart Tests, but these are the surrogate tests. The drop tests are Tests 33 and 34.

[16] Tests 1, 2, and 8 are mentioned by GM in reference to other testing (GM Opp'n to Mot. to Exclude Carhart Tests at 43), but no effort is made to counter Fox's arguments that these tests are inadmissible.

[17] GM's brief focuses entirely on the CRIS method as used in other testing, but it fails to mention the CRIS tests that Carhart has indicated he may rely upon. See

14-30, 36-40.  See Kramer v. Gwinnett Cty., 306 F. Supp. 2d 1219, 1221 (N.D. Ga. 2004) ("[A] party's failure to respond to any portion or claim in a motion indicates such portion, claim or defense is unopposed.").  Accordingly, the Court finds that these tests should be excluded.[18]  The Court will first discuss the standards applied to the admissibility of testing and then the remaining tests *seriatim*.

### a.   Admissibility of Testing

Under the precedent established in Barnes v. Gen. Motors Corp., 547 F.2d 275 (5th Cir. 1977), a district court "has wide discretion to admit evidence of experiments conducted under substantially similar conditions."  Burchfield, 636 F.3d at 1336 (quoting Barnes, 547 F.2d at 277).[19]  "The burden is on the party offering evidence to lay a proper foundation establishing a similarity of circumstances and conditions."  Id.  "For the experiment to be admissible, it is not

---

GM Opp'n to Mot. to Exclude Carhart Tests at 38-40.  GM does not respond to Fox's arguments that these tests are irrelevant and would confuse and prejudice the jury.

[18] In the event that Fox's counsel asks a question on cross-examination that GM contends would "require" Carhart to reference any of these excluded tests, the Court will rule on such matter at the appropriate time during trial.

[19] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

required that all the conditions shall be precisely reproduced, but they must be so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed." Id. at 1336-37. Such evidence is subject to Rule 403 and should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury. Id. at 1337.

If the proffered evidence is not meant to recreate an event but instead simply to demonstrate scientific principles, then the substantial similarity requirement does not apply. See McCune v. Graco Children's Prods., Inc., 495 F. App'x 535, 540 (5th Cir. 2012) ("if a party offers the demonstrative evidence only as an illustration of general scientific principles . . . it need not pass this 'substantial similarity' test") (quoting Muth v. Ford Motor Co., 461 F.3d 557, 566 (5th Cir. 2006)). "Such demonstrative aids, however, must not be misleading in and of themselves, and one such way that a demonstration might mislead is when, as here, the demonstration resembles the disputed accident." Muth, 461 F.3d at 566. "[I]t is this resemblance which gives rise to the requirement of substantial similarity." Id. Thus, even where the proponent offers testimony to support scientific principles, where the proponent offers a demonstrative exhibit, such as a video recreation, which "purports to coincide with [a party's] theory of how the accident

occurred[,]" the substantial similarity requirement is imposed for the admission of the video.  Burchfield, 636 F.3d at 1336 (quotations and citations omitted).

In Muth, the passenger in a 1996 Ford Crown Victoria was rendered quadriplegic when the car flipped and landed on its roof; the passenger contended the Crown Victoria contained "inadequate rollover/roof crush protection."  Muth, 461 F.3d at 560.  Ford sought to admit video and photographic evidence from a test using the Controlled Rollover Impact System ("CRIS"), a rollover crash test conducted several years after the actual crash using a 1998-2000 model Crown Victoria.  Id. at 565.  The district court permitted Ford's experts to discuss the data and conclusions from the test but excluded the video and photographic evidence illustrating those results.  Id. at 561.

In affirming the district court's evidentiary ruling, the Fifth Circuit stated that "Ford characterized the CRIS test as essentially depicting Ford's theory of the accident, all the while maintaining that it was offered, not as a reenactment, but only to show general scientific principles."  Id. at 567.  The Fifth Circuit found that "the similarities between Ford's theory of the accident and the conditions of the CRIS test heighten the visual evidence's prejudicial effect, and this is sufficient to justify the district court's exercise of discretion in limiting Ford's expert to oral testimony only."  Id.

In Burchfield, the Eleventh Circuit reviewed evidentiary rulings of the district court in a personal injury case where the plaintiff was injured when three railcars, including one identified the "AEX 7136," ran over him. Burchfield, 636 F.3d at 1332. The plaintiff alleged that the injuries were caused by Defendant CSX's failure to deliver the AEX 7136 to the rail yard with an efficient hand brake. Id. He contended that he applied the hand brake, but it was inefficient and failed to hold the railcar in place. Id. at 1334-35. The district court allowed CSX to present a video that showed the AEX 7136 with an activated hand brake. Id. CSX argued that the experiments were used to demonstrate only general scientific principles, not to reenact disputed events. Id. at 1334. After examining the manner in which the video was used at trial, the Eleventh Circuit concluded that "CSX repeatedly emphasized the purported similarities between the events depicted on the video and the circumstances surrounding Burchfield's accident." Id. at 1335. It found that CSX "expressly argued that the video recreated the incident at issue in this case, and proved that Burchfield did not properly apply the hand brake." Id. at 1336. Because the results of the video coincided with CSX's theory of how the accident occurred, the "substantially similar standard" applied, which CSX failed to meet, resulting in a reversal of the ruling of the district court that admitted the video. Id. at 1337-38.

53

GM states that it is not trying to meet the substantial similarity test for any of the tests at issue but rather relies on the argument that scientific principles are demonstrated by each test, and, "if there is any question about this, the Court should provide a limiting instruction to avoid confusion." GM Opp'n to Mot. to Exclude Carhart Tests at 14.

The Court discusses each of the tests for which GM provides an argument supporting admission.

### b.      Test 7: Dolly Rollover Subaru Foresters

Test 7 is testing done with a dolly on Subaru Foresters. "Subaru Foresters (with unmodified production roof structures) were subjected to dynamic dolly rollover testing, including one test with test dummies inside the vehicle." GM Opp'n to Mot. to Exclude Carhart Tests at 41. "These tests demonstrate what happens to a vehicle with a roof strength-to-weight ratio of 4.8 when it is involved in a violent rollover similar to Veronica Fox's crash (the roof is deformed, not unlike the roof deformation in the *Fox* vehicle)." Id. GM presents side-by-side photographs of the Subaru Forrester testing and Fox's vehicle. Id. at 42. Despite explicitly arguing how similar the study is to Fox's accident, GM states the tests will not cause confusion to the jury. Id. at 14.

GM argues that Test 7 is necessary because it demonstrates these scientific principles:

- They found that the roof structure performed as an assembly, such that a roof-to-ground impact on one side of the vehicle resulted in displacement of the roof on both the struck and non-struck sides.

- During a rollover crash, even strong roof vehicles deform. At one point, the top of the B-pillar—the vertical structure between the front and rear doors—deformed in-board nearly seven inches laterally and over five inches vertically.

- The residual damage to the roof at the end of the crash was not representative of the roof's movements during the crash.

- Even the strongest roof on the market cannot prevent side glass from breaking in a real-world, full-scale crash test.

- When comparing the crash tests performed on concrete versus desert soil, the rollover on concrete resulted in fewer rolls because the vehicle-to-ground contacts on concrete resulted in sliding as opposed to the more forceful impacts in the desert soil, which converted some translational energy into rotational energy.

GM Opp'n to Mot. to Exclude Carhart Tests at 44.

Although GM shows that testing concerning Test 7 may support one or more of these scientific principles, the Court finds that permitting GM to offer demonstrative evidence in addition to oral testimony would risk misleading the jury. Accordingly, it is clear that "this [is] not a case of evidence offered to merely show physical principles. Rather, it is one in which the results of the experiment

55

purported to coincide with [the proponent's] theory of how the accident occurred."[20]  Burchfield, 636 F.3d at 1336 (citing Four Corners Helicopters, Inc. v. Turbomeca, S.A., 979 F.2d 1434, 1442 (10th Cir. 1992)); Barnes, 547 F.2d at 277-78) (alterations accepted).  As such, the similarities "heighten the visual evidence's prejudicial effect."  Muth, 461 F.3d at 567.  "[D]emonstrative exhibits tend to leave a particularly potent image in the jurors' minds."  United States v. Gaskell, 985 F.2d 1056, 1061 n.2 (11th Cir. 1993) (citation omitted).  Therefore, it is appropriate to limit Carhart to oral testimony regarding Test 7.  See, e.g., Dugas v. 3M Co., No. 3-CV-1096-J-39JBT, 2016 WL 3946802, at *6 (M.D. Fla. June 21, 2016) (excluding video to support expert's opinion where "the video offers little probative evidence, but invites a plethora of unfair inferences"); Graves v. Toyota Motor Corp., No. 2:09CV169KS-MTP, 2012 WL 13019013, at *4 (S.D. Miss. Jan. 12, 2012) (excluding video which was "too dissimilar to be a reenactment . . . and too similar to be a mere demonstration of basic scientific or vehicle handling principles" and "would confuse the jury").

