# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| VERONICA ALAINE FOX, | * | |
| | * | |
| Plaintiff, | * | CIVIL ACTION FILE |
| | * | |
| v. | * | NO. 1:17-cv-209-JPB |
| | * | |
| GENERAL MOTORS LLC, | * | |
| | * | |
| Defendant. | * | |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO GM LLC'S
## CONSOLIDATED MOTIONS IN LIMINE

James E. Butler, Jr.
Tedra L. Cannella
Robert H. Snyder, Jr.
Rory A. Weeks
BUTLER WOOTEN & PEAK LLP
2719 Buford Highway
Atlanta, GA 30324
(404)321-1700

Kenneth S. Nugent
William G. Hammill
KENNETH S. NUGENT, PC
4227 Pleasant Hill Road
Building 11, Ste. 300
Duluth, GA 30096
(404)885-1983

*Attorneys for the Plaintiff*

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

LEGAL STANDARD ...........................................................................................2

RESPONSES TO GM'S MOTIONS IN LIMINE NUMBERED 1-20................4

1.   Evidence or argument concerning any alleged defect other than those alleged by the Complaint, discovery responses and supported by Plaintiff's experts.................................................................................4

2.   Evidence or argument concerning any alleged failure to warn that occurred on or after the date GM LLC came into existence. ....................5

3.   Evidence or argument related to or suggesting a standard of negligence, strict liability or anything less than willfulness, recklessness, or wantonness in the design of the vehicle. .......................10

4.   Evidence relating to new Federal Motor Safety Standards, IIHS ratings, or other government standards which did not come into effect until after this vehicle was manufactured and sold. ......................11

   i.    The increased federal minimum roof strength standard. ................13

   ii.   The IIHS roof strength ratings. ........................................................15

   iii.  Evidence about the increased federal minimum roof strength standard and IIHS roof strength ratings is admissible. .................18

5.   References to money paid to GM LLC's experts by other companies and/or in other cases should be excluded...............................24

6.   Evidence or argument concerning so-called "subsequent designs" of the Cadillac SRX.................................................................................27

7.   Documents requested but not produced in discovery. ............................35

8.  Documents or arguments that "positive fasteners" were recommended by Webasto for the roof structure (or any characterization by Plaintiff's counsel about what that phrase means)...................................................................................36

9.  Evidence concerning Brian Herbst's drop tests on Cadillac SRX vehicles. ...............................................................................................37

10. Evidence concerning Brian Herbst's drop tests of Volvo XC90 vehicles. ...............................................................................................41

11. Evidence of alleged "other similar incidents" *unless/until* the proper foundation is laid...........................................................................42

12. Any reference to the ignition switch recall, the "Valukas Report," the Deferred Prosecution Agreement and/or statements made to Congress relating to the ignition switch recall. .........................................44

13. Evidence or argument regarding GM LLC's bankruptcy or subsequent "government bailout." ........................................................48

14. Evidence or reference to unrelated well-known product liability lawsuits (i.e., Firestone tire recall/litigation, GM ignition switch recall/litigation, Crown Victoria Police Interceptor cases, Ford Pinto recall/litigation, etc.). .....................................................................52

15. Evidence, questions or references regarding statements allegedly made outside of the formal pleadings and/or outside of statements actually made in Court...............................................................................53

16. Arguments or statements related solely to punitive damages (i.e., "send a message," "teach a lesson," "punish," etc.)................................54

17. Evidence or argument regarding prior discovery disputes or discovery motions (including motions for sanctions) which were previously filed and addressed by the Court (in this action or the previously state-court action). .................................................................54

18.    Evidence or argument concerning the size, net worth, profitability or any other financial circumstances concerning the parties in this case, or their employees. .........................................................................55

19.    Arguments/references to "consumer safety" as a purpose for this case, or talking of the jury's verdict as a way to "regulate" industries or otherwise direct the conduct of others.................................56

20.    Questions, statements or argument from counsel that GM has "destroyed evidence" or otherwise acted improperly with respect to incident(s) which occurred at the Milford Proving Grounds. ..................56

# INTRODUCTION

Motions in limine *can have* a very legitimate purpose and useful function: they *can* narrow the issues and thereby shorten the trial, avoid needless objections during trial and delays within the trial while lawyers argue, and help avoid reversible error. But too often defendants abuse the form and use MILs to create traps for the Court and opposing counsel.[1] That's what GM is doing with its MILs.

Almost none of GM's 20 MILs identify precisely what GM does not want said at trial or what evidence it wants excluded. Many are vague or overbroad. Some are both. With respect to nearly all, if not all, of GM's MILs it is impossible for anyone to predict, now, in advance of trial, what GM's trial counsel may, at trial, think is a "violation" of something supposedly covered by a GM MIL—and impossible to predict, now, what GM's appellate counsel may argue on appeal was a supposed "violation."

To make sure the case is tried cleanly without error, Plaintiff asks that the Court instruct GM to object at trial anytime GM contends something objectionable has occurred—whether the Court has granted, denied, or deferred a GM MIL. That way both the Court and Plaintiff's counsel have an opportunity to consider the

---

[1] Plaintiff has filed a trial brief detailing the traps that MILs can create. *See* Doc. 227-13 at 7-13.

claim, and potentially try to cure the supposed 'error.'[2]  So handled, experience

teaches that few, if any, issues related to GM's MILs will materialize at trial.[3]

## LEGAL STANDARD

The Court should only grant a motion in limine and exclude evidence if the

evidence is clearly inadmissible for any purpose.  *Wilson v. Pepsi Bottling Grp.,*

*Inc.*, 609 F. Supp. 2d 1350, 1359 (N.D. Ga. 2009) (Evans, J.).  GM bears the

burden of proving that the evidence or argument it asks be excluded is

inadmissible.  *Id.*; *see also Conklin v. R T Eng'g Corp.*, No. 3:17-cv-415, 2018 WL

7291430, at *1 (M.D. Fla. Nov. 16, 2018) ("M[ILs] should be limited to specific

pieces of evidence and not serve as reinforcement regarding the various rules

governing trial . . . .").

---

[2] Ordering GM to object at trial even if a MIL is granted or denied does not create
an undue burden on GM because GM already must do so to preserve the issue for
appeal.  *See Frederick v. Kirby Tankships, Inc*., 205 F.3d 1277 (11th Cir. 2000)
(plaintiff's granted motion in limine excluding certain testimony did not preserve
the issue for appeal where he failed to timely object to the testimony's admission at
trial); *Judd v. Rodman*, 105 F.3d 1339, 1342 (11th Cir. 1997) ("An overruled
motion in limine does not preserve a party's objection for purposes of appeal; a
timely objection at trial is required.").

[3] Plaintiff's counsel have been down this MIL-abuse road before with automakers,
most recently with Ford in *Hill v. Ford* in Gwinnett County.  In that case Judge
Bratton denied or deferred most of Ford's MILs.  While that trial had myriad
problems—most significantly Ford's flagrant and repeated violations of the court's
orders culminating in a mistrial after 15 days in trial (and months of pretrial
work)—issues related to Ford's MILs were nonexistent.

No MIL should be granted unless the MIL very precisely and with particularity identifies *what it is* the movant seeks to proscribe at trial.  *The Court and* Plaintiff both have an absolute right at trial *to notice* if and when GM claims an evidentiary error has occurred or a Court ruling has been violated.  That is the purpose of an "objection."  GM's lawyers certainly know how to object.  The Court should deny MILs that are vague, or overbroad, or that fail to specify what evidence should be excluded, or that are made in the abstract, anticipating hypothetical situations that may or may not materialize at trial.  *See Showan v. Pressdee*, No. 1:16-cv-468, 2017 WL 9400750, at *4 (N.D. Ga. Nov. 3, 2017) (Evans, J.) (denying MILs "too vague to warrant a ruling in limine"), *aff'd*, 922 F.3d 1211 (11th Cir. 2019).[4]

---

[4] *See also United States v. An Easement & Right-of-way Over 1.58 Acres of Land*, 343 F. Supp. 3d 1321, 1333 (N.D. Ga. 2018) (Murphy, J.) (denying MIL in part because it "is not sufficiently specific, as he fails to identify any parcel that he claims is not comparable"); *City of Mountain Park, Ga. v. Lakeside at Ansley, LLC*, No. 1:05-cv-2775, 2010 WL 3942788, at *6 (N.D. Ga. Apr. 26, 2010) (Pannell, J.) ("Because the plaintiff has not identified specific testimony for the court to consider, this motion in limine is DENIED."); *U.S. Bank Nat'l Ass'n, N.D. v. Tompkins & Somma LLC*, No. 2:09-cv-1823, 2011 WL 13234321, at *2 (N.D. Ala. Dec. 21, 2011) (denying MIL as too vague where movant pointed to no particular evidence that was supposedly inadmissible); *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, No. 2:05-cv-165, 2006 WL 1071997, at *2 (M.D. Fla. Apr. 24, 2006) (denying MIL "too vague for the Court to make a ruling excluding evidence"); *Grant v. Target Corp.*, No. 4:14-cv-132, 2015 WL 5898421, at *1 (S.D. Ga. Oct. 8, 2015) (denying  MILs based on their "uncertain applicability and abstractness").

**RESPONSES TO GM'S MOTIONS IN LIMINE NUMBERED 1-20**

1.   **Evidence or argument concerning any alleged defect other than those alleged by the Complaint, discovery responses and supported by Plaintiff's experts.**

As this Court Ordered, Plaintiff met and conferred in good faith with GM about this (and every other) MIL.  *See* Pretrial Order, Doc. 242 at 6.  During that process, Plaintiff told GM that she will not argue she is entitled to recover for any defects other than those identified in her Complaint, discovery responses, and expert materials.  GM, however, refused to take "yes" for an answer and insisted on filing MIL 1.

This MIL should be denied because it is too vague for a response or ruling. GM does not to specifically identify what "other" defects it is talking about.[5] Plaintiff and the Court can only guess what GM is talking about.  Plaintiff and the Court should not have to try to read GM's mind to figure out what "evidence and argument" would supposedly be excluded by this MIL.  The Court should instruct GM to object at trial if it claims that something has been (or is about to be) said

---

[5] Though only a guess, GM seems to be trying to secure an *in limine* ruling to immunize itself and its experts from Exponent from questions, evidence, and arguments that undermine GM's claim that the SRX's seatbelt was incapable of keeping Ms. Fox in her seat and off of the roof because she is overweight.  *See* Pl.'s Omnibus MILs, Doc. 297 at 15-17.  But it is *GM* who suggests the seatbelt did not keep Plaintiff in her seat.  Plaintiff obviously must respond to that.

4

that supposedly is a "violation" of this MIL.  Then, with the benefit of context, the Court can rule on GM's objection.

### 2. Evidence or argument concerning any alleged failure to warn that occurred on or after the date GM LLC came into existence.

This MIL should be denied because GM LLC is the defendant in this case and its conduct is admissible at trial for impeachment and other purposes.  The MIL also is vague.[6]

GM Corp. declared bankruptcy in June 2009.  Forty days later, a new entity that became GM LLC emerged from bankruptcy, having used a taxpayer bailout to purchase substantially all of GM Corp.'s assets, including its books and records, while escaping most of GM Corp's liabilities.  The new GM entity continued to employ all of GM Corp.'s employees. *See In re Motors Liquidation Co.*, 829 F.3d 135, 144-48 (2d Cir. 2016) (providing brief history of GM bankruptcy).  As part of its purchase of GM Corp. assets, GM LLC agreed to assume liability for product liability claims arising after the bankruptcy sale that involved cars manufactured by GM Corp.  That is why GM LLC is the defendant in this case and why it is irrelevant whether GM LLC is legalistically a "new" or "different" company.  *See*

---

[6] For example, it is unclear what GM means by arguments or statements that "impugn" its "independent conduct."  Plaintiff and the Court should not have to guess what GM contends should not be said at trial.