---

[20] Indeed, GM's own brief presents the study as a side-by-side comparison to Fox's accident vehicle.

### c. Test 35: Spin Demonstration, Moffatt 2003 (PH07127)

Test 35 consists of spin demonstrations done on a 2001 Nissan Pathfinder, a four-door SUV, at rates including the rates involved in Fox's crash. GM Opp'n to Mot. to Exclude Carhart Tests at 45. GM contends that the demonstrations "illustrate the scientific principle that in a violent rollover crash, the occupant will move even further than what is reflected in the static inversion demonstrations[.]" Id. Carhart's Report confirms that Test 35 is relied upon to support this principle. Carhart Report at 32. However, upon viewing the videos associated with Test 35, the Court finds a risk of misleading the jury. Accordingly, for the reasons expressed above, the Court will permit Carhart to testify about Test 35 but will exclude the videos to avoid confusing the jury.

### d. Tests 10 and 11: Malibu II & Malibu I

GM argues that the Malibu testing, Tests 10 & 11, demonstrate "basic scientific principles important to roof design." GM Opp'n to Mot. to Exclude Carhart Tests at 33. These tests were performed on a 1983 Chevrolet Malibu, a mid-size four-door sedan, as opposed to the vehicle in question in this case, a 2004 Cadillac SUV. The scientific principles GM contends are demonstrated by the Malibu tests are:

- During a rollover, centrifugal forces push an occupant "up and out" potentially causing an occupant's head to contact the roof;

- When the roof hits the ground[,] the roof stops as does the occupant's head in contact with the roof, but the occupant's body does not stop. It continues to move downward (toward the occupant's head) thereby compressing the spine.

- The measured force on the spine caused by the occupant's body compressing the spine will climb well above the reported injurious levels before the weight of the vehicle begins to significantly deform the roof supports;

- While modern 3-point seat belts are very effective in preventing injuries in most crash modes, including rollover crashes when worn properly, seat belts cannot prevent an occupant from contacting the roof when the vehicle is spinning and upside down.

Id. at 33-36. GM states that "the differences between a Malibu and a Cadillac SRX ensures that the jury will not be confused into thinking that the Malibu tests are an attempt to recreate Veronica Fox's crash." Id. at 38.

The Court finds that this argument is insufficient to show that a jury would not be mislead by the demonstrative evidence. In Graves, for example, the subject vehicle was a 1995 Toyota 4Runner. Graves, 2012 WL 13019013, at *1. The Court found that the Malibu tests were "too dissimilar to be a reenactment, what with all of the varying scenarios and no rollover, and too similar to be a mere demonstration of basic scientific or vehicle handling principles." Id. at *4. The

Court excluded the video, but permitted the expert to testify orally about the conclusions of the tests.  Id.  Carhart will be permitted testify in reference to the Malibu tests to support the scientific principles espoused in his report.  However, the Court limits Carhart to oral testimony only and excludes the videos and any other demonstrative exhibits, as the latter would "too closely resemble[] the disputed accident to effectively present abstract principles without misleading the jury."  Muth, 461 F.3d at 566.

### e.    Tests 33 & 34: Inverted Drop Tests (reinforced) 5-26-16 and Inverted Drop Tests (production) 5-27-16

Tests 33 and 34 were tests that Carhart performed for the instant litigation on 2004 Cadillac SRXs.  Despite explicitly stating that "[t]here is no way to exactly duplicate the four to five roll crash that involved Veronica Fox," GM explains at length its methodology for "creat[ing] tests that approximate [the] forces [of Fox's crash]."  GM Opp'n to Mot. to Exclude Carhart Tests at 24.  Despite GM's attempt to disclaim that it needs to reach the "substantial similarity" standard, it is evident that Tests 33 and 34 are, in fact, attempts to recreate the two rollover impacts for the jury.  Atl. Specialty Ins. Co. v. Porter, Inc., No. CV 15-570, 2016 WL 6569346, at *5 (E.D. La. Nov. 4, 2016), aff'd, No. 16-31259, 2018 WL 3763263 (5th Cir. Aug. 7, 2018) ("The Court, rather than the plaintiffs' self-serving

characterization of the evidence, must determine what category the proffered evidence falls under.").

> Using the accident reconstruction done by Dr. Geoffrey Germane, he and Dr. Carhart were able to estimate the forces involved in this third impact. By combining the various forces from the vehicle spinning while still moving across the ground, they calculated an equivalent drop height that would create these same types of forces in the same direction at the instant when Veronica Fox sustained her thoracic spine injury. They determined that a 2-foot drop height would be a conservative estimate for the forces involved.

GM Opp'n to Mot. to Exclude Carhart Tests at 26, 27. But GM does not provide any specifics on how it calculated the specific forces and why a drop test would be substantially similar to those forces Fox experienced in a rollover. The Exponent Reports for Tests 33 and 34 also do not contain these specifics. Carhart's Report discusses these tests but fails to state why the angles and forces chosen for his tests were substantially similar to Fox's accident. Carhart Report at 29-31. This lack of specifics makes it impossible for the Court to understand whether this testing is substantially similar; thus, GM has not met its burden to prove substantial similarity. See Burchfield, 636 F.3d at 1336-37 (internal quotation marks and citation omitted) ("[f]or the experiment to be admissible, it is not required that all the conditions shall be precisely reproduced, but they must be so nearly the same in

substantial particulars to afford a fair comparison in respect to the particular issue to which the test is directed.").

Even if the Court were to take at face value GM's position that it is not attempting to meet the substantial similarity test, the Court finds that GM has established in its brief that the tests are similar enough to Fox's accident that they must be excluded because of the danger of unfair prejudice or confusion of the issues. Id. at 1337. Oral testimony on these tests is allowed, otherwise, Tests 33 and 34 are excluded.[21]

### f.    Test 41: FMVSS 216 test

Fox "also moves to exclude the FMVSS 216 test conducted by Exponent on a 2006 SRX—and all references to that test in the deposition testimony—for the reasons articulated in Plaintiff's Daubert motion to exclude [Kon-Mei] Ewing's testimony[.]" Mot. to Exclude Carhart Tests at 8, n.7. Notably, Fox does not contend that this test should barred under Burchfield, 636 F.3d at 1336-37. Rather, Fox contends that Carhart's reliance on Test 41 must be excluded because he did not personally perform the test, it has not been authenticated by a person with

---

[21] Because of this holding, the Court need not reach Fox's contentions regarding the biofidelity of the Hybrid III dummies used in these tests.

knowledge under Federal Rule of Evidence 901, the report is hearsay and should

be excluded under Federal Rule of Evidence 801, and the probative value is

outweighed by its prejudicial effect under Federal Rule of Evidence 703.  Pl.'s

Mot. to Exclude the Test. of GM "Expert" Kon Mei Ewing ("Mot. to Exclude

Ewing") [Doc. 130] at 16-18; Reply in Supp. Mot. to Exclude Carhart Tests [Doc.

191] at 14-15.  GM responds that

> [I]f this argument were taken literally (and, Plaintiff cites no case law
> to support it), it would mean that no expert in this case—whether called
> by Plaintiff or Defendant—could rely on any test other than a test that
> they personally conducted and, if they did, they would somehow no
> longer be qualified to give expert testimony.  The fact is that engineers
> rely all the time on tests done by other engineers.  They are able to look
> at reports, see how the test was performed, and confirm that the results
> are reliable.

GM LLC's Resp. in Opp'n to Pl.'s Daubert Mot. to Exclude the Test. of Gm

Expert Kon-Mei Ewing ("Resp. in Opp'n to Mot. to Exclude Ewing") [Doc. 142]

at 13.  GM also notes that Fox's expert Herbst "testified that he had no concern

about how the test was run or the reliability of the results[.]"  Id.

Federal Rule of Evidence 703 explicitly permits an expert to rely upon data

that the expert has not personally observed.  FED. R. EVID. 703 ("An expert may

base an opinion on facts or data in the case that the expert has been made aware of

or personally observed.") (emphasis added).  See also In re Wright Med. Tech.

62

Inc., Conserve Hip Implant Prods. Liab. Litig., 127 F. Supp. 3d 1306, 1325 (N.D. Ga. 2015) (holding that experts could reasonably rely in part upon the opinions of other experts).  Fox acknowledges this in her motion but argues that it is unreasonable for the experts to rely on an Exponent test, which is "a private, for-profit company that does experiments for automakers to advocate automakers' defenses in litigation."  Mot. to Exclude Ewing at 17.  This argument goes to the weight of the evidence, not its admissibility.  See CBS, Inc. v. Prime Time 24 Joint Venture, 9 F. Supp. 2d 1333, 1342 (S.D. Fla. 1998) (holding that the expert's reliance on information and data developed by an outside company was permissible as it was the type of information reasonably relied upon by experts in his field).  Test 41 is not excluded.