Pl.'s MIL No. 5, Doc. 297 at 12-15.

Veronica Fox was paralyzed on November 12, 2013, in a rollover wreck in which the glued-on glass-and-plastic roof (the ultraview roof) separated from her 2004 SRX and the remaining roof structure crushed down into the occupant compartment.  GM Corp. designed and manufactured Ms. Fox's car.  GM Corp. knew for certain by December 16, 2004 that the design of the ultraview roof was dangerous, yet GM Corp. never warned anyone of those dangers.  After it purchased all of GM Corp.'s assets and employed all of GM's Corp.'s employees, GM LLC also knew of the dangers of the SRX's glued-on glass-and-plastic roof and also never warned anyone of those dangers from July 2009 until November 12, 2013.  GM LLC's failure to warn continues to this day.  ***That no GM entity (Corp. or LLC) has ever warned anyone about the dangers of the ultraview roof in the 2004-2009 Cadillac SRX is an indisputable fact that the jury is entitled to know.***

In *Fox I*, Plaintiff sued GM LLC for its own failure to warn in a complaint filed on December 23, 2014.  On June 1, 2016, GM LLC sought to delay a specially set September 23, 2016 trial in that case by filing a motion against Ms. Fox in the Bankruptcy Court of the Southern District of New York, suddenly claiming that her claims against GM LLC violated the bankruptcy court's orders despite never having raised *any* bankruptcy issues in that case during the preceding

18 months.  To avoid delaying her then-specially set trial, Ms. Fox agreed not to assert "independent claims" against GM LLC for its own conduct.[7]  Ms. Fox did not agree that she has no such claims or that GM LLC conduct is wholly irrelevant in this case.  *See* Stip. & Agreed Order ¶ 5, *In re Motors Liquidation Co.*, No. 09-50026-mg (Bankr. S.D.N.Y. July 12, 2016), ECF No. 13679.

GM is flat wrong when it declares that "GM LLC's independent conduct is entirely irrelevant to the claims in this lawsuit."  Doc. 296 at 4.  While Plaintiff has not brought an "independent claim" against GM LLC in this case, that does not mean all evidence of GM's post-bankruptcy conduct is irrelevant and inadmissible.  This is so for multiple reasons.

*First*, GM LLC's defenses in this case include the argument that Veronica Fox *was warned* and she had *knowledge of and assumed the risk* associated with the SRX roof.[8]  Plaintiff cannot fully defend against that claim unless she can tell

---

[7] At the time of GM's June 1, 2016 motion, there was an appeal pending before the Second Circuit on the viability of so-called "independent claims" (claims against GM LLC for its own conduct).  Plaintiff had no idea when the Second Circuit would rule, and the bankruptcy court stated at the hearing on GM's motion that it was inclined to stay Plaintiff's case until the Second Circuit ruled, which in turn would likely cause Plaintiff to lose her special trial setting.  With a quadriplegic client and strong claims based on GM Corp.'s conduct, Plaintiff's counsel agreed to dismiss Plaintiff's claims against GM LLC for its own conduct in order to save Plaintiff's trial setting.

[8] *See* Doc. 5 at 3; Dorris Dep. Ex. 9 at 5 (GM's expert stating "the warnings and

the jury the truth: that she received no warning at any time, either before or after 2009.  GM's MIL is not just an attempt to exclude evidence; it is also an attempt to prevent Plaintiff from truthfully responding to GM LLC's affirmative defense in the case.  That GM LLC never warned anyone, especially Ms. Fox, about the ultraview roof's dangers is an important fact that the jury needs to know to decide the affirmative defenses GM LLC has raised.  If GM has its way, the jury will be left wondering whether—or believing that—some warning may have been made after July 2009.  Allowing GM to create that false impression with the jury would be improper and prejudicial.  Fed. R. Evid. 403.

*Second*, the fundamental job of the jury is to assess the credibility of the party making an argument.  It is GM LLC—not GM Corp.—that will make the 'adequate warning' and 'assumption of the risk' argument to the jury.  The credibly of GM LLC is therefore extremely relevant.  Plaintiff must be permitted to impeach GM LLC on its claim that Plaintiff was warned and had full knowledge of the dangers of the SRX roof.  Plaintiff should be able to ask: how can a party— who knew all about the design of the SRX, who knew about the proving grounds rollovers—stand up in Court and claim Ms. Fox had full knowledge of the danger?

---

instructions associated with the subject 2004 Cadillac SRX were reasonable and appropriate . . . .") (excerpt attached as Exhibit 1).

GM LLC cannot credibly make its 'adequate warning' or 'assumption of the risk'
argument if the jury knows the full truth, which is why GM LLC wants to exclude
that truth.

*Third*, GM LLC has asserted throughout this case that the nearly identical
wreck on GM's own proving grounds nine years before Ms. Fox's wreck did not
give GM notice of a potential defect, and thus GM did not have to issue a
warning,[9] because no one, according to GM, was seriously hurt in that rollover.[10]
Plaintiff contends that is false—GM would not have warned anyone regardless of
whether someone would have been more severely injured or killed in the 2004
proving grounds rollover.  The evidence GM wants this Court to exclude is the
evidence that impeaches GM LLC's argument and proves Plaintiff is correct: after
Plaintiff was paralyzed when the roof came off, no warning was issued.  This
impeachment evidence is relevant and admissible regardless of whether GM LLC

---

[9] GM's argument is legally flawed.  There is no requirement that an automaker
have notice that someone has been seriously injured in one of its cars for a duty to
warn to arise.  The automaker simply has to know of the danger of injury caused
by its product.  *See* Pl.'s MIL No. 10, Doc. 297 at 23-25.

[10] *See* Doc. 227-14 at 23 ("The fact that there were accidents involving a Cadillac
SRX on GM's own proving grounds does not give rise to a duty to warn.  There
were no serious injuries in any of those crashes.").  GM has the facts wrong.
People were seriously injured in that December 2004 rollover—blood and hair
were found on the pavement, blood was splattered all over the inside of the car,
and two occupants were hospitalized.

can be held financially liable for its own failure to warn, because *the party making the argument* that no warning is necessary until a serious injury happened *did not issue a warning* after serious injuries did happen.  GM can try to explain its conduct to the jury by arguing it had no duty to warn, but the jury is ultimately entitled to weigh the undisputed evidence and come to its own conclusion.

Because GM LLC's own failure to warn is admissible for various purposes, the Court should deny GM's MIL 2.

**3.    Evidence or argument related to or suggesting a standard of negligence, strict liability or anything less than willfulness, recklessness, or wantonness in the design of the vehicle.**

The Georgia statute of repose has four exceptions in an auto products case: the manufacturer's conduct manifests a (1) willful, *or* (2) reckless, *or* (3) wanton disregard for life or property; *or* (4) the manufacturer breached its duty to warn of a known danger.  O.C.G.A. § 51-1-11(c); *Chrysler Corp. v. Batten*, 450 S.E.2d 208, 213 (Ga. 1994).  To prevail at trial, a plaintiff need prove only one of those four exceptions.[11]  (Plaintiff does not attempt to use the "willful" exception.  *See*

---

[11] To the extent that GM's MIL claims that there is only one exception for design defect claims—rather than three—that claim is contrary to Georgia law.  *See Chrysler Grp., LLC v. Walden*, 792 S.E.2d 754, 759-61 (Ga. Ct. App. 2016) (affirming products liability verdict in statute of repose case where only reckless or wanton conduct were alleged), *aff'd unanimously*, 812 S.E.2d 244 (Ga. 2018).

Doc. 1-1 at 20 n.9.[12]).  Instead, she has alleged—and will prove at trial—not only that GM's misconduct was reckless and wanton but also that GM breached its duty to warn of a known danger.[13]

During the meet-and-confer process, Plaintiff told GM that she agrees not to argue that her design defect claim is subject to any standard other than reckless or wanton conduct.  GM refused to withdraw this MIL.  GM's brief offers no clues as to why it would not agree, nor does GM explain why a Court Order is needed on this MIL.  The law is the law.  The Court should deny this unnecessary MIL.

**4.    Evidence relating to new Federal Motor Safety Standards, IIHS ratings, or other government standards which did not come into effect until after this vehicle was manufactured and sold.**

GM asks this Court to exclude evidence that GM's primary argument—that "roof crush doesn't matter"[14]—has been categorically rejected by the National Highway Traffic Safety Administration ("NHTSA") and by the independent auto

---

[12] The reason is that the caselaw defining the word "willful" is so scrambled and contradictory crafting a jury instruction that would clearly not cause potential error on appeal is not worth the risk.

[13] Even in a statute of repose case, GM's failure to warn does not have to be reckless or wanton.  Here, however, GM's failure to warn was both reckless and wanton.  *See* Doc. 152 at 6, 23; Doc. 227-4 at 17.

[14] GM calls its argument "making roofs stronger would not prevent injury."  Doc. 155 at 14; *id.* at 27 ("increased roof strength does not prevent injuries").  That is the same as "roof crush doesn't matter."

safety analysis agency IIHS (Insurance Institute for Highway Safety).  GM calls

that position the "heart and soul" of its "defense in this case."[15]  Doc. 151 at 10.

Plaintiff is obviously allowed to dispute and impeach that testimony with the

undisputed fact that GM's regulator and the safety industry flatly rejects that

theory.  ***Even GM has admitted Plaintiff may do so***.  GM told this Court:

"[P]laintiff can cross-examine [GM's expert] about what everyone else 'in the

known world,' including NHTSA, IIHS, and GM's engineers, have said about roof

---

[15] GM's "heart and soul" argument is made up.  GM has offered no proof whatsoever that GM ever even considered the "roof crush doesn't matter" argument when designing the 2004 SRX, much less that GM settled on such a weak roof *because of* that argument.  GM's own lead roof design engineer for the 2004 SRX, Conrad, testified that in designing the SRX's roof, there was no discussion about what would happen when the glass-and-plastic-roofed SRX rolled over.  Doc. 174, 3/18/16 Conrad Dep. 13/17-23; *see also* Doc. 343, 7/3/19 Conrad Dep. 41/17-42/6.  More fundamentally, GM indisputably does not believe its own "heart and soul" argument.  McLean, GM's own lead roof design engineer for the new roof GM designed after the 2004 rollover on GM's own proving grounds, unequivocally testified "as a GM engineer" that "I have to say that I do believe roof crush matters" because "there are injuries caused by roof crush, yes."  Doc. 176, McLean Dep. 77/22-78/3.  McLean testified he had never heard a GM engineer say what GM's lawyers call their "heart and soul" argument, that "roof crush doesn't matter."  *Id.* at 107/12-14.  GM's own actions also are diametrically opposed to its "heart and soul" argument.  After the December 16, 2004 proving grounds wreck, and after the GM Legal and engineering investigation of that wreck and the SRX involved, GM totally redesigned the roof, abandoning the glued-on design.  Within nine months—lightning fast for an automaker—GM had created specifications for a new sunroof that was bolted on to the roof structure.  Px. 69a (attached as Exhibit 2).

strength." Doc. 151 at 27. GM's prior admission that its MIL is without merit should be the end of the Court's analysis.