Accordingly, Fox's Motion to Exclude Carhart from relying on Tests 1-6, 8-9, 12-30, 36-40, and 42 is **GRANTED,** although the Court will reconsider its ruling if GM contends Carhart needs to rely upon any of these tests during Fox's cross-examination.  Fox's Motion to Exclude Tests 7, 10, 11, 33-35, and 41 is **GRANTED IN PART and DENIED IN PART**.  GM is limited to oral testimony only with respect to these tests.

### 3.    Medical Testimony of Michael Carhart and Geoffery Germane

As was the case with many of GM's <u>Daubert</u> motions, Fox's motion contends that Carhart and Germane offer opinions beyond their stated areas of expertise.  Namely, Fox contends that Carhart's criticisms of Fox's medical experts amounts to him rendering medical testimony.  Pl.'s <u>Daubert</u> Mot. to Exclude any Medical Test or Opinions of GM's Paid Testifiers Michael Carhart and Geoffrey Germane ("Pl.'s Mot. to Exclude Carhart and Germane") [Doc. 127] at 4.  The only medical opinions that Fox contends Carhart is offering are contained in the June 29, 2018 "supplemental report" where Carhart criticizes the opinions Eisenstat and Pradilla.  Pl.'s Mot. to Exclude Carhart and Germane at 4.  The Court has ruled above that due to late disclosure, this information is inadmissible.  Accordingly, Fox's motion with respect to Carhart is **DENIED AS MOOT**.

With respect to Germane, an accident reconstructionist, Fox objects to his use of "charts related to *injuries* purportedly suffered by occupants in other rollovers based on data from the NASS-CDS database for the years 1995-2001." Pl.'s Mot. to Exclude Carhart and Germane at 7-8.  Fox contends that the charts and testimony about them are inadmissible (1) because "the testimony is an attempt to correlate the severity of the wreck with the *severity of the injuries*

64

*caused by the wreck*, and thus, implicitly but profoundly, discuss the causation of Ms. Fox's medical injuries[,]" and (2) because he did not put any opinion about the NASS-CDC injury data into his expert report. Id. at 8-10. At his deposition, Germane produced charts from the NASS database which contain AIS or MAIS scores, which are tools for ranking injury severity. Id. at 8. According to Fox, "[a]nalysis of a person's AIS score requires 'assessment of the severity of injury including the threat to life associated with the injury.'" Id. (citation omitted). GM states that the injury scores are simply one component of the NASS database, and that Germane is unlikely to testify about the injury scores. GM's Resp. in Opp'n to Pl.'s Daubert Mot. to Exclude any Medical Test. or Opinions of GM's Experts Michael Carhart and Geoffrey Germane ("Def.'s Resp. to Pl.'s Mot. to Exclude Carhart and Germane") [Doc. 150] at 7. GM further contends that "a person does not need a medical degree to rely on publicly available data, even if that data was initially complied by medical professionals." Id.

GM's response focuses on the first issue and does not address non-disclosure.[22] The opinion at issue is that:

---

[22] Only one paragraph in GM's response seemingly deals with the non-disclosure; GM states:

The subject crash was a rare event within the population of motor vehicle crashes in the United States. The fraction of rollover crashes relative to all tow-away passenger car and light truck crashes in the United States is less than 5%. The severity of the subject rollover in terms of number of roll revolutions exceeded that of more than 99% of all rollovers documented nationally. The rollover crash severity was exacerbated by the sloped terrain that contributed to the magnitude of the vertical ground contact impulses applied to the roof. No planar collision, regardless of severity, produces the specific vehicle accelerations similar in magnitude and direction to those that occurred in the subject crash.

Germane Report ¶ 8. Germane's Report states that he is relying upon the following

materials:

- Georgia Uniform Motor Vehicle Accident Report
- City of Atlanta Fire Incident Report
- Depositions of Gregory Bryant, Titus Cave, Bryant Buchner, Carl Coward, Nicole Fox, Veronica Fox, Huizhen Lu
- In-vehicle video from responding law enforcement vehicle
- Audio recordings from Ms. Fox's cell phone
- Crash Data Retrieval report for vehicle SDM for subject incident
- Medical Records
- Vehicle data and specifications

As an initial matter, the inclusion of the injury scores in the NASS data will only come in, through Dr. Germane, in one of two ways: (1) through Plaintiff's cross-examination, or (2) upon the Court's finding that the disclosure, by GM LLC of the basis for his conclusions that four-roll accidents are rare is proper because its probative value outweighs its prejudicial effect.

Def.'s Resp. to Pl.'s Mot. to Exclude Carhart and Germane at 7. Whether the evidence meets the standard under Federal Rule of Evidence 403 does not address the problem of whether GM failed to disclose Germane's reliance on NASS-CDS charts in his report.

- U.S. Department of Transportation Crash Statistics

Germane Engineering Report ("Germane Report") [Doc. 146-10] at 2.  "The

NASS/CDS is a database of crash descriptions and factors collected by the

National Highway Transportation Safety Administration (NHTSA) from 24

different geographic sites nationwide."  Bavlsik, 2015 WL 4920300, at *4 (citing

expert report).  The NHTSA is part of the U.S. Department of Transportation.  See

About NHTSA, https://www.nhtsa.gov/about-nhtsa (last visited Feb. 2, 2019).

Thus, Germane properly disclosed his reliance on the data generally in his report.

However, to the extent that GM intends Germane to testify on the injury data,

those opinions are not properly expressed in the Report, and thus, must be

excluded.  FED. R. CIV. P. 26(a)(2)(B)(i).  Accordingly, Fox's motion with respect

to Germane is **GRANTED.**

### 4.     Edward Moffatt's Testimony

GM offers Edward Moffatt ("Moffatt") to testify about the "knowledge

available to 'Old GM' when it decided how to design the roof on the 2004 Cadillac

SRX."  GM's Resp. to Pl.'s Daubert Mot. to Exclude Edward Moffatt's Test.

("Resp. to Mot. to Exclude Moffatt") [Doc. 151] at 1.  Moffatt "is one of the most

knowledgeable experts anywhere about how injuries occur in rollovers."  Id. at 1.

He has written the seminal papers about injuries suffered in rollover accidents.  Id.

67

at 3-5. However, because Moffatt was not a GM employee at the time the SRX was designed, he is not being offered as a fact witness as to what GM knew at that time. According to Fox, "there is no proof at all that anyone at GM relied on the 'diving' theory or the 'roof crush doesn't matter' argument when designing and building the SRX." Pl.'s <u>Daubert</u> Mot. to Exclude Edward Moffatt's Test. ("Mot. to Exclude Moffatt") [Doc. 128] at 8. GM does not directly respond to this assertion. Rather, its response simply assumes that GM knew and relied upon Moffatt's research. The closest GM comes to responding is the statement: "There was no other way for GM to choose a roof strength target for a new vehicle other than to rely on past history, including testing and field research." Resp. to Mot. to Exclude Moffatt at 13.

Unless GM produces a witness to testify that it relied upon Moffat's theories in designing the Cadillac SRX, Moffatt's testimony must be excluded as irrelevant. Fox's Motion to Exclude Moffatt is **GRANTED**.

### 5.    GM's Experts' Proposed Testimony on Statistics

Fox moves to prohibit GM's experts Carhart, Germane, and Kon Mei Ewing ("Ewing") from presenting statistical studies to show that Fox's rollover accident was "rare." Pl.'s Mot. on Statistics. Fox objects to the following testimony:

68

- Carhart's stated plans at his deposition to rely on articles by Gloeckner and Eigen,[23] both of which contain statistical analysis of data pulled from the NASS-CDS data.  Pl.'s Mot. on Statistics at 4, 7 (citing Carhart Dep. Excerpts [Doc. 129-2] at 319-25).