However, because GM has filed a MIL on evidence it has already conceded is admissible, Plaintiff must respond. NHTSA's increased minimum roof strength standard and the IIHS standard are admissible to (1) prove that after GM had indisputable, actual knowledge that the SRX's roof was unacceptably weak and dangerous, it violated its continuing duty to warn Ms. Fox (and everyone else) of the dangers posed by the roof; (2) rebut and impeach GM's "roof crush doesn't matter" argument and testimony; and (3) prove that GM's decision to design and sell such a weak roof was reckless and wanton because both NHTSA and IIHS have concluded that such a low roof strength was unacceptable. In fact, the law and NHTSA have always rejected GM's "roof crush doesn't matter" argument.[16]

### i.   The increased federal minimum roof strength standard.

The federal minimum[17] roof strength standard (FMVSS 216) in force in

---

[16] *For 48 years*—since 1971—the law has been that "the purpose" of the federal minimum roof strength standard, FMVSS 216, "is to reduce deaths and injuries due to the crushing of the roof into the occupant compartment in rollover crashes." 49 C.F.R. § 571.216(S2). *That is the law*; it is the opposite of GM's argument that "roof crush doesn't matter." *See also* 36 Fed. Reg. 23,299 (Dec. 8, 1971) (stating "improved roof strength will increase occupant protection in rollover accidents").

[17] That FMVSS 216 is merely a "minimum" requirement cannot be disputed—that is the law. 49 U.S.C. §30102(10) ("'motor vehicle safety standard' means a

2004 was put in place 48 years ago, in 1971. That "standard" required only a minimum roof strength of 1.5 SWR.[18] By no later than 2001, GM (and all other automakers) knew that NHTSA was going to change the roof strength standard—substantially. In 2001, NHTSA announced its intention to change the roof strength standard to address the "[s]afety problem" of "roof intrusion" *before* the 2004 SRX was made and sold.[19] Both GM and the auto-manufacturer trade organization to which it belongs (the Alliance of Auto Manufacturers) commented on NHTSA's proposal and argued against changes to the test procedure or increases in the roof strength standard. *See* Docket 1999-5572-032, General Motors (Dec. 5, 2001); Docket 1999-5572-No. 2-17, The Alliance of Automobile Manufacturers (Dec. 6, 2001). That was long before GM built and sold the subject 2004 SRX, and long before Ms. Fox bought her SRX in 2013.

Despite the auto industry's objections, NHTSA announced a proposed rule change in August 2005 that would increase the minimum SWR to 2.5. 70 Fed. Reg. 49223 (Aug. 23, 2005). That was while GM was still selling the 2004-2009 SRX with a weak glued-on glass-and-plastic roof, rated by GM itself at only a 1.57

---

minimum standard for motor vehicle or motor vehicle equipment performance").
[18] Strength-to-weight ratio.
[19] Px 65, Request for Comment, Federal Motor Vehicle Safety Standards; Roof Crush Resistance, 66 Fed. Reg. 53,376, 53,376 (Oct. 22, 2001).

SWR, and long before Ms. Fox bought her SRX in 2013.  Ultimately on May 12, 2009, NHTSA announced the final rule, now called FMVSS 216a, which increased the minimum SWR to 3.0.  74 Fed. Reg. 22348 (May 12, 2009).  That was also while GM was still selling the 2004-2009 SRX with a weak glued-on glass-and-plastic roof, and long before Ms. Fox bought her SRX in 2013.

### ii.    The IIHS roof strength ratings.

The IIHS is an "independent safety organization funded by insurance companies."  Doc. 176, McLean Dep. 18/1-4.  It is "dedicated to reducing the losses—deaths, injuries and property damage—from crashes."[20]  Part of what IIHS does is test and rate vehicles.  IIHS rates a car's performance on its tests as good, acceptable, marginal, or poor.  *Id.*  GM never 'objected' to *any* IIHS ratings; it had started designing cars to meet extant IIHS ratings as early as 2003—before the subject 2004 SRX was first sold.  Doc. 174, 3/18/16 Conrad Dep. 56/8-19 (2004 SRX designed to comply with IIHS frontal offset test); *see also* Doc. 343, 7/3/19 Conrad Dep. 81/1-9.  That was before GM built and sold the subject 2004 SRX, and long before Ms. Fox bought her SRX in 2013.

In March 2009, IIHS announced that it was going to start rating the roof

---

[20] About Us, IIHS, http://iihs.org/about-us (last visited Aug. 2, 2019).

strength of cars.[21]  IIHS set its standards as follows: cars with an SWR above 4.0 are rated good; cars with an SWR of 3.25-4.0 are rated acceptable; cars with an SWR of 2.5-3.25 are rated marginal; and cars with an SWR less than the 2.5 are rated poor.[22]  The test IIHS uses to determine the SWR of cars (and where the car's roof strength falls on the poor-to-good scale) is the same static test required by FMVSS 216.[23]  The roof on the 2004 SRX was rated *by GM*, using the *same FMVSS 216 test*, at only 1.57 SWR[24]—which is in the "poor" category.  Instead of protesting the IIHS roof standards, GM was forced by sales considerations to meet the IIHS standard.[25]

There was never any doubt that GM engineers could design a far stronger

---

[21] Doc. 152-33, Px 56a.

[22] About our Tests: Roof Strength Test, IIHS, http://iihs.org/ratings/about-our-tests#roof-strength-test (last visited Aug. 2, 2019).

[23] The test is conducted by slowly pushing a large metal plate against the driver's side roof and measuring the force needed to crush the roof by five inches.

[24] Doc. 177, Nance Dep. 22/22-24 ("Q. All right, Mr. Nance.  Have you calculated the SWR according to this May 15 or May 17, 2002, GM evaluation report?  A. Yeah, I calculated it about 1.57."); *id.* at 23/5-7 (Q. Well, let me just ask you this: 1.57 is less than 2.5, correct?  A. Yes, it is.").  In fact, the subject roof did not even meet GM's own internal standard of 1.80 SWR.  *Id.* at 23/16-17 ("Q. All right.  Isn't it true that 1.57 is less than 1.80?  A. Yes.").

[25] *See* Doc. 176, McLean Dep. 47/19-49/4 (explaining that the reason GM set an internal roof strength standard of 4.2 SWR was "for the purpose of achieving the five-star rating with IIHS . . . [b]ecause with the five-star safety rating it allows us [GM] to get a Consumer Reports best buy").

roof.  By January 2006, GM engineers had finished designing a new ultraview roof for the SRX that had a SWR of 3.8.[26]  GM increased its own internal roof strength standard, first to an SWR of 3.4, then to an SWR of 3.8—far higher than its earlier internal standard of 1.8.  That conduct by GM itself is the exact opposite of the argument GM wants to have its lawyers and testifiers make to the jury—the "roof crush doesn't matter" argument.

GM has taken pains to coach its witnesses to protest that the IIHS roof strength standard did not apply to the 2004 SRX because IIHS did not announce its roof strength ratings system until 2009.  That is nonsensical: roofs don't change.

---

[26] Doc. 176, McLean Dep. 98/10-23.  This was McLean's testimony on direct examination by GM lawyer Klein:

> Q. Okay.  So, *when you originally designed the roof* on the GMT166, the one that rolled off the line starting in September of 2009, what was your roof strength design target?
> A. Our target was to meet FMVSS 216a, which was three times curb weight of the vehicle.
> Q. Okay.  And, then, was there a GM internal standard?
> A. Which would have been 3.4 internally.
> Q. Okay.  And do you remember about what the strength to weight ratio was of the first model year of the GMT166, the 2010?
> A. I do.
> Q. What was it?
> A. It was 3.8.

There is no doubt that the roof for the subsequent SRX model was designed in 2005—that's what led to the specifications issued January 5, 2006.  *See* Ex. 2 (Px. 69a).

The roof on the 2004 SRX, rated by GM at only 1.57 SWR, is, was, and always will be "poor" by IIHS standards.[27]

### iii.   Evidence about the increased federal minimum roof strength standard and IIHS roof strength ratings is admissible.

The increased federal minimum roof strength standard and the IIHS roof strength rating system are highly relevant to two key issues in this case.

*First*, under Georgia law, GM's duty to warn does not stop when the car is sold.  GM has a continuing post-sale duty to warn of known dangers, even when the knowledge was "acquired months, years, *or even decades after . . . the first sale of the product*."  *See Chrysler Corp. v. Batten*, 450 S.E.2d 208, 211 (Ga. 1994) (emphasis added).  Thus, ***all evidence*** proving GM's knowledge of the dangers of the 2004 SRX is relevant to Plaintiff's failure to warn claim.  GM's motion does not even mention this obvious reason the evidence is admissible.

*After* NHTSA finally increased the federal minimum standard in 2009 to an SWR of 3.0 *and after* IIHS announced its standard of an SWR of 4.0 (but before

---

[27] The independent IIHS itself disagrees with GM's argument that the IIHS roof strength ratings don't apply to cars sold before 2010: on the IIHS webpage discussing its roof strength standard, IIHS states that a ***2008*** Kia Sportage would have a "poor" roof strength rating and a ***2009*** Volkswagen Tiguan would have a "good" rating.  http://iihs.org/ratings/about-our-tests#roof-strength-test (last visited Aug. 15, 2019).  In 2008 and 2009, GM was still selling the glass-and-plastic-roofed 2004-2009 SRX—without warning anyone what GM knew about the weakness and danger of that roof.

GM Corp.'s bankruptcy), GM kept right on selling the 2004-2009 SRX with a roof

strength that barely met the old federal minimum standard of 1.5 and did not even

meet GM's own weak internal standard of 1.8.  GM kept silent despite this

knowledge, warning nobody that the SRX's roof strength was weak or that GM

had abandoned that roof design in 2005 because GM knew it was too weak.  That

was reckless.  That was wanton.  That was a breach of GM's duty to warn of a

known danger.  Veronica Fox did not even buy her SRX until 2013, and she was

not injured until November 12, 2013.  She never knew those things GM knew,

because GM never told her.

*Second*, GM's "defense" is that designing the roof of the 2004 SRX to an

SWR of 1.5 was allegedly reasonable because "roof crush doesn't matter."  *See*

Doc. 151 at 10, 13.  It would be an abomination for GM present that argument to

the jury without the jury also hearing the proof that *no one* believes that argument

and the proof that GM's own actions prove that *GM itself* does not believe that

argument.

GM's basis for its "roof crush doesn't matter" argument is old experiments

funded by GM solely to create doubt about whether roof crush causes injury.  *See*

*generally* Docs. 128 at 10-22 & 126 at 21-31 (Pl.'s Mots. to Exclude Testimony of

Moffatt & Carhart).  GM even went so far as to hire in this case the originator of

the "roof crush doesn't matter" argument, Edward Moffatt, as a paid expert, although this Court has ruled he may not testify.  Doc. 211 at 68.[28]  *See* Doc. 297 at 21-22 (Pl.'s Omnibus MIL).

GM proposes to present to the jury "papers" by Moffatt going back to 1975 and litigation experiments (Malibu and "CRIS") done decades ago in an attempt to justify the design of the SRX's glued-on glass-and-plastic roof based entirely on that argument.  To be clear: GM's position is not that it erroneously believed roof crush didn't matter during the time it designed the 2004 SRX.  Instead, GM and its testifiers will tell the jury it still believes "roof crush doesn't matter" today— despite the overwhelming authority to the contrary.

GM contends Plaintiff may not refute GM's argument with the fact that both NHTSA and the independent IIHS consider that argument nonsense,[29] as have

---

[28] "Unless GM produces a witness to testify that it relied upon Moffat's theories in designing the Cadillac SRX, Moffatt's testimony must be excluded as irrelevant. Fox's Motion to Exclude Moffatt is **GRANTED**."