- Germane's opinion that: The subject crash was a rare event within the population of motor vehicle crashes in the United States.  The fraction of rollover crashes relative to all tow-away passenger car and light truck crashes in the United States is less than 5%.  The severity of the subject rollover in terms of number of roll revolutions exceeded that of more than 99% of all rollovers documented nationally.  Pl.'s Mot. on Statistics at 8 (citing Germane Report ¶ 8).[24]

- Ewing's opinion that: Rollover crashes involving four and more rolls are extremely rare.  Ms. Fox's rollover is a severe crash, and the potential for serious and catastrophic injuries is high due to the number of repeated ground impacts.  Based on data found in the PRIA for FMVSS 226, 98.9% of all rollovers in the field occur in two or less revolutions.  Pl.'s Mot. on Statistics at 10 (citing Ewing Report [Doc. 142-2] at 28.[25]

---

[23] Fox also objects to Carhart's stated use of an article by "Hair" because Fox contends that GM did not produce the article or list it on his literature bibliography.  Pl.'s Mot. on Statistics at 7, n.11.  In response, GM notes that the paper is actually by "Hare."  GM's Resp. to Pl.'s Daubert Mot. to Exclude GM's Experts Proposed Testimony on Statistics ("Resp. to Pl.'s Mot. on Statistics") [Doc. 155] at 23 n.10.  However, "Hare" is also not listed on Carhart's literature bibliography.  Carhart Report.  Accordingly, Carhart may not rely on the study in presenting his opinion.  Mitchell v. Ford Motor Co., 318 F. App'x 821, 825 (11th Cir. 2009).

[24] Fox previously objected to the same testimony on the basis that Germane was improperly testifying on injury data contained in the underlying data set.  As held above, Germane may not testify on injury data.

[25] Pagination refers to pdf pagination as filed on the docket.

69

Fox contends this testimony should be excluded because (1) Carhart, Germane, and Ewing are unqualified to testify about statistics, (2) testimony about statistics is irrelevant, (3) the experts merely parrot the opinions of others, (4) the statistics are inadmissible hearsay, (5) the collisions in the statistics are not substantially similar to Fox's accident, and (6) the statistics are unduly prejudicial. Id. at 13-25.

### a.      The Qualification of the Experts

Fox makes the same specious argument regarding the expert's qualifications as GM did about Brian Herbst—that because Carhart, Germane, and Ewing do not claim to be statisticians, they cannot rely on statistics. See Pl.'s Mot. on Statistics at 13. Like Herbst, each expert reported regularly using statistics as a basic tool in their practice. Resp. to Pl.'s Mot. on Statistics at 6-8. "Using statistical tools to analyze a dataset is a common practice in many fields; one does not need a degree in statistics to be able to understand and apply basic statistical concepts." Bacho, 2016 WL 4607880, at *4. The Court is not persuaded by the case law cited by Fox. Pl.'s Mot. on Statistics at 13. In those cases, the excluded non-statistician experts were offering sophisticated statistical analyses they had performed, whereas Fox's experts here either rely on analysis done by others (Carhart) or perform simple percentage calculations using the data (Germane and Ewing). See

70

Increase Minority Participation by Affirmative Change Today of Nw. Fla., Inc.

(IMPACT) v. Firestone, 893 F.2d 1189, 1195 (11th Cir. 1990) (upholding

exclusion of a political scientist analyzing statistical disparity between employment

actions taken in favor of black applicants as against those taken in favor of whites);

Malletier v. Dooney & Bourke, Inc., 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007)

(excluding a colorimetrist offering conclusions regarding probabilities).

### b.        The Relevance of the Evidence

Fox contends that the testimony is irrelevant and does not "fit" the case.

Pl.'s Mot. on Statistics at 14.  The Court agrees with GM that the testimony is

relevant; statistical analyses of real-world accidents involving vehicles with the

same roof strength speaks to the issue of whether GM, in designing the Cadillac

SRX, was willfully, recklessly, or wantonly negligent.  See Resp. to Pl.'s Mot. on

Statistics at 21.  Fox's argument regarding "fit" is similarly misplaced.  Fox argues

that because her injury was suffered on one half roll of her vehicle (a factual

premise that GM disagrees with), then statistics regarding rollovers with additional

turns do not "fit" her case.  Pl.'s Mot. on Statistics at 15.  Of course, the more

times an item rolls over is directly indicative of the amount of force applied before

the item is released.  Thus, "the amount of energy and severity of the first impact is

71

greatly increased" and the risk of injury is increased when additional turns of a rollover are present.  Resp. to Pl.'s Mot. on Statistics at 2-3.

### c.        The Parroting Objection

Fox contends that the experts merely "parrot" other's opinions, which is grounds for the exclusion of that testimony.  Fox states that "GM seeks to have these witnesses testify about statistical analyses and/or results and conclusions they did not produce, have not verified, and cannot reproduce."  Pl.'s Mot. on Statistics at 17.  Fox makes similar arguments with respect to Ewing's reliance on Test 41. As noted above, the basis for an expert's opinion—that is, the type of facts or data an expert may rely upon in reaching their opinion—is evaluated under Rule 703 of the Federal Rules of Evidence.  Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.  But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

FED. R. EVID. 703.  The facts and data upon which an expert may rely in reaching an expert opinion includes the opinions and findings of other experts, if experts in their respective field would reasonably rely on other expert's opinions and

72

findings.  See United States v. Winston, 372 F. App'x 17, 20 (11th Cir. 2010).  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."  In re Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig., 127 F. Supp. 3d 1306, 1325 (alteration accepted) (quoting Viterbo v. Dow Chem. Co., 826 F.2d 420, 422 (5th Cir. 1987)).

With respect to Carhart, Fox objects that in his deposition he stated that he may rely on studies by Gloeckner, Eigen, and Hare with respect to crash severity statistics.  His report lists Gloeckner and Eigen studies in the "literature" section, but he does not cite these studies in his report.  See Carhart Report.  GM provided an affidavit by Carhart, wherein he testifies that he regularly relies on studies like Gloeckner and Eigen that have been published in peer-reviewed scientific literature.  Aug. 31, 2018 Aff. of Michael R. Carhart, Ph.D. [Doc. 155-1] ¶ 19.

Fox contends that it is unreasonable for Carhart to rely on the Gloeckner study because it was performed by Exponent, Inc., "a private, for-profit company that does experiments for automakers to advocate automaker's defenses in litigation."  Pl.'s Mot. on Statistics at 20-21.  As discussed above, this argument goes to the weight of the evidence, not its admissibility.  Fox does not state why it would be unreasonable for Carhart to rely on the Eigen study.

73

To the extent that Fox's objections for all three relate to the use of the NASS-CDS database, those objections are overruled, as multiple courts have found the NASS-CDS data a reasonable source on which experts may rely.  See Bacho, WL 4607880, at *5 ("Any weaknesses with the NASS data collection may be probed on cross-examination."); Hernandez v. Ford Motor Co., No. C-04-319, 2005 WL 6240743, at *1 (S.D. Tex. July 20, 2005) ("Vogler's technique of utilizing the motor vehicle accident databases has been used and tested by a variety of researchers . . . .  Defendant also established that all databases used are maintained with accuracy and generally accepted as valid by the relevant scientific community, including NHTSA.").

> The NASS/CDS is a database of crash descriptions and factors collected by the National Highway Transportation Safety Administration ("NHTSA") from 24 different geographic sites nationwide.  Each crash is weighted to represent all police-reported motor vehicle crashes occurring in the United States during the year involving passenger cars, light truck and vans that were towed due to damage.  Selected crashes are then investigated in detail.  The NASS/CDS provides insight into the types of injury, crash types, crash severity, vehicle damage, nature of injury by body region, and other factors associated with a crash.
> . . .
>
> The database[] ha[s] been tested and [is] in wide use by not only government agencies but also academic entities. The possibility of errors and small sample sizes are known and can be accounted for.

74

Roberts v. Gen. Motors, LLC, No. 4:13-CV-541 CAS, 2015 WL 6955362, at *10-11 (E.D. Mo. Nov. 10, 2015).

Inappropriate parroting occurs when an expert adopts another expert's opinion wholesale, without reaching independent conclusions in reliance on that opinion. Trade AM Int'l, Inc. v. Cincinnati Ins. Co., No. 1:08-CV-3711-ECS, 2010 WL 11508365, at *2 (N.D. Ga. Oct. 6, 2010). That is not the situation with the three experts here. Cf. Eberli v. Cirrus Design Corp., 615 F. Supp. 2d 1357, 1364-65 (S.D. Fla. 2009) ("The Court fails to see how Mr. Klepacki's opinion that the breather line did not freeze would assist the trier of fact, given that Dr. Butler made the flight test conclusions and Mr. Klepacki admitted that the flight test conclusions were the sole basis for his conclusion that the breather line did not freeze.").

### d.    The Hearsay Objection

Fox contends that the NASS-CDS data and "Carhart's and Ewing's testimony about the statistical conclusions of the authors of the studies they cite" are inadmissible hearsay. Pl.'s Mot. on Statistics at 19-22. GM counters that the data and studies cited are admissible under the learned treatise exception to the hearsay rule. Resp. to Pl.'s Mot. on Statistics at 8-11. Federal Rule of Evidence 803(18) states:

> The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>> (18) *Statements in Learned Treatises, Periodicals, or Pamphlets.* A statement contained in a treatise, periodical, or pamphlet if:
> (A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination; and
> (B) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.
> If admitted, the statement may be read into evidence but not received as an exhibit.