[29] In testimony before Congress, IIHS spokesperson Stephen Oesch said that the studies supposedly finding 'roof crush doesn't matter' "defy logic, because . . . the basic principles of occupant protection dictate that the compartment be designed to resist intrusion . . . .  There is no logical reason to assume that in a rollover crash, you would design a vehicle to permit excessive intrusion."  Stephen Oesch, Statement Before the U.S. Senate Committee on Commerce, Science, and Transportation (June 4, 2008).

other courts who heard that argument from other automakers.[30]

The mere fact GM still intends to rely on the "roof crush doesn't matter" argument made by Moffatt and supposedly supported by the experiments done to support that litigation argument proves what Plaintiff has warned about: GM has no intention of obeying this Court's Orders. This Court's February 4, 2019 Order was explicit: "Unless GM produces a witness to testify that it relied upon Moffat's theories in designing the Cadillac SRX, Moffatt's testimony must be excluded as irrelevant. Fox's Motion to Exclude Moffatt is **GRANTED**." Doc. 211 at 68.[31] As revealed by the testimony identified in footnote 15, GM has no evidence "that it relied on Moffatt's theories in designing the Cadillac SRX." That is because the 'theories' have always been false—created only to delude jurors, and never relied

---

[30] *See, e.g.*, Doc. 126-3 at 3, Order, *Hatfield v. Ford Motor Co.*, No. 77639 (Bibb Cnty. St. Ct. Aug. 20, 2013) ("Defendant Ford's position in this case, described by Defendant Ford as counterintuitive, is that a stronger car roof does not necessarily reduce the risk of injury in a rollover accident. Given that Federal Motor Vehicle Safety Standard number 216, 'Roof crush resistance', has as its purpose 'to reduce death and injuries due to the crushing of the roof into the occupant compartment in rollover crashes', 49 CFR 571.216 (S2) *Defendant Ford's position could be described as something other than counter-intuitive*." (emphasis added)).

[31] This Court also excluded all evidence about Malibu, Doc. 211. at 58-9, and excluded the CRIS "tests," *id.* at 99 (excluding "tests" numbered 12 and 13, identified *id.* at 47.)

upon in designing vehicles.[32]

When, despite this Court's Orders, GM attempts at trial to insinuate its "roof crush doesn't matter" argument, Plaintiff will show that neither GM nor its litigation testifiers could possibly believe that argument because *nobody* believes that argument. The law stating the purpose of the federal minimum standard and NHTSA's decision to **double** the minimum roof strength standard shows that NHTSA does not believe that roof crush doesn't cause injury. Evidence from IIHS proves that independent organization does not believe the argument. Both IIHS and NHTSA are independent of this litigation.

When GM's 'experts' take the stand and claim "roof crush doesn't matter," they must be subject to cross-examination for taking a position that has been thoroughly debunked by the independent IIHS and the regulating agency NHTSA. GM has no 'comeback' to that, because GM has itself built far stronger roofs and

---

[32] Plaintiff has filed her own MIL to exclude the "roof crush doesn't matter" argument, Doc. 297 at 9 (Pl.'s MIL 3), and has filed a MIL to exclude those documents already excluded by this Court's February 4, 2019 Order (Doc. 211), Doc. 297 at 21 (Pl.'s MIL 9). Plaintiff has also objected to the excluded documents GM put on its trial exhibit list despite this Court's Order excluding them. *See* Doc. 283 at 7-8; *see also* Doc. 283-1 (Moffatt documents: Dxs 230, 231, 233, 242, 243, 950-959; "CRIS" documents: Dxs 172, 235, 239, 956, 993, 1047; "Malibu" documents: Dxs 203, 205, 230, 231, 232). The fact GM put all that stuff on its exhibit list **after** this Court's February 4, 2019 Order proves GM's intention to turn the trial into a circus.

raised its own internal roof strength standards as a result of what NHTSA and IIHS have done.

GM also argues that the evidence regarding the NHTSA rule change and the IIHS ratings standards is "unduly prejudicial." Evidence should only be excluded as prejudicial under Rule 403 if its "probative value is ***substantially outweighed***" by the danger of unfair prejudice. Here, the NHTSA rule change and the IIHS ratings are highly probative: they show that GM's "heart and soul" argument has been rejected by both NHTSA and an independent safety organization.[33] "Relevant evidence is inherently prejudicial, but it is only *unfair* prejudice *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403." *United States v. Mills*, 704 F.2d 1553, 1560 (11th Cir. 1983) (emphasis in original, quotations omitted). There is no "unfair" prejudice to GM, let alone unfair prejudice that ***substantially outweighs*** the probative value of the NHTSA rule change or the IIHS ratings. GM will be given the opportunity to

---

[33] GM also makes a hearsay argument about the IIHS ratings. The IIHS ratings are not hearsay. It is a fact that IIHS created a roof strength rating system in 2009. GM has admitted that fact. GM has also admitted that it knew about IIHS roof strength ratings and it relied on those ratings in deciding to increase the roof strength target of the 2010 SRX. Doc. 176, McLean Dep. 99/13-22. Even if the Court concluded that the IIHS rating system was somehow hearsay, the IIHS roof strength ratings are admissible to show notice to GM and GM's actions in conformity therewith.

put into evidence its criticisms of NHTSA's decision to increase the roof strength

standard and of the IIHS rating system.[34]

    For the foregoing reasons, the Court should deny GM's MIL 4.

## 5.   References to money paid to GM LLC's experts by other companies and/or in other cases should be excluded.

    GM's experts are professional testifiers for automakers.[35]  GM's 'defense'

depends entirely on the testimony of those professional testifiers.  GM wants to

keep from the jury the truth about how much its hired experts and the companies

they work for have been paid to defend automakers, including GM.  That's because

the truth will shred those testifiers' credibility, and because GM utterly depends on

them, will thus shred GM's credibility.  The truth is that over the years, GM's

experts and the companies they work for have been paid hundreds of millions of

---

[34] In fact, GM has already begun to do so through its cross-examination of Plaintiff's experts at deposition, *see, e.g.,* Doc. 120, 5/17/16 Herbst Dep. 62/17-69/24 (attacking IIHS president's qualifications and IIHS's conclusions), and through its own expert reports, Doc. 112-5 (Carhart Rep.); Doc. 128-3 (Moffatt Rep.)—reports that, again, make arguments this Court has already excluded.

[35] GM witness Michael Carhart of Exponent admitted to testifying 158 times between 2004 and 2016, plus he conceded to working on over 200 cases for automakers where he didn't testify.  Doc. 125-5, Carhart Dep. 68/8-11, 60/14-61/2. GM witness Sridhar Natarajan of Exponent has testified about 400 times; he has worked as a "litigation consultant" in rollover cases between 50 and 500 times. Doc. 125-6, Natarajan Dep. 52/22-53-3, 31/10-32/13.  GM witness Geoffrey Germane admitted he'd been retained "hundreds of times" by automakers.  Doc. 125-7, Germane Dep. 54/2-8.

dollars by automakers.[36]  Exponent testifiers have defended virtually every

automotive defect ever alleged.[37]  The truth is that these testifiers *never* turn down

cases and *never* have opinions that contradict the automaker's account.[38]  The

credibility of GM's testifiers must be tested by cross-examination, if the truth is to

be ascertained by the jury.[39]

Plaintiff has the absolute right to cross-examine GM's experts about how

---

[36] For example, known payments to Exponent from automakers include $155 million from Ford for work performed over a 21-year period and $22 million from Toyota for work performed over a 5-year period.  *See* 6/30/17 Ford Suppl. Resp. to Pl.'s 4th Interrog. No. 4, *Hill v. Ford*; Doc. 188-3 (Toyota).  In other cases, but not this one despite being repeatedly Ordered by the Court to provide this information, GM has admitted to paying Exponent $10.3 million for work performed between 2002–2006 and $6.7 million for "litigation related expenses" from October 31, 2011 to October 31, 2016.  *See* Docs. 188-1, 188-2.

[37] Exponent, for example, has 'defended' the designs of well-known defective products, including GM ignition switches, Toyota sudden acceleration, and Ford Bronco II & Explorer rollovers.  *See* Doc. 126-4.  Exponent has also defended GM's "CK" trucks with gas tanks mounted on the side—the worst defect (measured in lives lost and lawsuits filed) in automotive history; GM's "Type III unmodified door latch," which GM continued to use until a GM engineer named Abbatte shut down assembly lines and refused to ship finished cars; and the Suzuki Samurai, which even GM refused to sell in this country because it was so rollover prone.  The list is endless.

[38] Germane, for example, testified that he had never turned down a case because he could not support an automaker's theory of the case.  Doc. 129-3, Germane Dep. 53/20-24.

[39] The jury will also have to assess the credibility and bias of Exponent itself.  That is because GM plans to rely on testing performed by Exponent *itself*—and not overseen by either of its Exponent witness (Carhart and Natarajan).  *See* Doc. 198-7 (2015 Exponent roof crush test).

much they and the companies that employ them have been paid by GM and other automakers over the years. That evidence is directly relevant to each expert's credibility and bias. *See Collins v. Wayne Corp.*, 621 F.2d 777, 784 (5th Cir. 1980) ("A showing of a pattern of compensation in past cases raises an inference of the possibility that the witness has slanted his testimony in those cases so he would be hired to testify in future cases. The trial court did not err in allowing" an expert to be cross-examined about the defendant's payments to the expert's company in prior cases.); *Reynolds v. Gen. Motors Corp.*, No. 2:04-cv-106, 2007 WL 2908564, at *2 (N.D. Ga. Sept. 28, 2007) (Story, J.) (holding that "[w]hether an expert has an ongoing relationship with a party and whether the expert earns a significant amount of income from testifying on behalf of that party . . . is certainly relevant to a witness's credibility and may be useful in the cross-examination of an expert witness").

Plaintiff's "cross-examination pertinent to the credibility of a witness and for the development of facts that may tend to show bias or prejudice should be given the ***largest possible scope***." *SEC v. Goldstone*, 317 F.R.D. 147, 166 (D.N.M. 2016) (emphasis added) (quoting *Abeyta v. United States*, 368 F.2d 544, 545 (10th Cir. 1966)); *see also United States v. Lowe,* 234 F.2d 919, 922 (3d Cir. 1956) ("No authority needs to be cited for the proposition that one of the purposes of cross-

examination is to test the credibility of the witness . . . ."); *Coca-Cola Co. v. Moore*, 246 F. 942, 943 (8th Cir. 1917) ("An opportunity for thorough cross-examination is especially essential in cases of expert or opinion testimony. Any question is proper that fairly tends to test the accuracy of the opinion of the witness or his credibility . . . ."); *cf. McConnell v. United States*, 393 F.2d 404, 406 (5th Cir. 1968) ("Cross-examination is a right and its availability is essential to a fair trial; accordingly, cross-examination of a witness in matters pertinent to his credibility ought to be given the largest possible scope.").

Because evidence of GM's (and other automakers') massive payments to the experts and expert companies hired by GM in this case is directly relevant to those experts' credibility and bias, the Court should deny GM's MIL 5.