FED. R. EVID. 803(18). The Eleventh Circuit has adopted a "liberal interpretation" of Rule 803(18), favoring admissibility. Allen v. Safeco Ins. Co. of Am., 782 F.2d 1517, 1520 (11th Cir. 1986). In Allen, the Eleventh Circuit held that an arson expert had provided a sufficient foundation for a magazine article's admission in evidence by testifying that he relied on the magazine to keep abreast of developments in fire-scene investigation and analysis, that the magazine's articles were generally considered "somewhat authoritative," and that the author had a good reputation in the field. Id. at 1519-20.

As held above, Carhart has established that he reasonably relies on peer-reviewed literature such as the studies by Gloeckner and Eigen. The Court further finds it is reasonable for GM's experts to rely on the NASS-CDS data. "The rationale for this exception is self-evident: so long as the authority of a treatise has been sufficiently established, the factfinder should have the benefit of expert

76

learning on a subject, even though it is hearsay." Kirksey v. Schindler Elevator

Corp., No. CV 15-0115-WS-N, 2016 WL 7116223, at *8 n. 13 (S.D. Ala. Dec. 6,

2016) (quoting Costantino v. David M. Herzog, M.D., P.C., 203 F.3d 164, 170-71

(2nd Cir. 2000)).

### e.      The Objection of Dissimilarity

Fox objects to the use of the statistics GM seeks to rely upon based upon the

"substantial similar conditions" foundational requirement that applies to the

introduction of out-of-court experiments.  Pl.'s Mot. on Statistics at 22-24.[26]  GM

asserts that "numerous courts around the country, including the Eleventh Circuit,

have concluded that the substantial similarity requirement does not apply when

references to other incidents are used to illustrate other principles and not the

existence of a defect or notice."  Resp. to Pl.'s Mot. on Statistics at 16-17.

Contrary to GM's assertion, a number of courts have applied the "substantial

---

[26] Fox relies primarily on Heath v. Suzuki Motor Corp., 126 F.3d 1391, 1396-97
(11th Cir. 1997).  In Heath, the plaintiff argued that the district court should not
have allowed Suzuki's expert to present evidence involving rollover rates of three
dissimilar vehicles.  The Eleventh Circuit held that rollover rates were not
statistics.  Indeed, in Heath, "the district court's pretrial order limiting the use of
statistics to those reflecting substantially similar conditions" meant that "statistics
were not an issue at trial."  Id. at 1395.  In fact, the Eleventh Circuit held that the
trial court's admission of evidence in the three rollover accidents of other
dissimilar vehicles was not an abuse of discretion.  Id. at 1397.

similarity" standard to statistical evidence and limited the introduction of such evidence to vehicles that are the same type as that underlying the case before the court.  See, e.g., Morales v. Am. Honda Motor Co., 151 F.3d 500, 512 (6th Cir. 1998) (holding that, in products liability suit involving alleged defective motorcycle, the "substantially similar" requirement was met "where the district court limited the accident statistics at issue to minibikes and small vehicles of the same sort."); Bavisik v. Gen. Motors LLC, No. 4:13 CV 509, 2015 WL 4920300, at *5 (E.D. Mo. Aug. 18, 2015) (quotation and citation omitted) ("the [statistical] evidence's proponent must show that the other accidents occurred under circumstances substantially similar to those surrounding the accident in the instant case."); Morris v. Mitsubishi Motors N. Am., Inc., No. CV-08-0396, 2010 WL 11561486, at *2 (E.D. Wash. Dec. 17, 2010) (holding that admissibility of statistical evidence is governed by the "substantial similarity" standard in product liability cases); Miller ex rel. Miller v. Ford Motor Co., No. 2:01-CV-545-FTM-29DNF, 2004 WL 4054843, at *2 (M.D. Fla. July 22, 2004) (finding that accident statistics in databases were not based upon substantially similar accidents as in case before court).

Moreover, in Hockensmith v. Ford Motor Co., No. 03-13729, 116 F. App'x 244, *11 (11th Cir. Aug. 5, 2004), the Eleventh Circuit, in an unpublished opinion,

78

reversed a decision of a district court which permitted an expert to present statistical evidence of accidents without any showing of substantial similarity to the accident at issue at trial and stated as follows: "[w]e hold that the substantial similarity doctrine applies to this type of [statistical] evidence." Hockensmith, 116 F. App'x 244 at *11. Thus, contrary to GM's position, the Eleventh Circuit has not rejected the "substantial similarity" requirement when referencing statistical evidence.[27]

Consequently, the Court will permit GM's experts to testify only on statistical studies concerning vehicles that are substantially similar to the vehicle at issue in this case. GM's brief contains no argument as to why the statistics they wish to rely upon meet the substantial similarity standard; rather the brief simply argues the standard should not apply. The Court will permit testimony on statistics regarding SUVs that have been subject to rollover accidents. See, e.g., Hernandez, 2005 WL 6240743, at *3 ("Because the statistics review the same class of vehicle,

---

[27] GM cites Heath which, as previously stated, did not review the trial court's order which in fact applied the "substantially similar" standard to statistical evidence, and Tran v. Toyota Motor Corp., 420 F.3d 1310, 1316 (11th Cir. 2005), which affirmed the trial court's admission of a Toyota study that examined other accidents involving a model's restraint system, finding that "the substantial similarity doctrine did not apply to situations . . . where the evidence is "pointedly dissimilar" and "not offered to reenact the accident." (citing Heath).

in the same class of accident (rollover), this Court finds that Dr. Vogler's proposed

testimony is relevant and probative."). Accordingly, Fox's Daubert Motion to

Exclude GM's "Experts" Proposed Testimony on Statistics is **GRANTED IN**

**PART and DENIED IN PART**.

### 6. Kon Mei Ewing

Ewing is GM's roof design expert. Fox moves to disqualify Ewing for

several reasons. First, Fox contends that Ewing "is not qualified to testify as a roof

design expert because she lacks 'knowledge, skill, experience, training, or

education' related to roof design." Mot. to Exclude Ewing at 10-11 (quoting FED.

R. EVID. 702). Second, Fox contends she failed to base her opinions on sufficient

facts or data. Id. at 12-16. Third, Fox contends she improperly relied on Test 41.

As discussed above, GM's experts may rely on Test 41. The Court will address

Fox's other two contentions regarding Ewing.

### a. Is Ewing Qualified to Testify as a Roof Design Expert?

Ewing is an automotive engineer who worked at GM for 30 years before

retiring in 2008. Ewing Resume [Doc. 142-1]. She holds degrees in Metallurgical

Engineering and Bioengineering. Id. From 1999 to 2008, her work at GM

focused on providing expert testimony for GM and other litigation support, and she

80

also worked on product development teams "evaluating advanced glazing materials and manufacturing and body design alternatives for future vehicle programs." Id. Prior to that, her work focused on fatigue strength studies of welded and clinched automotive materials. Id. She "established Design for Manufacturability evaluation criteria for body-in-white design and manufacturing process." Id. Earlier in her career she "evaluated static, impact and fatigue properties of arc-welded, spot-welded, clinched, adhesive-bonded and laser welded automotive steels as influenced by manufacturing and service variables" and conducted stiffness and fatigue property studies on tubular joints for possible spaceframe construction of vehicles." Id. She also "performed failure analyses on post-collision and service failure metallic components using SEM and optical metallographs, and recommended solutions." Id.

Fox contends that Ewing is unqualified to testify about roof design because her background is in welding, she has never designed a roof, and she has never written an article or made a presentation about roof design, roof strength standards, or roof testing. Mot. to Exclude Ewing at 3-4, 8. GM responds that Ewing has experience in vehicle body design, including "how different steel sub-assemblies are joined together to form a body structure, including a roof structure." Resp. in Opp'n to Mot. to Exclude Ewing at 3. Further, as noted on her resume, Ewing has

81

experience in "body-in-white" design, which "generally describes the steel structure of the vehicle, including the roof structure." Id.  She also has experience in "rollover vehicle crush" and "vehicle body design." Id.  She also observed numerous roof-strength tests and participated in "writing GM's submission to the NHTSA's roof strength docket." Id. at 4.

"Rule 702 takes a liberal view of expert witness qualifications; thus, an expert's training does not always need to be narrowly tailored to match the exact point of dispute in a case." Haines v. Webb, No. 1:13-CV-1783-AT, 2014 WL 12828962, at *10 (N.D. Ga. Sept. 26, 2014) (quoting McGee v. Evenflo Co., No. 5:02-CV-259-4 (CAR), 2003 WL 23350439, at *3 (M.D. Ga. Dec. 11, 2003)). "[I]t is not necessary that the witness be recognized as a leading authority in the field in question.  Gaps in an expert witness' qualifications or knowledge generally go to the weight of the witness' testimony not its admissibility." Leathers v. Pfizer, Inc., 233 F.R.D. 687, 692 (N.D. Ga. 2006) (citation omitted, alteration accepted).  However, an expert must "stay within the reasonable confines of his subject area." Trilink Saw Chain, LLC v. Blount, Inc., 583 F. Supp. 2d 1293, 1304 (N.D. Ga. 2008) (citation omitted).