## 6. Evidence or argument concerning so-called "subsequent designs" of the Cadillac SRX.

Here are the facts pertinent to GM's MIL 6:

In the December 16, 2004 SRX rollover on GM's own proving grounds the car rolled four times, the glass-and-plastic roof came completely off and the remaining roof structure crushed into the occupant compartment.[40]  That's the

---

[40] There were two other rollovers in SRXs with the ultraview roof and two rollovers in steel-roofed SRXs.  GM's Legal Staff investigated only the rollovers in the ultraview SRXs.  *See* Doc. 346, Weinberg Dep. 19/1-18.

same thing that happened to Veronica Fox's car nine years later: the GM engineer driving that car in 2004 has admitted that fact.[41]  That GM proving grounds rollover was investigated for months by GM's Legal Staff and by "many other engineers," Doc. 343, 7/3/19 Conrad Dep. 13/7-13, including the engineer in charge of upper body structures on the 2004 SRX, Conrad, *id.* at 9/18-20, 10/22-25, 31/1-8, Conrad's supervisor Marcel Cannon, *id.* at 11/1-12/1,[42] GM Technical Fellow Ben Derocher, Doc. 345, Derocher Dep. 9/1-5 & Doc. 345-9 (Px 1044, Derocher résumé), and others.  In the months after the December 16, 2004 rollover, there were multiple inspections of the roof area by GM engineers before GM crushed the car "fast and very low profile."  Doc. 347-8, Px 38.

Obviously as a result of that prolonged investigation, GM changed the roof design of the SRX in 2005.  GM completely abandoned the glued-on roof design and reverted to encasing the glass in a steel frame that was bolted onto the rest of

---

[41] Doc. 152-9, 4/20/16 Craig Dep. 61/19-24 ("Q. Isn't it true that what happened to Veronica Fox is the same thing that happened to your car nine years earlier? [Objection by GM] A: It appears it has similar deformation, *yes*."); *testimony reconfirmed*, Doc. 344, 7/3/19 Craig Dep. 14/4-8 ("Q. Is your answer to that question still yes, that that photograph looks a lot like what happened to the car you were driving nine years earlier at the Proving Grounds?  A. Yes, it is similar."), 15/20-25, 16/2-17/6.

[42] Conrad and Cannon were directed to investigate that rollover by Mike McGarry, the executive in charge of body engineering *for all of GM*.  Doc. 343, 7/3/19 Conrad Dep. 11/19-12/1.

the roof structure, massively increasing the roof strength.  Although GM's lawyers insist those changes were made for the "next generation" SRX—an argument automakers always make—it is an irrefutable fact those design changes were completed by January 2006, when formal specifications were published.[43]  GM's decision to abandon the dangerous roof design of the 2004 SRX is relevant to prove the 2004 SRX was defective and that GM had notice of those defects, which triggered its duty to warn Ms. Fox and others of the dangers.

Evidence of GM's new SRX roof design for the 2010 SRX also is relevant because it shows GM knew by no later than 2005 that a bolted-on roof was the much stronger and safer choice.  There is simply no basis to exclude evidence of what GM actually did in response to its Legal Staff and engineering investigation of a wreck at GM's own proving grounds that was very similar to what happened to Ms. Fox nine years later.[44]

---

[43]PX 69a, January 5, 2006 "Program Specific and Corporate Requirements" document for the "sunroof system" (attached as Exhibit 2).  GM never used that new design in an SRX until the 2010 model year.  Although GM tries to argue that the 2010 SRX is a "completely different vehicle" from the 2004 SRX, GM cannot dispute that both cars are marketed and sold *as the* "Cadillac SRX" and both cars feature a "panoramic" sunroof.  GM can make its "completely different vehicle" argument to the jury.

[44] What GM *actually did* further proves that no one at GM believes the "roof crush doesn't matter" argument, for if that argument had any validity, GM would not have abandoned the glued-on roof design it purports to defend in this case so soon

29

Under Georgia law, evidence of subsequent remedial measures *to the product* is admissible to prove liability in a statute of repose case.  O.C.G.A. § 24-4-407.[45]  In addition, subsequent remedial measures are frequently admissible in non-repose cases, "such as when the subsequent repair, change, or modification tends to prove some fact of the case on trial, . . . *to show contemporary knowledge of the defect*, causation, a rebuttal of a contention that it was impossible for the accident to happen in the manner claimed" or to show feasibility of "removing or minimizing the danger."  *Chastain v. Fuqua Indus.,* 275 S.E. 2d 679, 682 (Ga. App. 1980); *Wittenberg v. 450 Capitol Assocs.,* 427 S.E. 2d 547, 550 (Ga. App. 1993).  Obviously what GM actually did in response to the proving grounds wreck nine years before Ms. Fox's wreck "*show[s] contemporary knowledge of the defect*."  The jury *should* conclude that GM abandoned the glued-on roof design for a bolted-on glass roof with more than twice the roof strength **because of** the dangers posed by the original SRX roof design—dangers GM certainly learned

---

after the December 16, 2004 proving grounds rollover.

[45] Though found in Georgia's Evidence Code, O.C.G.A. § 24-4-407 expresses a substantive policy decision of the State of Georgia about holding manufacturers liable for product defects.  To the extent that the Georgia rule conflicts with Federal Rule of Evidence 407, this Court should follow the Georgia rule because it is substantive rather than procedural.  *See Pipkins v. TA Operating Corp.*, No. 05-cv-1200, 2006 WL 8443187, at *2 (D.N.M. Dec. 4, 2006) ("[I]n evaluating whether to admit evidence of subsequent remedial measures, a federal court sitting in a diversity case must follow state law that conflicts with Rule 407.").

about from the wrecks at GM's own proving grounds nine years before Ms. Fox was injured.

In a footnote, GM also suggests that what GM did as a result of the December 16, 2004 proving grounds wreck—abandoning the very roof design at issue after lengthy investigations by GM's Legal Staff and "many engineers"—"should also be excluded" under Fed. R. Evid. 407.  Doc. 296 at 23 n.6.  That is incorrect.  Rule 407 is not even implicated by GM's changes to the roof design of the SRX between 2005 and 2010, even though those changes were made after Ms. Fox's 2004 SRX was designed, manufactured, and sold.  That is because for purposes of Rule 407 a "subsequent remedial measure" means only those changes made *after the incident giving rise to the current action*.[46]

GM argues that its decision to completely change the roof design was not "to remedy any perceived safety issues or concerns."  *See* Doc. 296 at 23.  That is a question for the jury to decide.  When nine years before Ms. Fox was injured there

---

[46] *See Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1343 (5th Cir. 1978) (holding document written before collision was not a subsequent remedial measure within the meaning of Rule 407); *see also* Fed. R. Evid. 407 advisory committee's note to 1997 amendments ("[T]he words 'an injury or harm allegedly caused by' were added to clarify that the rule applies only to changes made after the occurrence that produced the damages giving rise to the action."); *Chase v. Gen. Motors Corp.*, 856 F.2d 17, 22 (4th Cir. 1988) (Rule 407 did not bar evidence of GM's design change made after plaintiffs' car was manufactured and sold but before injury-causing collision).

was a nearly identical wreck with very similar results on GM's own proving

grounds, followed by a months-long investigation by GM Legal Staff and GM

engineers, followed almost immediately by a complete abandonment of the design

and issue, no juror could reasonable conclude GM's statement is true.  The only

reasonable conclusion is that GM knew, then, nine years before Ms. Fox was

injured, that the subject roof was no good, was dangerous, and had to be changed.

Attempting to obscure the import of its own actions, GM also argues that the

redesign of the roof was done because of anticipated increases in the federal

minimum standard.  Doc. 296 at 21.  That is contradicted by GM's own MILs.  In

GM's MIL 4, GM argued that the changes to the minimum standard did not apply

to cars sold before 2015.  Doc. 296 at 7-8.  Obviously the redesign in 2005 was not

prompted or provoked by a change to the federal minimum standard GM says did

not even apply for another 10 years.

What GM actually did as a result of the investigation of the December 16,

2004 proving grounds wreck is also admissible because that proved building a

safer, stronger roof was technologically feasible—back then.  *See Wittenberg*, 427

S.E. 2d at 550.  GM could have built the stronger roof in the 2004 SRX—"bolts"

were certainly available back then, and GM's initial design drawings for that roof

called for bolts.[47]

The evidence of what GM actually did as a result of its investigations of the

December 16, 2004 proving grounds wreck also is admissible to prove:

> the gravity and severity of the danger posed by the [2004] design; the
> likelihood of that danger . . . ***the ability to eliminate danger without***
> ***impairing the usefulness of the product or making it too expensive***;
> and the feasibility of spreading the loss in the setting of the product's
> price . . . . ***the feasibility of an alternative design; the availability of***
> ***an effective substitute for the product which meets the same need***
> ***but is safer; the financial cost of the improved design***; . . .  the
> adverse effects from the alternative . . . and the collateral safety of a
> feature other than the one that harmed the plaintiff.

*Banks v. ICI Ams., Inc.*, 450 S.E.2d 671, 675 n.6 (Ga. 1994) (emphasis added).

Evidence of GM's redesign of the SRX roof also is admissible because it

totally rebuts GM's "heart and soul" argument that "roof crush doesn't matter."

Doc. 151 at 10.  It is a fact, undeniable, that within months after the December 16,

---

[47] *See also* Fed. R. Evid. 407 ("[T]he court may admit [evidence of subsequent
remedial measures] for ***another purpose***, such as impeachment or—if disputed—
[to prove] the feasibility of precautionary measures." (emphasis added)); *see also*
*Wood v. Morbark Indus., Inc.*, 70 F.3d 1201, 1208-09 (11th Cir. 1995) (reversible
error to preclude cross-examination on design change after defendant denied
changes were made, then argued the original design was the "safest"); *Dixon v.*
*Int'l Harvester Co.*, 754 F.2d 573, 584 (5th Cir. 1985) (no abuse of discretion to
allow evidence of design changes that occurred years after original manufacturing
design because "the feasibility of alternative designs may almost always be in
question in design defect cases"); *Rozier*, 573 F.2d at 1343 (evidence of
subsequent remedial measure would be admissible to prove "knowledge of the
dangerous condition").

2004 proving grounds wreck GM designed a much stronger ultraview roof for the SRX.

GM's response to the investigations of the December 16, 2004 proving grounds wreck also is admissible to prove GM had a duty to warn the public. A reasonable juror should conclude GM's actions prove GM knew the roof was dangerous, which creates the duty to warn. Automotive manufacturers have a duty to warn consumers as soon as the manufacturer learns that a vehicle is unreasonably dangerous—even if the manufacturer acquires that knowledge "months, years, or *even decades after the date of the first sale of the product*." *Batten*, 264 Ga. at 724 (emphasis added). What GM learned, on December 16, 2004 and in the months that followed when GM investigated that wreck, happened just before it redesigned the SRX's roof. GM's actions in redesigning the SRX's roof show that GM knew it had a dangerous roof. That is knowledge contemporaneous with GM's continuing duty to warn. A reasonable juror should conclude GM had a duty to warn—then, in 2005—many years before Veronica Fox even bought an SRX.[48]

---

[48] Exclusion is no answer. If during the trial, the Court has any concerns about the evidence, it can use a limiting jury instruction, if necessary. *See Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1316-17 (11th Cir. 2017) ("[W]hen evidence is relevant for some purposes but not others, limiting instructions—not exclusion—are generally the best way to handle the issue.").

For all the foregoing reasons, and because it is incomprehensibly overbroad, GM's MIL 6 should be denied outright; let GM object during trial, when the Court can consider the objection in context.