While Ewing might not be the most qualified witness to discuss roof design, she is minimally qualified based on her education and experience.  Thus, the Court

82

will not exclude her as unqualified.  See Bracey v. Jolley, No. 1:10-CV-4064-TCB, 2012 WL 12870257, at *3 (N.D. Ga. Aug. 3, 2012) ("Even if Defendants' characterization of Chambers as 'minimally qualified' were accurate, his testimony would be admissible as long as it is reliable and helpful to the jury.").

### b. Is Ewing's Opinion Based on Sufficient Facts and Data?

Fox also contends that Ewing's opinions are based on "partial and incomplete review of the record" and that "GM withheld crucial information that should have informed her opinions."  Mot. to Exclude Ewing at 15.  Fox contends that Ewing failed to consider a number of pieces of evidence.  Id. at 12-13.  The Court will examine each piece of evidence in turn.

Fox objects that "Ewing did not speak to any GM roof engineers who worked on the SRX[.]"  Id. at 12.  GM responds that she actually did speak to Wayne Reeder, the individual who selected the structural adhesive used in the SRX, and that there is no requirement that she speak to the engineers to form her opinion.  Resp. in Opp'n to Mot. to Exclude Ewing at 8.  The Court finds that Ewing need not have spoken to the engineers that designed the SRX, as her opinions are limited to the technical issue of whether the roof was properly

83

designed and do not involve factual issues of what was internally occurring at GM when the SRX was designed.

Fox objects that "Ewing knows nothing about GM's redesign of the SRX roof that began in 2006 and that resulted in strengthening of the roof and jettisoning of the glued-on roof concept—or why GM did that (which is crucial evidence)" and "Ewing was not provided and did not even know about the deposition of GM engineer Kenneth McLean who was in charge of the changes to the SRX roof design that began in 2006[.]" Mot. to Exclude Ewing at 12. GM contends that this information is not necessary to evaluate the 2004 SRX design. Resp. in Opp'n to Mot. to Exclude Ewing at 8. The Court finds that while this information would certainly have been useful in evaluating the 2004 design, this issue is more properly grounds for cross-examination, rather than exclusion. See Nixon, 2016 WL 1572949, at *3.

Fox objects that "Ewing didn't inspect the roof of Ms. Fox's SRX until fifteen days before she finalized her opinions[.]" Mot. to Exclude Ewing at 12-13. GM notes that Ewing reviewed documents prior to her vehicle inspection and that there is no minimum number of days that need elapse between inspection and report. Resp. in Opp'n to Mot. to Exclude Ewing at 8-9. The Court agrees that this is not a reason to exclude Ewing's testimony.

84

Fox objects that "Ewing reviewed no alternative designs to compare the roof structures of other models[.]" Mot. to Exclude Ewing at 13. GM responds that Ewing was not tasked with comparing the SRX to other designs, rather she evaluated the performance of this vehicle. Resp. in Opp'n to Mot. to Exclude Ewing at 11. The Court finds that while this information would certainly have been useful in evaluating the 2004 design, this issue is more properly grounds for cross-examination, rather than exclusion. See Nixon, 2016 WL 1572949, at *3.

Fox objects that "Ewing testified that she did not review or rely upon weld drawings or key proving ground rollover documents[.]" Mot. to Exclude Ewing at 13. The "weld drawings" are apparently "documents that prove that there are weaker welds at critical junctures of the 2004 SRX with a glass and plastic roof (Plaintiff's car) than there are on the 2004 SRX with a steel roof." Id. at 5 n.4. Ewing "testified she did not rely on weld drawings for the 2004 SRX because they were not provided to her until a month after her report was served and one day before her deposition." Id. (citing June 22, 2016, Dep. of Kon-Mei Ewing [Doc. 130-2] at 66-68). GM responds that Ewing did not need the weld drawings because she was able to examine the welds on the subject vehicle itself. Resp. in Opp'n to Mot. to Exclude Ewing at 10. The "key proving ground rollover documents" include documents related to a December 2004 proving grounds

85

rollover on an SRX.  Pl.'s Reply in Supp. of Mot. to Exclude the Test. of GM

'Expert' Kon-Mei Ewing ("Reply in Supp. Mot. to Exclude Ewing") [Doc. 192] at

4 n.4.  GM dismisses this issue:

> [S]ome of those events involved different types of roofs and different types of crashes.  Plaintiff offers no reason to believe that looking at these other crashes would enhance in any way what Ms. Ewing did, which was a careful examination of the roof on Ms. Fox's vehicle, as well as three exemplar roofs that had been subjected to roof strength testing.  It is Plaintiff's opinion that these proving ground incidents have some relevance to this matter but that is not GM LLC's position and, therefore they are not relevant to Ms. Ewing's opinions.

Resp. in Opp'n to Mot. to Exclude Ewing at 9.  GM ignores the fact that one of the

incidents that Ewing was not provided documents for was the exact same vehicle

where the roof failed.  Mot. to Exclude Ewing at 6-7.  Though these issues seem to

be pertinent to the jury's consideration of Ewing's testimony, these issues are

proper grounds for cross-examination, rather than exclusion.  See Nixon, 2016 WL

1572949, at *3.

Fox further objects that "Ewing has apparently done no work since June 22,

2016, when she was deposed by Plaintiff's counsel in Fox I—instead choosing to

ignore multiple expert reports, 94,000 newly produced documents, and additional

depositions."  Mot. to Exclude Ewing at 13.  These documents include "26

additional crash tests" which "show the ultraview roof separating from the body in

86

crash tests." Reply in Supp. Mot. to Exclude Ewing at 4 n.5. The Court finds that while Ewing's failure to consider these documents is proper grounds for cross-examination, it is not grounds for disqualification. Accordingly, Fox's motion with respect to Ewing is **DENIED.**

### C.    **Summary Judgment Motion**[28]

---

[28] In connection with its summary judgment briefing, the parties filed several motions to seal.

- Fox filed a Motion for Leave to File Under Seal [Doc. 154] images included in its Response to GM's Motion for Summary Judgment ("Pl.'s Resp. Br.") [Doc. 152] and various exhibits filed in support thereof, all of which were designated as confidential by GM. GM filed a response in support of the Motion to Seal, identifying the documents to be sealed. [Doc. 180.]

- Fox filed a Motion for Leave to File Under Seal [Doc. 173] various portions of depositions and exhibits that GM designated as confidential. GM filed a response in support of the Motion to Seal, identifying the documents to be sealed. [Doc. 207.] GM notes that several of the documents were actually designated by Fox as confidential. Fox did not file any supporting reply as to why the documents it designated as confidential should be sealed.

- Fox filed a Motion for Leave to File Under Seal [Doc. 197] a video clip of a crash test GM designated as confidential. GM filed a response in support of the Motion to Seal, identifying the documents to be sealed. [Doc. 204.]

- GM filed a Motion for Leave to File Under Seal [Doc. 199] ("Motion to Seal 199") an exhibit it filed in support of its Reply, an email from Brad Bowers.

Given the Court's previous holding on protection of documents, the parties are aware that the Court does not take motions to seal lightly. See May 8, 2018, Order [Doc. 87]. Fox never filed any brief that supports maintaining the confidentiality

Taking into consideration the Court's previous holdings regarding the admissibility of certain experts and opinions, the Court now turns to GM's Motion for Summary Judgment. GM contends that it is entitled to summary judgment because the negligent design claim is barred by Georgia's Statute of Repose and there is no evidence to support Fox's failure to warn claim.

### 1.    Does the Statute of Repose Bar the Claim?

Georgia's Statute of Repose bars claims filed more than ten years after a vehicle is first sold unless the claim arises "out of conduct which manifests a

---

of documents that she designated confidential. Accordingly, to the extent the motions to seal concern documents that Fox designated confidential, Fox is **ORDERED** to file a brief detailing factual and legal support for maintaining the confidentiality of those documents within ten (10) days of the date of this Order or the Court will enter an order unsealing the provisionally-sealed documents.