**7.      Documents requested but not produced in discovery.**

This MIL is unnecessary.  Judge Cohen's Standing Order, Doc. 4, says what it says.  In MIL 7, GM does not identify all of the documents it seeks to have excluded, nor does GM identify the specific discovery requests to which each document was supposedly responsive.  As a result, Plaintiff cannot properly respond to GM's MIL.  It is also odd—it seeks to exclude things like congressional testimony given by GM's CEO, which GM obviously had since the time the testimony was given.  The Court should deny GM's MIL and instruct GM to object at trial if GM believes that some document should not be introduced because it was 'not disclosed' during discovery.  Then, with the benefit of context, the Court can rule on the admissibility of whatever document GM is challenging.  *See Conklin v. R T Eng'g Corp.*, No. 3:17-cv-415, 2018 WL 7291430, at *1 n.1 (M.D. Fla. Nov. 16, 2018) (explaining that MILs requesting "broad forms of relief, such as exclusion of evidence that may not have been properly disclosed, [w]ithout specifying the exact piece of evidence to be excluded," permit the Court to respond only "by ordering a broad mandate to follow the rules, which is redundant").

8.   **Documents or arguments that "positive fasteners" were recommended by Webasto for the roof structure (or any characterization by Plaintiff's counsel about what that phrase means).**

This MIL should be denied because it is too vague.  GM does not specify all the evidence it seeks to have excluded under this MIL.  *See* Doc. 296 at 25, 296-4 (claiming a "primary *example*" of what GM is talking about is Px 386 but identifying no other supposedly inadmissible evidence (emphasis added)).  For that reason alone, the Court should deny this MIL.

As for Px 386, GM's MIL is confusingly drafted to try to prevent Plaintiff not only from introducing Px 386 itself into evidence but also from asking any GM witness at trial about the "positive fasteners" mentioned in that document.  Even if GM had carried its burden of proving that Px 386 can never be admissible as substantive evidence at trial (which it hasn't), that fact alone would not entitle GM to an Order prohibiting Plaintiff from asking about "positive fasteners" on cross-examination or using Px 386 for impeachment, for Px 386 need not come into evidence itself to be the subject of a question.

GM's real problem with Px 386 is that it supports Plaintiff's position that GM's decision to affix a glass-and-plastic roof the size of a 10-person dining room table to the top of the SRX with only glue was obviously dangerous.  Px 386, which Webasto produced in discovery in response to a valid subpoena, making its

authenticity self-evident, shows that GM's own component supplier of the

ultraview roof recommended ***in 1999*** that GM use fasteners and not just glue to

hold that huge glass roof in place.  That fact is plainly relevant and admissible at

trial in this case where one key issue is whether GM's design of the SRX's roof

was reckless or wanton.

**9.     Evidence concerning Brian Herbst's drop tests on Cadillac SRX
        vehicles.**

This MIL should be denied because it consists of repackaged *Daubert*

arguments already rejected by this Court and a months-late motion for

reconsideration of this Court's Order excluding GM's witness Carhart from

offering anything but oral testimony about his rigged SRX drop tests.  *See* Doc.

211 at 16-21 (rejecting GM's *Daubert* motion to exclude Herbst's SRX drop tests),

59-61 (prohibiting GM from offering anything but oral testimony about two SRX

drop tests that were "attempts to recreate the two rollover impacts for the jury").

Brian Herbst's drop test of two 2004 Cadillac SRX cars (one with a

production roof and one with a reinforced roof) are admissible.  GM's principal

complaint about those drop tests in MIL 9—that Mr. Herbst did not place a Hybrid

III test dummy inside the cars he dropped—has already been heard and rejected by

this Court.[49]  According to GM, again, because Mr. Herbst didn't use a dummy, his

drop tests are "irrelevant" or unfairly prejudicial.  Doc. 296 at 29-30.

GM already lost that argument.  In denying GM's *Daubert* motion, this

Court held that "Herbst's report becomes irrelevant only if GM's theory of the

case—that a stronger roof would not have prevented Fox's injury—proves

correct."  Doc. 211 at 18.  As this Court concluded, "[i]f the jury finds that a

stronger roof would have prevented Fox's injury, then Herbst's testimony

regarding the availability of alternative designs and their costs is relevant to the

jury's determination of whether the Cadillac SRX roof was a design defect, and if

so, whether GM was reckless or wanton in the design."  *Id.* at 18-19.[50]  GM did not

move for reconsideration of the Court's ruling in the February 4, 2019 Order, and

---

[49] Hybrid III dummies were developed in the 1970s by GM for frontal crash tests.
Problematically for rollover testing, the necks of Hybrid III dummies do not
function like human necks; they are not, in other words, biofidelic.  For this and
other reasons, Mr. Herbst's decision not to use Hybrid III dummies in his drop
tests is perfectly reasonable.  *See* Doc. 120, 5/17/16 Herbst Dep. 152/5-156/2
(explaining nonuse of Hybrid III dummies in drop tests due to lack of biofidelity);
Doc. 126 at 14-15 (discussing problems with using Hybrid III dummies in drop
testing).

[50] GM claims that **"[a]ll"** (the only thing) Mr. Herbst's drop tests tend to prove is
that the 2004 SRX's roof could have been strengthened.  Doc. 296 at 29 (emphasis
added).  GM's claim is preposterous.  Among other things, Mr. Herbst's drop tests
prove that (1) all else being equal, stronger roofs crush less, and (2) Mr. Herbst's
alternative roof designs are not only feasible but also perform substantially better
than GM's production roof.  GM knows that's what Mr. Herbst's drop tests prove,
which is why GM is desperate to have them excluded.

GM cannot do so now through a MIL.  Mr. Herbst's SRX drop tests are relevant and admissible, as this Court already held.

GM's next argument is also a rehash.  Continuing to fault Mr. Herbst for not using Hybrid III dummies in his drop tests, GM attacks his SRX drop tests because the Society of Automotive Engineers ("SAE") stopped using such tests in 1990. *Compare* Doc. 107-1 at 9-10 (GM's *Daubert* motion on Herbst), *with* Doc. 296 at 30-31.  Mr. Herbst has already explained why SAE's reasons for rejecting drop tests are unpersuasive in an affidavit that this Court found offered a "detailed, point-by-point response."  Doc. 211 at 20; Doc. 149-8 & -9 (Herbst Aff.).  This Court has rejected this attack on his drop testing, holding that SAE's conclusions "do not render Herbst's methods unreliable."  Doc. 211 at 21.  Having lost its argument that Mr. Herbst's drop tests are unreliable, GM tries to change gears and argue that the SRX drop tests that this Court has already held were relevant and reliable are unfairly prejudicial because GM says so.  Doc. 296 at 30.  Being bad for GM's 'defense' is not the standard for exclusion under Rule 403.  *See Mills*, 704 F.2d at 1560 (holding that "relevant evidence is inherently prejudicial, but it is only *unfair* prejudice *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403").

Indeed, excluding probative evidence under Rule 403 "is an extraordinary

remedy which should be used sparingly," and in ruling on requests to exclude evidence as unfairly prejudicial, "courts must 'look at the evidence in the light most favorable to admission, maximizing its probative value and minimizing its undue prejudicial impact.'"  *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2014) (citations omitted).  GM has not proved that it is entitled to such an "extraordinary remedy"; thus, the Court should deny GM's MIL.

The last two paragraphs of GM's MIL reveal what GM is really after: reconsideration of this Court's ruling that all evidence about Carhart's rigged drop tests is excluded except for oral testimony.[51]  GM hopes that Judge Boulee will grant a months-late motion for reconsideration and overrule Judge Cohen.  This Court should not do so.

GM's 'motion for reconsideration' is based on a false premise: the "only significant difference between Carhart's tests and Herbst's test[s]" is that Carhart used a dummy in his drop tests.  Doc. 296 at 31.  This Court already found Carhart tried to recreate what happened in Ms. Fox's wreck with his rigged drop tests.  *See* Doc. 211 at 59 ("[I]t is ***evident*** that [Carhart's SRX drop tests] are, in fact, attempts

---

[51] That Carhart's drop tests were rigged is fact, not hyperbole.  *See* Doc. 126 at 10-20 (outlining the myriad ways in which Carhart's drop tests, which were designed to recreate what happened to Ms. Fox during her rollover, were rigged to mislead the jury).

to recreate the two rollover impacts for the jury." (emphasis added)).  Mr. Herbst's

drop tests, conversely, are so obviously not attempts to recreate Ms. Fox's wreck

that not even GM claims otherwise.  That significant difference explains why Mr.

Herbst's drop tests are admissible and Carhart's drop tests are not.  *see* Doc. 211 at

61(unlike Herbst's tests "GM has established in its brief that the [Carhart] tests are

similar enough to Fox's accident that they must be excluded because of the danger

of unfair prejudice or confusion of the issues").  The Court should adhere to this

Court's prior Orders and deny GM's months-late motion-for-reconsideration-

masquerading-as-a-MIL.

**10.    Evidence concerning Brian Herbst's drop tests of Volvo XC90 vehicles.**

This MIL should be denied for the same reasons that GM MIL 9 should be

denied.  Plaintiff will not repeat those arguments here.  Plaintiff will note the

following.

*First*, the Subaru Forrester tests that GM wanted Carhart to rely on and that

the Court excluded all but oral testimony about were not drop tests, despite what

GM says.  *Contra* Doc. 296 at 34 ("Subaru drop tests").

*Second*, as with Carhart's SRX drop tests, this Court found that GM wanted

to use the Subaru rollover tests to coincide with GM's theory of how Mr. Fox's

rollover occurred.  Doc. 211 at 56.  Mr. Herbst's Volvo drop tests are not attempts

41

to recreate what happened in Ms. Fox's wreck but rather are evidence that rebuts GM's "core" claim that "roof crush doesn't matter" and also rebuts GM's contention that dynamic testing isn't useful when designing car roofs.

*Third*, GM has claimed that there is no reason for an automaker to perform any sort of roof strength testing other than the FMVSS 216 static platen test. Volvo obviously disagrees (as do GM's own subsidiaries Saab and Opel) because Volvo conducts dolly rollover testing, drop testing, and inverted restraints testing during development in addition to the FMVSS 216 static platen test.  As a result of its corporate attitude toward safety, Volvo unsurprisingly produced SUVs that have stronger, safer roofs than GM.  Plaintiff is entitled to tell the jury about the different approaches automakers take to safety in order to prove that GM's conduct was reckless, or wanton, or that GM failed to warn of a known danger.

## 11.    Evidence of alleged "other similar incidents" *unless/until* the proper foundation is laid.

During the meet-and-confer process, Plaintiff told GM that she would agree to a consent order requiring both parties to lay a proper foundation before tendering any other similar incident ("OSI") evidence for the purpose of proving defect or notice of defect as long as GM agreed that the ruling applied to both Plaintiff and GM.  GM rejected Plaintiff's offer.  GM had no reason to reject that offer given that the rules of evidence and procedure apply to all parties equally.

*See* Doc. 297 at 27-29 (explaining that substantial similarity requirement applies to both parties).  Plaintiff could only guess why GM denied her proposal until she got GM's Omnibus MILs.

The description of MIL 11 that GM sent Plaintiff during the meet-and-confer process and the title of MIL 11 that GM submitted to the Court are about laying "proper foundation."  Yet the relief GM seeks in MIL 11 has nothing to do with laying proper foundation; instead, GM asks this Court to prevent Plaintiff from making any "references to 'other similar incidents.'"  Doc. 296 at 38.

GM's brief focuses on *Lear v. GM*, the one OSI Plaintiff identified in her discovery responses.  GM declares that "based on her discovery responses, Plaintiff should without question be precluded from even mentioning 'other similar incidents' other than *Lear*."  Doc. 296 at 35.[52]  But *Lear* is not the only similar SRX rollover GM seeks to keep out of evidence pursuant to GM MIL 11.