Although GM files briefs in an effort to support its confidentiality designations, the briefs are woefully short of legal arguments as to why the subject documents should be sealed. The briefs are identical and contain one sentence regarding the reasons the Court should seal the documents: "It is GM LLC's position that this document is confidential and there is no less drastic alternative available other than sealing the document in order to maintain its confidentiality." Motion to Seal [Doc. 199] at 2. Of course, it is GM's burden to prove these documents are worthy of protection. Simply listing the documents as "confidential" does not meet this burden. GM is **ORDERED** to file a brief detailing factual and legal support for maintaining the confidentiality of those documents within ten (10) days of the date of this Order or the Court will enter an order unsealing the provisionally-sealed documents.

willful, reckless, or wanton disregard for life or property." O.C.G.A. §§ 51-1-11(b)(2), (c). The Statute of Repose also contains an exception: "Nothing contained in this subsection shall relieve a manufacturer from the duty to warn of a danger arising from use of a product once that danger becomes known to the manufacturer." Id. § 51-1-11(c). The parties agree that, given the timing of the manufacture and sale[29] of the vehicle to Fox, her claim is viable only if an exception to the Statute of Repose applies. GM's Br. in Supp. of its Mot. for Summ. J. ("Def.'s Br.") [Doc. 113-1] at 5; Pl.'s Resp. Br. at 21-22. Fox contends that both exceptions apply, and GM contends neither apply.

A plaintiff must show by a preponderance of the evidence that the exception applies. Ivy v. Ford Motor Co., 646 F.3d 769, 773 (11th Cir. 2011); Gaddy v. Terex Corp., No. 1:14-CV-1928-WSD, 2017 WL 1493615, at *5 (N.D. Ga. Apr. 26, 2017). "The burden of showing something by a preponderance of the evidence simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." United States v. Trainor, 376 F.3d 1325, 1331

---

[29] Fox leased the car. Exhibit I [Doc. 113-10]. Georgia courts have interpreted leases as the equivalent of a sale under the Statute of Repose. See Thorpe v. Robert F. Bullock, Inc., 179 Ga. App. 867, 872 (1986).

(11th Cir. 2004) (alterations accepted) (quoting Concrete Pipe & Prods. of Cal.,

Inc. v. Constr. Laborers Pension Trust for So. Cal., 508 U.S. 602, 622 (1993)).

> Georgia courts
>
> have defined a reckless act as an act that is intended by the actor, although the actor does not intend to cause the harm which results from it.  It is enough that he [or she] realize or, from facts which he [or she] knows, should realize that there is a strong probability that harm may result, even though he [or she] hopes or even expects that his [or her] conduct may prove harmless.  [Georgia courts] have defined wanton conduct as conduct that is so reckless or so charged with indifference to the consequences as to be the equivalent in spirit to actual intent.

Chrysler Grp., v. Walden, 339 Ga. App. 733, 737 (2016) (quotation marks and

citations omitted; alterations accepted).  Fox's position is that GM's conduct was

reckless and wanton in the following ways: (1) the ultraview roof of Fox's 2004

Cadillac SRX, was a new design consisting of two large pieces of glass and a thin

frame of plastic attached to the roof only by glue that was designed to last ten

years; this meant that the roof "had almost no lateral support and the underlying

structure was extremely weak"; (2) GM failed to test the design of the ultraview

roof to ensure it would stay on in a rollover; and (3) GM failed to warn Fox of the

dangers posed by the ultraview roof, even though a December 2004 rollover on

GM's own proving grounds showed that the ultraview roof would come off and the

90

roof structure of the SRX would crush down into the occupant compartment in a rollover.  Pl.'s Resp. Br. at 22-23.

GM's position is that "[t]he undisputed evidence . . . is that the strength of the overall roof structure significantly exceeded the federal safety standard that was applicable in 2004"[30] and, therefore, GM could not have been reckless or wanton.  Def.'s Br. at 8.  While not conceding that GM met minimum federal standards, Fox argues that, even if it did, this would not entitle GM to summary judgment on the issue of whether it acted recklessly or wantonly.  Pl.'s Resp. Br. at 24-25.  The parties dispute the importance of compliance with federal standards. In Walden, Chrysler appealed a jury verdict finding that it acted with reckless or wanton disregard for human life when it located the gas tank in the rear of its Jeep Grand Cherokee vehicle.  Walden, 339 Ga. App. at 737-38.  Chrysler argued that because the design complied with Federal Motor Vehicle Safety Standards, it was

---

[30] Fox points out that "GM never tested the ultraview SRX to know whether it met federal minimum standards and still doesn't know whether the SRX meets the minimum standards once the roof comes off in a rollover."  Resp. Br. at 25.  GM contends that contemporaneous documents it produced confirm that the computer analysis was done.  GM's Reply in Supp. of its Mot. for Summ. J ("Reply") [Doc. 198] at 3 (citing "Brad Bowers Email," Bates FOXII000000672-673 [Doc. 200-1]). The Court will assume for the purposes of summary judgment that GM met all applicable federal standards for the Cadillac SRX 2004 design.

91

entitled to a directed verdict on the issue of reckless or wanton conduct.  Id. at 737.

The Georgia Court of Appeals disagreed, concluding that "[s]uch compliance is a

factor for the jury to consider in deciding the question of reasonableness, but it

does not render Chrysler immune from liability.  Id. (quoting Doyle v.

Volkswagenwerk Aktiengesellschaft, 267 Ga. 574, 577 (1997) (quotation marks

omitted)).  Sitting in diversity jurisdiction, this Court is bound by the Georgia

Court of Appeals' interpretation of the Statute of Repose.  Erie R. Co. v.

Tompkins, 304 U.S. 64, 79 (1938).  Accordingly, assuming GM's design of the

2004 Cadillac SRX met Federal Motor Vehicle Safety Standard 216, the Court

finds that such compliance does not establish as a matter of law that GM was not

wanton or reckless in the design of the 2004 Cadillac SRX.  See Walden, 339 Ga.

App. at 737-38.

GM relies heavily on Ivy to argue the opposite conclusion.  In that case, the

Eleventh Circuit held that

> where the vehicle at issue satisfied the two tests deemed most
> appropriate by the relevant federal agency and satisfied as well the
> Consumers Union Test, the mere fact that some expert might develop
> an after-the-fact opinion that the vehicle is defective is not sufficient to
> create a genuine issue of material fact as to whether Ford was willful
> and wanton with respect to marketing the vehicle.

Ivy, 646 F.3d at 777.

92

Unlike <u>Ivy</u>, in this case, Fox has presented more than "an after-the-fact opinion that the vehicle is defective."  Rather, Fox has presented evidence sufficient to allow a reasonable trier of fact to find that GM exhibited reckless and wanton conduct based on the following facts: (1) GM's 2004 Cadillac SRX ultraview roof never was tested in a rollover, (2) GM never considered what would happen to the plastic and glass roof in a rollover, and (3) the NHTSA standards were not based on the possibility of the roof coming off in a rollover, which GM has admitted was foreseeable.  Pl.'s Resp. Br. at 29.[31]

---

[31] GM argues in its Reply that Fox has failed to establish any facts that would establish reckless or wanton conduct prior to the manufacture of the vehicle in 2003.  Reply at 7.  For design defect cases, "the trier of fact may consider evidence establishing that <u>at the time the product was manufactured</u>, an alternative design would have made the product safer than the original design and was a marketable reality and technologically feasible."  <u>CertainTeed Corp. v. Fletcher</u>, 300 Ga. 327, 328 (2016) (citation omitted; emphasis added), <u>reconsideration denied</u> (Dec. 8, 2016).  While Fox establishes many facts post-2003 that show troubling behavior on the part of GM, most of the pre-2003 facts relate to actions GM could have taken, but did not.  For example, by GM's own admission, prior to the manufacture in 2003, it never actually tested the ultraview roof on the Cadillac SRX.  <u>See</u> Def.'s Br. at 10 ("GM performed a test on a conventional roof Cadillac SRX, then used that data to create a computer model of an SRX with a sunroof.").  The Court finds that this last fact, standing alone, is sufficient to permit a reasonable trier of fact to find evidence of reckless or wanton misconduct.

**2.     Are Fox's Failure to Warn Claims Barred for Lack of Evidence?**

**a.     Did GM Have a Duty to Warn?**

"[T]he duty to warn arises whenever the manufacturer knows or reasonably should know of the danger arising from the use of its product." Chrysler Corp. v. Batten, 264 Ga. 723, 724 (1994). Without citing any case law, GM makes the argument that Fox's age at the time of the manufacture (age 11) somehow absolves it of a duty to warn her of dangerous conditions with the vehicle. Def.'s Br. at 19. However, the duty arises once GM discovers a dangerous condition with the product. See Batten, 264 Ga. at 724. Fox's age at the time of manufacture is irrelevant. See id. ("[T]he duty to warn of a danger arises from a manufacturer's post-sale knowledge acquired months, years, or even decades after the date of the first sale of the product."). To the extent GM is attempting to make an argument about the foreseeability of Fox's use of the vehicle, Fox owed her a duty because she leased the vehicle. See CertainTeed, 300 Ga. at 330 ("The duty to warn may be owed to consumers, reasonably foreseeable users, and, purchasers of the product."). Moreover, it is entirely foreseeable that a ten-year-old car may be purchased/leased and used.