GM's real target is the December 16, 2004 proving grounds SRX rollover.[53]

---

[52] To the extent that GM's argument is based on Plaintiff's supposed failure to disclose some "other similar incident" besides *Lear v. GM* during discovery, the Court should deny GM MIL 11 and instruct GM to raise whatever objection it claims at trial.  Without any indication from GM about what other OSI Plaintiff supposedly failed to disclose during discovery, Plaintiff cannot respond to GM's argument.

[53] The December 16, 2004 proving grounds rollover is not responsive to subpart 17 of GM's first interrogatory because it did not result in "claims or lawsuits against

That rollover wreck indisputably *is* similar to Ms. Fox's rollover (GM's driver admitted that, *see supra* note 41), so an Order prohibiting Plaintiff from making "references to 'other similar incidents'" would cover the December 16, 2004 proving grounds rollover.  That is what GM is after, and that is why GM rejected Plaintiff's offer to agree that foundation must be laid before discussing any OSI evidence.  The Court should deny GM's MIL and instruct GM to object at trial when the objection can be both argued and considered by the Court in context.

**12.**   **Any reference to the ignition switch recall, the "Valukas Report," the Deferred Prosecution Agreement and/or statements made to Congress relating to the ignition switch recall.**

This MIL should be denied.  It is vague and unnecessary.

Aside from GM's vague request that the Court "preclude any argument, evidence or reference to GM's Ignition Switch Recall"—which is duplicative of GM MIL 14 and should be denied for the reasons outlined in Plaintiff's response thereto—the other supposedly inadmissible evidence GM refers to is presumably listed on Plaintiff's exhibit list, though neither the Court nor Plaintiff can be certain because GM didn't bother to specifically cite it in the MIL.  Rather than waiting for the Court to take up GM's specific objections to the admissibility of those

---

General Motors Corporation or General Motors LLC which [Plaintiff] believe[s] involve allegations similar to the allegations [she is] making against General Motors LLC in this case."  Doc. 296-8 at 10.

documents when it rules on the parties' exhibit objections or at trial if Plaintiff

actually attempts to tender them into evidence, GM asks this Court to exclude

these documents sight unseen and context-free.  The Court should decline to do so.

Because GM filed a MIL to exclude the Valukas Report,[54] DPA,[55] and any

testimony by GM LLC or its executives and employees before Congress in their

entirety, GM must prove that *no part* of that evidence *could ever be* admissible at

trial.  GM has not—and cannot—meet that burden.

Plaintiff has no interest in introducing the entire versions of the Valukas

Report, DPA, or transcripts of GM CEO Mary Barra's congressional testimony.

This case is, after all, about the defective roof 2004 Cadillac SRX and not what

---

[54] In February 2014, GM announced the first of what turned out to be many recalls of vehicles based on the ignition switch defect.  Shortly thereafter, GM hired the law firm Jenner & Block LLP and its chairperson, Anton Valukas, to investigate the ignition switch defect and why the defective GM cars were not recalled sooner. In a report to GM's board of directors (the "Valukas Report"), the lawyer GM hired detailed his findings.  *See In re Gen. Motors LLC Ignition Switch Litig.*, 80 F. Supp. 3d 521, 524-25 (S.D.N.Y. 2015).  GM subsequently adopted those findings.  *See In re: Gen. Motors LLC*, No. 14-MD-2543, 2015 WL 8578945, at *3 (S.D.N.Y. Dec. 9, 2015) ("[T]he Court concludes that the Valukas Report is 'sufficiently tied' to [GM LLC] to qualify as an adoptive admission under Rule 801(d)(2)(B).").

[55] In September 2015, GM LLC and the U.S. Attorney for the Southern District of New York entered into a deferred prosecution agreement in which GM avoided prosecution for engaging in a scheme to conceal a deadly safety defect from NHTSA and wire fraud in exchange for a payment of $900 million to the federal government.

GM calls the "*alleged* ignition switch defect in six specific vehicle models"[56] discussed in the Valukas Report.  Doc. 296 at 39 (emphasis added).  Plaintiff put complete versions of those documents on her exhibit list to avoid objections for lack of completeness.  At trial, Plaintiff can excerpt the relevant portions of any document she plans to put into evidence or use as impeachment and present them to the Court and GM for consideration outside the presence of the jury.

Next, the Valukas Report, DPA, and Mary Barra's testimony transcripts contain highly relevant evidence useful about the culture at GM—not limited to some specific car models or design teams, but to GM *as a whole*—during the period when Ms. Fox's SRX was designed and manufactured and when GM was investigating the December 16, 2004 proving grounds rollover.[57]

---

[56] GM's use of the word "alleged" is *stunning*—and reveals much about the party defendant this Court must deal with.  That is because in the DPA, GM *admitted* that the six GM models discussed in the Valukas Report had defective ignition switches.  The DPA that GM signed *prohibits* GM from contradicting the facts it agreed were true in the DPA.  In any event, so that the record is clear in this Court, the six GM models discussed in the Valukas Report *are* admittedly defective, no 'allegedly' about it.

[57] *See*, for example, pages 252-57 of the Valukas Report, which detail GM's culture when it comes to safety (excerpt attached as Exhibit 3).  The Valukas Report outlines five issues that plagued GM, including (1) "resistance or reluctance to raise [safety] issues or concerns"; (2) the "'GM salute,' the crossing of the arms and points outward towards others, indicating that the responsibility belongs to someone else, not me"; (3) "[t]he GM nod, [GM CEO Mary] Barra described, is when everyone nods in agreement to a proposed plan of action, but then leaves the

The jury should have that evidence to determine, as just an example, the credibility of the testimony GM has adduced from some of its witnesses about why and how they investigated the December 16, 2004 proving grounds rollover. Incredible though it sounds, GM has had its witnesses, including senior engineers, testify they and at least one GM Executive[58] investigated the three proving grounds rollover wrecks of SRX cars with ultraview roofs (but not the two proving grounds wrecks of SRX cars with conventional steel roofs) on a personal whim undirected by anyone—but took no notes, sent no memos or emails, and reached no conclusion that anything was wrong with the roof.[59]  GM wants this Court to

_____

room with no intention to follow through, and the nod is an empty gesture"; (4) GM employees failure "to search for, share or gather knowledge," preferring to keep information in discrete silos; and (5) GM's obsession with finding the "root cause," which led to the "view that no action should be taken until the 'root cause' of the problem was fully understood and a solution developed."  *Id.*

[58] The executive was Robert Lange.  Doc. 346, Weinberg Dep. 24/19-25, 28/18-29/7.  Lange was a GM executive *whose job was to investigate product defects. Id.* at 25/7-21, 30/32-31/2.  Lange came to GM from Exponent, and returned to Exponent from GM.  *Id.* at 31/16-25.  That's what Exponent's own website states.  Doc. 346-14, Px 1022A.

[59] *See, e.g.*, Doc. 343, 7/3/19 Conrad Dep. 17/25-18/14 (Conrad claims he took no notes or photos during his inspection and sent no emails about the inspection); Doc. 346-11, Px 173 (Weinberg claimed that he investigated rollovers at the proving grounds for his own education); Doc. 345, Derocher Dep. 11/12-13 (claiming he asked to inspect the vehicle but was not told to do so).  Incredibly, GM presented an affidavit of Weinberg in which he claimed he could not recall showing any of his three PowerPoint presentations to anyone at all—even though the PowerPoint presentation about the December 16, 2004 wreck had 55 slides and

preemptively preclude Plaintiff from telling the jury *what GM itself has admitted* is true and what the evidence in this case proves about GM's culture during the pertinent period.  Such misleading by omission should not be countenanced.[60]

Finally, even if these documents and testimony were completely inadmissible at trial (which they aren't), GM's MIL should still be denied because it asks the Court to rule now, before trial and without context, that Plaintiff cannot reference those documents and the GM admissions they contain to impeach or cross-examine the corporate representative GM brings to trial (assuming GM brings someone to trial).

### 13. Evidence or argument regarding GM LLC's bankruptcy or subsequent "government bailout."

This MIL should be denied.

*First things first*.  Plaintiff does not intend "to weaponize the financial recession that occurred over a decade ago."  *Contra* Doc. 296 at 43.  GM's

---

began with a slide proclaiming "Good Morning," followed by an "agenda."
[60] *See* Order, *Prospere v. Gen. Motors LLC*, No. 05-212-CA-045273 (Brevard Cnty, Fla. Jan. 15, 2015) (permitting plaintiffs to question GM's corporate representative in a non-ignition switch defect case involving a 2002 Chevrolet Trailblazer by mentioning the Valukas Report and using it as background for questions about safety issues, and specifically permitting questions about GM's "culture" related to safety meetings, the GM "nod," cost-cutting programs that could affect safety, writing instructions to GM engineers about describing safety issues, and any GM policies regarding note taking at meetings) (attached as Exhibit 4).

complaints about Plaintiff's supposedly "non sequitur" references to GM Corp.'s bankruptcy and the U.S. government's "bailout" are nonsensical. The term *bailout* is hardly taboo. Indeed, newspapers across this country—in their news sections— used that word to describe what happened in the GM bankruptcy. *See, e.g.*, Peter Whoriskey, *With Bankruptcy Behind It, GM Focuses on a Culture Change*, Wash. Post, July 11, 2009 ("a landmark government bailout"); Jim Puzzanghera & Martin Zimmerman, *GM Exits Bankruptcy, Details Its Plan*, Chi. Tribune, July 11, 2009 ("a taxpayer bailout"). Courts have too. *E.g.*, *In re Motors Liquidation Co.*, 829 F.3d at 144.

*Second*, GM's motion is vague. GM seeks an Order prohibiting Plaintiff from making any "argu[ment] about or refer[ence] to [GM Corp.]'s bankruptcy or the government's role in financing NGMCO (now, GM LLC)." Doc. 296 at 46. This MIL would seemingly prevent Plaintiff and the Court from explaining to the jury why GM LLC is the defendant rather than GM Corp. The law does not require the Court to keep the jury in the dark about such an important fact.

At the same time that GM LLC seeks to keep Plaintiff from even referencing GM Corp.'s bankruptcy, GM LLC plans to cast the GM Corp. bankruptcy in a central role in its 'defense' by claiming that GM LLC is a "new" or "different" company than GM Corp. *See* Doc. 297 at 12-15 (Pl.'s MIL 5). That's an unsubtle

way to try to 'blame another,' and 'take the heat' off the only defendant in the

case.[61]  GM cannot have it both ways.  GM will inject something about bankruptcy

into the case.

*Third*, the single supposedly 'objectionable' question to GM engineer

Conrad—"Isn't it true that you were employed by General Motors as an engineer

before the 2009 bankruptcy and government bailout?," Doc. 174, 3/18/16 Conrad

Dep. 8/4-6 —has a legitimate purpose: to undercut GM LLC's claim that it is a

"new" or "different" company.  Plaintiff is entitled to show that the 2009

bankruptcy did not affect GM LLC's ability to access the books and records of GM

Corp. or its knowledge about the design of the 2004 SRX—facts that disprove

GM's claim to being a "new" or "different" company for purposes of this case.

Also, whatever GM's issues with this question, they will be resolved by the

Court's ruling on Plaintiff's MIL 5 and objections related to the parties' deposition

designations.  Should any "issues" remain after those rulings, GM should raise

them in an objection at trial.