94

GM also contends that it had no duty to warn because "the risk of glass breaking in a high-speed rollover accident is open, obvious, and generally known." Def.'s Br. at 19. "Generally, there is no duty on the seller to warn the user or consumer of a patent defect or danger that the purchaser should recognize." Boyce v. Gregory Poole Equip. Co., 269 Ga. App. 891, 895 (2004) (noting that "An open and obvious danger no longer alone bars design defect claims in Georgia, but may bar 'failure to warn' claims."). But Fox's allegations are that GM failed to warn her that the ultraview roof could detach and thus increase the risk of a roof-crush injury to vehicle occupants. Pl.'s Resp. Br. at 32. The risk of such an event is far less obvious than the simple risk that glass could break. Warnings must be appropriate to the risks. R & R Insulation Servs., Inc. v. Royal Indem. Co., 307 Ga. App. 419, 429 (2010) ("[W]hile generally speaking one might understand that a plastic material will melt or burn when exposed to an open flame, it does not necessarily follow that one would understand this particular product would burn in the manner and speed alleged by Wayne Farms."). The Court finds that GM had a duty to warn Fox that the ultraview roof could detach and thus increase the risk of a roof-crush injury to vehicle occupants.

95

### b.      Did GM Warn Fox?

GM further argues that it adequately warned Fox of the risks because the 2004 SRX Owner's Manual states that "[i]n a rollover or other crash, the Ultraview roof can be damaged or destroyed" and that Fox admitted she knew the sunroof could break or be damaged in a rollover.  Def.'s Br. at 19 (citing June 29, 2015, Dep. of Veronica Alaine Fox [Doc. 113-21] at 131).  But Fox does not contend that she should have been warned about the glass breaking; rather, she contends she should have been warned about the possibility of the ultraview roof could detach, thus increasing the risk of a roof-crush injury to vehicle occupants.  Pl.'s Resp. Br. at 32.  GM's position that a warning that the roof "can be damaged or destroyed" was sufficient to adequately warn Fox of the potential of the roof detaching falls short of establishing that GM is entitled to summary judgment on the issue of failure to warn.  It is up to the trier of fact to consider whether this warning was inadequate to warn Fox of the risk of a detached roof.  See Key Safety Sys., Inc. v. Bruner, 334 Ga. App. 717, 721 (2015) (holding that the adequacy of warning in owner's manual would have been a fact question for the jury); Zeigler v. CloWhite Co., 234 Ga. App. 627, 629 (1998) ("Such matters generally are not susceptible of summary adjudication and should be resolved by a trial in the ordinary manner.") (citation omitted).

96

### c.    Is There Evidence of Proximate Cause?

GM further contends that it is entitled to summary judgment on the failure to warn claim because Fox cannot show proximate cause because she admits she did not read the owner's manual, research the vehicle online before purchasing it, see any television advertising, or view the Insurance Institute for Highway Safety's vehicle ratings.  Def.'s Br. at 21.  However, "failure to read a warning does not bar recovery when the plaintiff is challenging the adequacy of the efforts of the manufacturer or seller to communicate the dangers of the product to the buyer or user."  Thomas v. Hubtex Maschinenbau GmbH & Co KG, No. CIV.A. 7:06-CV-81 HL, 2008 WL 4371977, at *11 (M.D. Ga. Sept. 23, 2008) (quoting Camden Oil Co. v. Jackson, 270 Ga. App. 837, 840 (2004)); Jones v. Amazing Prods., Inc., 231 F. Supp. 2d 1228, 1247 (N.D. Ga. 2002) ("A plaintiff's failure to read a warning will not . . . bar recovery . . . where the plaintiff is challenging the *adequacy* of the defendant's efforts to communicate the dangers of the product to the user, not the *substance* of those warnings.").  Even if the Court was to presume that GM actually issued a warning, "[i]t is a jury question whether or not the manufacturer was negligent in failing to place a warning in such position, color and size print or to use symbols which would call the user's attention to the warning or cause the user to be more likely to read the label and warning than not."  Camden Oil Co.,

97

270 Ga. App. at 841.  As the Georgia Supreme Court held in Ford Motor Co. v.

Gibson, 283 Ga. 398 (2008), on the issue of proximate cause:

> [A]s there exists some evidence from which a jury could conclude that Ms. Gibson was unaware of (and could not have obviously known about) the potential dangers posed by the Marquis, that Ford was aware of the dangers and failed to adequately warn Ms. Gibson of them, and that the very dangers of which Ford failed to warn Ms. Gibson came to fruition during the car accident that ultimately killed her, this argument is without merit.

Gibson, 283 Ga. at 403.  Because Fox has proffered evidence that GM failed to

adequately warn Fox of the dangers that the roof could detach, GM's motion for

summary judgment on the issue of failure to warn is **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** as follows on the

motions filed by Defendant General Motors LLC:

A.    Motion to Exclude the Expert Testimony of G. Bryant Buchner [Doc. 105] is **DENIED**;

B.    Motion to Exclude the Expert Testimony of Cathy Gragg-Smith [Doc. 106] is **DENIED**;

C.    Motion to Exclude the Expert Testimony of Brian Herbst [Doc. 107] is **DENIED**;

D.    Motion to Exclude the Expert Testimony of Lila Laux [Doc. 108] is **DENIED**;

98

E.     Motion to Exclude the Expert Testimony of Allan Kam [Doc. 109] is **DENIED**;

F.     Motion to Exclude the Expert Testimony of Mariusz Ziejewski [Doc. 110] is **GRANTED IN PART and DENIED IN PART.** Ziejewski may reference the Air Force studies in the context of establishing his background and qualifications, but may not present the factual findings of the Air Force studies to the jury;

G.     Motion to Exclude Certain Expert Testimony of Jonathan Eisenstat, M.D. [Doc. 111] is **DENIED**;

H.     Motion to Exclude Certain Expert Testimony of Gustavo Pradilla, M.D. [Doc. 112] is **DENIED**;

I.     Motion for Summary Judgment [Doc. 113] is **DENIED**;

and as follows on the motions filed by Plaintiff Veronica Alaine Fox:

J.     Motion to Exclude GM Expert Witnesses [Doc. 125] is **GRANTED IN PART and DENIED IN PART**. The motion to exclude Pacheco and Lu is **DENIED AS MOOT**. The motion to exclude English and Michalski is **GRANTED**. The motion to exclude the new opinions of Natarajan, Carhart, Germane, and the 2006 Exponent test is **GRANTED**. The motion to exclude the entirety of the opinions of Natarajan, Carhart, and Germane is **DENIED**;

K.     <u>Daubert</u> Motion to Exclude Portions of Michael Carhart's Proposed Testimony [Doc. 126] is **GRANTED IN PART and DENIED IN PART**. The motion to exclude reliance on tests 1-6, 8-9, 12-30, 36-40, and 42 is **GRANTED**, although the Court will reconsider its ruling if GM contends Carhart needs to rely upon any of these tests during Fox's cross-examination. Fox's motion to exclude tests 7, 10, 11, 33-35, and 41 is **GRANTED IN PART and DENIED IN PART**; GM is limited to oral testimony only with respect to those tests;

99

L.     <u>Daubert</u> Motion to Exclude any Medical Testimony or Opinions of GM's Paid Testifiers Michael Carhart and Geoffery Germane [Doc. 127] is **GRANTED IN PART and DENIED IN PART AS MOOT**. The motion is **DENIED AS MOOT** with respect to Carhart, and **GRANTED** as to Germane;

M.    <u>Daubert</u> Motion to Exclude Edward Moffatt's Testimony [Doc. 128] is **GRANTED**;

N.    <u>Daubert</u> Motion to Exclude GM's "Experts" Proposed Testimony on Statistics [Doc. 129] is **GRANTED IN PART and DENIED IN PART**. The experts may present statistics regarding SUVs that have been subject to rollover accidents;

O.    Motion to Exclude the Testimony of GM "Expert" Kon Mei Ewing [Doc. 130] is **DENIED**.

**IT IS FURTHER ORDERED** that the parties supplement their briefing on the Motions to Seal [Docs. 154, 173, 197, & 199], detailing factual and legal support for maintaining the confidentiality of documents, within ten (10) days of the date of this Order. If they fail to do so, the Court will enter an order unsealing the applicable provisionally-sealed documents.

**IT IS FURTHER ORDERED** that the parties shall file a Consolidated Pre-Trial Order no later than thirty (30) days from the date of this Order.

**IT IS SO ORDERED** this ___4th___ day of February, 2019.


MARK H. COHEN
United States District Judge