*Fourth*, Plaintiff tried to head off all issues related to the GM Corp.

bankruptcy with stipulations in the pretrial order.  Plaintiff proposed the following

---

[61] It's a common tactic: Fiat does it too, in cases involving citizens burned alive in
Jeeps with exposed rear gas tanks, for which vehicles Fiat accepted full
responsibility in exchange for a bailout.

factually correct stipulations be read to the jury:

113.   When GM Corp. declared bankruptcy in June 2009, GM LLC purchased substantially all of GM Corp.'s business.

114.   When it was created in 2009, GM LLC was 60% owned by the U.S. Government, and it used U.S. taxpayer money to buy GM Corp.

115.   As part of the bankruptcy agreement, GM LLC agreed to be responsible for injuries caused by defects in cars that GM Corp. manufactured.

116.   Taxpayers no longer have any ownership of or responsibility for GM LLC or GM Corp., and a verdict against GM LLC would not be paid by taxpayer funds.

Doc. 227-7 at 12.  GM refused to agree to those stipulations.  Yet without such stipulations, there is substantial risk of jury confusion given that GM LLC (and not GM Corp.) is the defendant in this case.  Given GM's refusal to stipulate and the broad reach of GM MIL 13, GM's goal is quite clear: create confusion about its liability for Ms. Fox's injuries and muzzle Plaintiff to keep her from clearing up that confusion.  That is wrong.  The Court should deny GM's MIL and instruct GM to object at trial.[62]

---

[62] Plaintiff does however agree with GM about one thing: putting the GM bankruptcy into proper context at trial will take considerable time, cause confusion, and divert the jury from the actual issues in this case.  *Compare* Doc. 297 at 15, *with* Doc. 296 at 45.  That's why Plaintiff requests that the Court prohibit any statement or argument about GM being a "new" or "different" company.  Doc. 297

**14.   Evidence or reference to unrelated well-known product liability lawsuits (i.e., Firestone tire recall/litigation, GM ignition switch recall/litigation, Crown Victoria Police Interceptor cases, Ford Pinto recall/litigation, etc.).**

This MIL should be denied.  It is too vague for a response or ruling.

Plaintiff will not refer to the Ford Pinto, the Ford/Firestone recall and litigation, or the Toyota unintended acceleration cases, unless GM opens the door to such evidence.  If GM attempts to boast to the jury about the "overall safety" of its company and products, as it surely will, and such boasting is permitted, Plaintiff may need to set the record straight by addressing those claims with proof of the host of safety problems and defects with GM's vehicles over the years.  In addition, evidence that would arguably be excluded by this MIL could arise in all sorts of ways, including the cross-examination of GM's experts with their trial or deposition testimony from previous "product liability lawsuits" and their past defense of indefensible products.  The Court should deny this MIL and instruct GM to object at trial.

---

at 12-15.  But what's good for the goose is good for the gander.  So if GM can inject bankruptcy issues into the trial, Plaintiff must be given a chance to correct the misconceptions that GM has created.

**15.   Evidence, questions or references regarding statements allegedly made outside of the formal pleadings and/or outside of statements actually made in Court.**

This MIL should be denied.  It is too vague for a response or ruling.

In this MIL, GM does not identify a single bit of evidence, or question, or reference to "statements of counsel" that is supposedly inadmissible or improper. *See* Doc. 296 at 47-51.  Instead, GM uses MIL 15 to try to 'respond' to a trial brief Plaintiff filed with the pretrial order in March 2019.  *See* Doc. 227-13 at 15-18. GM's 'response' fundamentally misconstrues Plaintiff's trial brief.  The argument in Plaintiff's trial brief is simple: Plaintiff may cross-examine GM employees about GM's statements in its briefing and discovery responses.[63]  *Id.*  What GM has told the Court and Plaintiff through its briefing and discovery responses is either true or false.  Plaintiff has the right to test GM's statements in the crucible of cross-examination.  Because GM has not identified any supposedly improper evidence, questions, or references, Plaintiff cannot respond to this MIL.  The Court should deny this MIL and instruct GM to object at trial.

---

[63] Plaintiff made that argument in March 2019, four months before she took the trial depositions of four GM employees.  Plaintiff has now taken those trial depositions, served her deposition designations, and GM has filed its 'objections' to her designations.  Interestingly, GM did not 'object' to a single bit of evidence, question, or reference as supposedly being based on "statements of counsel."  *See* Docs. 343, 344, 345, 346.  That is proof that this MIL is unnecessary and should be denied.

**16.    Arguments or statements related solely to punitive damages (i.e., "send a message," "teach a lesson," "punish," etc.).**

This MIL should be denied.  It is too vague for a response or ruling.

It is unclear what GM means by "any argument based on punitive damages, including 'send a message' and 'teach a lesson' arguments."  Doc. 296 at 51.  As Plaintiff told GM during the meet-and-confer process, she will not use the phrases "send a message" and "teach a lesson."  Nor will she ask the jury to "punish" GM because she has no punitive damages claim.  As with previous MILs, GM refused to accept that compromise and insisted on filing this MIL.  The Court should deny this MIL and instruct GM to object at trial to whatever it claims is inadmissible. To the extent that GM's MIL seeks to preclude Plaintiff from presenting evidence to establish either the reckless or wanton exception to the statute of repose, the motion is overbroad and should be denied for that reason as well.

**17.    Evidence or argument regarding prior discovery disputes or discovery motions (including motions for sanctions) which were previously filed and addressed by the Court (in this action or the previously state-court action).**

This MIL should be denied because it is vague.  GM does not explain what it means by "discovery disputes," which could include a variety of things, including the fact that Plaintiff requested documents in discovery but GM did not produce them, or that GM did not provide key documents to its experts.  *See* Doc. 211 at 84

(holding GM expert Ewing's failure to review documents about the redesign of the SRX roof was proper grounds for cross-examination because those documents "would certainly have been useful in evaluating the 2004 design").  MILs cannot be granted as to broad generalizations.

The Court should deny this MIL and instruct GM to object at trial.

18.   **Evidence or argument concerning the size, net worth, profitability or any other financial circumstances concerning the parties in this case, or their employees.**

During the meet-and-confer process, Plaintiff told GM that she agreed not to offer evidence of the net worth, profitability, or financial circumstances concerning of GM Corp., GM LLC, or their employees.  The obvious caveat is that evidence of GM's financial condition may be relevant to rebut argument or statements by GM about the GM bankruptcy.  If GM opens that door, Plaintiff has the right to correct any misconceptions that GM has created.  Again, GM refused to take yes for an answer and filed another unnecessary MIL.

Plaintiff's financial condition is obviously relevant to the compensatory damages she seeks.  Evidence related to her financial condition includes where she works, how much she makes now, how much she can or will likely make in the future, how much her wages have been affected by her quadriplegia, and how much reasonable and necessary medical care costs both now and in the future.

Plaintiff plainly has a right to present this evidence at trial.  The Court should deny

this MIL and instruct GM to object at trial.

**19.    Arguments/references to "consumer safety" as a purpose for this case, or talking of the jury's verdict as a way to "regulate" industries or otherwise direct the conduct of others.**

This MIL should be denied.  It is compound and too vague for a response or

ruling.

GM cites no law to support its MIL.  GM ignores that this case is about

GM's breach of its duty to warn of dangers that GM undeniably knew and GM's

"reckless" or "wanton" misconduct because of the statute of repose.  GM's MIL is

nonsense: this case is all about "consumer safety"—warnings are required to

protect consumer safety.

GM's MIL is purposefully vague.  If this MIL is granted, Plaintiff will have

no way to know what "statements" GM will contend at trial or on appeal were

supposedly excluded because they are about what GM later claims is "the purpose

of enhancing 'consumer safety.'"  Doc. 296 at 58-59.  The Court should deny this

MIL and instruct GM to object at trial.

**20.    Questions, statements or argument from counsel that GM has "destroyed evidence" or otherwise acted improperly with respect to incident(s) which occurred at the Milford Proving Grounds.**

This MIL should be denied.  It is compound and too vague for a response or

ruling.

GM does not contend that evidence is missing because it was destroyed or lost. Plaintiff is currently unaware of any particular evidence that GM destroyed. What GM means by "otherwise acted improperly with respect to incident(s) which occurred at the Milford Proving Grounds" is a head-scratcher: Plaintiff has no clue what that means. Doc. 296 at 59. Plaintiff is allowed to tender evidence about SRX rollovers on GM's own proving grounds and what GM did, or did not do, to investigate those wrecks. That evidence is plainly and obviously related to Plaintiff's defect theories and Plaintiff's failure to warn claim.

Plaintiff likewise has no clue what "alleged conspiracy claims, 'cover up' theories, or the withholding of documents by GM LLC related to the Proving Grounds" means. Doc. 296 at 60.[64]  GM's production of materials related to the proving ground rollovers is plainly relevant and should be considered by the jury.

But because GM's MIL is too vague to properly formulate a response or warrant any ruling now, the Court should deny this MIL and instruct GM to object at trial.

---

[64] GM's reference to Plaintiff's motion for sanctions from three years ago in Cobb County State Court sheds no light on what GM is seeking to have the Court Order Plaintiff not to say at trial. Doc. 296 at 59-60. That paragraph makes GM MIL 20 appear duplicative of GM MIL 17 about "discovery disputes," which is itself vague.

Respectfully submitted this 16th day of August, 2019.

BUTLER WOOTEN & PEAK LLP


 s/  Tedra L. Cannella
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
  jim@butlerwooten.com
TEDRA L. CANNELLA
  Georgia Bar No. 881085
  tedra@butlerwooten.com
ROBERT H. SNYDER
  Georgia Bar No. 404522
  rob@butlerwooten.com
RORY A. WEEKS
  Georgia Bar No. 113491
  rory@butlerwooten.com
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax

KENNETH S. NUGENT
WILLIAM G. HAMMILL
  Georgia Bar No. 943334
  whammill@attorneykennugent.com
4227 Pleasant Hill Road
Building 11, Suite 300
Duluth, GA 30096
(404) 885-1983


**ATTORNEYS FOR PLAINTIFF**

58

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rules 5.1B and 7.1D, I hereby certify that the foregoing

filing complies with the applicable font and size requirements and is formatted in

Times New Roman, 14-point font.

s/ Tedra L. Cannella
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
  jim@butlerwooten.com
TEDRA L. CANNELLA
  Georgia Bar No. 881085
  tedra@butlerwooten.com
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
  rob@butlerwooten.com
RORY A. WEEKS
  Georgia Bar No. 113491
  rory@butlerwooten.com
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on August 16, 2019, I electronically filed with the Clerk of the Court PLAINTIFF'S RESPONSE TO GENERAL MOTORS LLC'S MOTIONS IN LIMINE using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

C. Bradford Marsh, Esq.
Myrece Johnson, Esq.
Swift, Currie, McGhee & Hiers, LLP
1355 Peachtree St., N.E., Suite 300
Atlanta, GA  30309

Reid C. Carpenter
Joel C. Bailey
Benjamin S. Willson
Michael L. Bell
Lightfoot, Franklin & White LLC
400 20th Street North
Birmingham, AL 35203

This 16th day of August, 2019.

s/ Tedra L. Cannella_____
JAMES E. BUTLER, JR.
  Georgia Bar No. 099625
TEDRA L. CANNELLA
  Georgia Bar No. 881085
ROBERT H. SNYDER, JR.
  Georgia Bar No. 404522
RORY A. WEEKS
  Georgia Bar No. 113491
BUTLER WOOTEN & PEAK LLP
2719 Buford Highway
Atlanta, Georgia 30324
(404) 321-1700
(404) 321-1713 Fax